# EXHIBIT 1

Name     VONDELL L. LEWIS

Address   P.O. Box 689/GW-307

          Soledad, CA 93960-0689


CDC or ID Number    #E-95977

## LOS ANGELES SUPERIOR COURT COUNTY

## OF LOS ANGELES; STATE OF CALIFORNIA
*(Court)*

PETITION FOR WRIT OF HABEAS CORPUS

VONDELL L. LEWIS
Petitioner
            vs.

BEN CURRY, WARDEN (A)
Respondent

No. *BH 004281*

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS — READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.,
Cal. Rules of Court, rules 56.5, 201(h)

This petition concerns:

[☐] A conviction                    [XX] Parole

[☐] A sentence                      [XX] Credits

[☐] Jail or prison conditions       [☐] Prison discipline

[☐] Other (specify): _____

1. Your name:  VONDELL L. LEWIS

2. Where are you incarcerated?  SOLEDAD STATE PRISON C.T.F. (CENTRAL)

3. Why are you in custody?  [X] Criminal Conviction  [☐] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   SECOND DEGREE MURDER, WTIH GUN ALLEGATION.

   b. Penal or other code sections:  187(a); §12022.5(a).

   c. Name and location of sentencing or committing court:  Los Angeles Superior Court; Long Beach, South Section; 415 W. Ocean Blvd, Long Beach, CA 90802.

   d. Case number:  NA004741

   e. Date convicted or committed:  April 1, 1991

   f. Date sentenced:  May 6, 1991

   g. Length of sentence:  15 years to life, plus 5 years enhancement.

   h. When do you expect to be released?  Indeterminate release date

   i. Were you represented by counsel in the trial court?  [XX] Yes.  [☐] No.  If yes, state the attorney's name and address:

   Kenneth T. Welch, 635 W. Foothill Blvd; Monrovia, CA 91016-2038

4. What was the LAST plea you entered? *(check one)*

   [X] Not guilty  [☐] Guilty  [☐] Nolo Contendere  [☐] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury  [☐] Judge without a jury  [☐] Submitted on transcript  [☐] Awaiting trial

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

THE BOARD OF PAROLE HEARINGS KNOWINGLY RELIED ON FALSE INFORMATION TO DENY PETITIONER PAROLE VIOLATING STATE AND FEDERAL DUE PROCESS OF LAW, BY FAILING TO CONSIDER THAT THE FACTS BEING RELIED ON BY THE STATE TO ESTABLISH THE COMMITTING OFFENSE WERE FALSE. P.C. §1473(b); U.S.C.A. 14.

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where).* *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

On May 5, 2006, petitioner appeared before a panel of the Board of Parole Hearings (BPH). Petitioner represented himself at this parole hearing. On page 7, of the hearing transcript (hereafter H.T.), this petitioner submitted duly certified court transcripts of a probable cause hearing and trial transcripts, of the testimony of Detective Josephson and witness Edna Gonzales, also petitioner presented the pre-trial minute orders of the proceedings in the Superior Court, pursuant to California Code of Regulations (CCR) Title 15, Section 2249. The Panel assured petitioner that the documents would be part of the evidence they considered. (See H.T. 7-11). Petitioner opted to speak in his own behalf and the presiding commissioner swore this petitioner in. (H.T. 11). Petitioner denied the accuracy of the facts as they were recited by the presiding commissioner. (H.T. 12) CON'T

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

Penal Code §1473 (b) (1), §3041 (b), §872 (b); In re Scott, 133 Cal. App.4th 573, 590-591, 603 (2005); In re De Luna, 126 Cal.App.4th 585, 593-598 (2005) In re Dannenberg, 34 Cal.4th 1061, 1095-96 (2005); In re Smith, 114 Cal.App.4th 343, 366-67 (2003); ADDITIONAL PAGE SEE!

CONTINUE QUESTION (6) SUPPORTING FACTS (a): GROUND ONE:

1    The Presiding Commissioner, then sought to rebuild the facts,

2  and petitioner complied with that suggestion. (H.T. 12-23).

3    The Presiding Commissioner then moved on to this petitioner's

4  criminal history, as reported by the Bureau of Criminal histroy.

5  (H.T. 24-30).

6    The Presiding Commissioner, then sought to discuss petitioners

7  upbringing and family history, along with petitioner's admitted

8  substance abuse, schooling, lost of college scholarship, sports

9  participation, petitioner being shot. (H.T. 31-41).

10   The Presiding Commissioner then discussed petitioner's letters

11  of support and potential job offers from family members. (H.T.

12  41-46).

13   The Presiding Commissioner, acknowledged that the legal notice

14  under Penal Code §3042 had been sent out **without any respones,**

15  save the representative from the Los Angeles County District

16  Attorney's office that was present at the hearing. (H.T. 46).

17   The Chair passed the panel to the Deputy Commissioner, which

18  discussed petitioner's post-conviction progess. (H.T. 47). The

19  deputy commissioner discussed all the positive progess that this

20  petitioner has made since imprisonment in remaining disciplinary

21  free, participating in vocational welding, becoming a lead cook,

22  participating in the P.I.A. Bakery, help rebuild the oven while

23  working as a baker, participating in drug self help programs,

24  (i.e.) NA and AA, petitioner's motivation and life's experiences

25  in discovering himself good and bad, petitioner's support of

26  the system and good participating chrono's. (H.T. 47-56).

27   The Deputy Commissioner, read verbatim the psych. report of

28  Dr. Macomber, which makes false statements about the facts, that

CONTINUE QUESTION (6) SUPPORTING FACTS (a): GROUND ONE:

1   petitioner had objected to before the hearing on May 4, 2006,

2   but the panel knowingly used the report during the hearing. The

3   deputy commissioner read verbatim specifically, "...prior psych-

4   ologists noted the troubling fact of this case was that Mr.

5   Lewis has been convicted of this murder and manslaughter once in

6   the past. The sequence of violence-- while outside the average

7   for population on the outside of prison. Since past behavior is

8   a strong predictor of future behavior, this fact must be consi-

9   dered. Also quite troubling in this case is the fact that he's

10  strongly denying his responsibility for the victim's death in

11  commitment offense. this is in spite of the fact that there were

12  (several witnesses) that observed him shoot the victim with a

13  gun and testified to the detective to that fact." (H.T. 57).

14     The foregoing statements are false and there is no evidence

15  to support these statements in the record that is reliable. The

16  panel relied on the assessment of dangerousness contained in the

17  psychologist report, without pointing out the false statements

18  regarding the numbers of witnesses and the conclusions based

19  upon that assumption of dangerousness.

20    Petitioner has no significant mental or emotional problems,

21  but the very serious criminal history as reflected in the score

22  under Section "B" of the psychological report. (See psych.

23  report attached as Exhibit "__".) This report make false and

24  unfounded statements in section "B", that is the focus of this

25  claimed ground for relief. No where can the Board justify or

26  show that several witnesses observed petitioner with a gun and

27  that these imaginary witnesses saw petitioner shoot the victim

28  and testified to what detective about these alleged facts.

QUESTION (6) ii.

CONTINUE QUESTION (6) SUPPORTING FACTS (a): GROUND ONE:

1  Petitioner on April 24, 2006, filed an administrative Appeal
2  (602) Form about the false statements made by Dr. Macomber, in
3  regards to his asessment of dangerousness, on page (3) of his
4  report. (See Exhibit "__"). This petitioner gave the Board prior
5  notice of the false statements made by Dr. Macomber on May 4,
6  2006, during a pre-Board meeting with the Panel. (H.T. 2-3).
7  Petitioner openly admitted his character defects during the
8  psych. evaluation and to the Board panel member, but what stands
9  out is that there is no evidence currently to support a threat
10  to the public. Both the psych. report and conclusions only can
11  recite unchanging factors as their reasons; some of which are
12  false, some are no longer applicable because of the self-help
13  and maturity of petitioner, that the psych. report fails to
14  mention are address. No where does the psych. report address
15  the continued self-help programs and other benefits that this
16  petitioner has consistently maintained as progress throughout
17  the pass (16) years as evidence of changed behavior. Because
18  the Doctors conclusions are base on false assumptions about the
19  evidence of this petitioner's guilt, the use of his report is a
20  violation  of this petitioner's right to liberty under the State
21  and Federal Constitutions. (H.T. 56-59).
22  
23  A. THE BOARD OF PAROLE HEARINGS ALLOWED DEPUTY DISTRICT
24      ATTORNEY MORRISON TO INTRODUCE FALSE STATEMENTS AND
25      UNFOUNDED FACTS INTO THE RECORD DURING CLOSING ARGUMENTS.
26  Following the psych. report inquiry, the deputy district
27  attorney was allowed to ask petitioner questions. (H.T. 61-63)
28  
QUESTION (6) iii.

<u>CONTINUE QUESTION (6) SUPPORTING FACTS (a): GROUND ONE:</u>

1 · "Deputy district attorney Morrison asked petitioner to explain

2 the facts reported in the official version that he was mad at

3 the victim for smoking up the dope, threatened him pulled out

4 the gun and shot him." (H.T. 62: lines 4-9). Petitioner offered

5 to explain, and stated, "That is false. I did note (sic) do that

6 what they're alleging in the complaint, and I mean, if you want

7 me to **present my disputes** regarding the accuracy veracity of the

8 facts, I can do that." (H.T. 62: lines 10-17).

9 The Presiding Commissioner stopped petitioner by stating, "Mr.

10 Lewis, let me -- **that's not the way to go.** What we're going to

11 do is let him ask you questions, you answer the questions and

12 when **you do your closing,** you can certainly present your own

13 case then." (H.T. 62: lines 18-23). Petitioner agreed. Then the

14 deputy district attorney asked whether petitioner accepts the

15 responsibility for the crime, and petitioner said "No, sir".

16 The Panel then turned to **closing arguments,** attorney Morrison

17 was allowed to proceed first. the first report spoke of by the

18 deputy district attorney is the **police reports** in the case, the

19 deputy district attorney recited from the statements within the

20 police report. Petitioner asked that the dep. district attorney

21 specifically identify what document he's referring to. (H.T. 63-

·22 64).

23 The Presiding Commissioner stated, "Let me help you out. He's

24 not required to do that but what I'm going to encourage you to

25 do, you also have the opportunity when you do your closing, to

·26 dispute anything that the district attorney is saying for your

27 (sic). But at this point, this is his opportunity to do his

28 whole closing, okay." (H.T. 64).

QUESTION (6).iv.

CONTINUE QUESTION (6) SUPPORTING FACTS (a): GROUND ONE:

1   The deputy district attorney, then referred to the statement

2   of Edna Gonzales, petitioner's prior manslaughter conviction,

3   the investigating officer Brent Josephson's statements in the

4   probation officer's report, at page 12, that the psych. report

5   was unfavorable and not favoring release at this time because of

6   risk assessment, that he commends petitioner's programming but

7   believe he's still a danger and should not be release at this

8   time. (H.T. 65).

9   Petitioner was allowed his opportunity to give his closing,

10  and reffered to the police report that the deputy district attn.

11  reffered to, petitioner explained that the report was part of

12  his legal challenge and legal disputes. Petitioner pointed out

13  that the statement of Ms. Edna Gonzales was not written by her;

14  but in fact was written by detective Josephson. Petitioner told

15  the panel that the detective omitted adverse facts to this

16  statements. Petitioner clearly put at issue the veracity of what

17  was recited by detective Josephson, and that the detective had

18  omitted material facts regarding Gonzales being under the influ-

19  ence of drugs, alcohol and cocaine during the witnessing of this

20  shooting. That the context of this statement was omitting vital

21  adverse material information, omitted by the detective who had

22  wrote it. (H.T. 66-67).

23  Petitioner then turned his focus to the preliminary hearing

24  transcript, page 14. Where by virtue of a special rule of law,

25  Penal Code §872(b), detective Josephson was allowed to give

26  sworn hearsay testimony to establish probable cause. Petitioner

27  quoted the portions of the detective's testimony where under the

28  penalty of perjury the detective denied knowledge of substantial

QUESTION (6) v.

CONTINUE QUESTION (6) SUPPORTING FACTS (a): GROUND ONE:

1 and material facts affecting the credibility and reliability of

2 the hearsay evidence, under oath. (H.T. 67-68).

3 The Presiding Commissioner stop petitioner, impling that this

4 petitioner was straying form suitability. (H.T. 68).

5 Petitioner stated, "Well, I was just going towards what the

6 prosecutor referred to as correct. So, I wanted to dispute that

7 is not totally correct." (H.T. 68).

8 The Presiding Commissioner, acknowledged that petitioner had

9 already put on the record the issue, that they have all the same

10 documents, that the issues petitioner was raising, was not part

11 of there job, that they could not help petitioner with his legal

12 argument, that they were not the right people to tell. (H.T. 68:

13 lines 10-26).

14 The Deputy Commissioner, stated, "We do see your point, and I

15 did see in here what you're saying, and I do know you're going

16 to refer in here." (H.T. 68-69).

17 Petitioner complied with the panel's request, and both panel

18 members assured petitioner that they, "So, we got it" "And for

19 the record, I'll review it during deliberations also". (H.T. 69:

20 lines 5-10).

21 Petitioner brought out that the sole witness in this case was

22 given immunity, and the jury was told she did not know she had

23 immunity, to bloster her credibility. (H.T. 69). Petitioner was

24 told to get back to suitability. (H.T. 69).

25 Petitioner began his closing argument in support of his being

26 found suitable, and why he was not a threat to society. First,

27 petitioner pointed out his institutional behavior, strong family

28 support, and his sorrowfuless in the circumstances of this case,

Question (6) vi.

CONTINUE QUESTION (6) SUPPORTING FACTS (a): GROUND ONE:

1 petitioner denied having committed the crime, but a human life
2 was lost and that's a tragedy for everyone involved. petitioner
3 offered his consistency throughout his prison term, that the
4 psych. report was not accurately reflecting his current mental
5 state. Petitioner pointed out that the only factors that weigh
6 real heavily against petitioner is the fact that petitioner has
7 two convictions for taking human lives. But, petitioner disputes
8 the conviction in the current case, and claims not to have been
9 the person who committed the current crime. Petitioner pointed
10 out that he has already served (16) years in prison for it, the
11 fact that he was convicted for it.  Not accepting responsibility
12 cannot be weighed against petitioner. But, the Court of Appeals
13 opinion and the facts as given by detective Josephson and the
14 witness Gonzales were **false.** That the panel claims to not be
15 able to resolve these allegations, but that petitioner believes
16 the panel could.  (H.T. 70).

17 Petitioner told the panel why his was ready to be released
18 and why the pstchologist report was being challenged in a (602)
19 Appeal, that petitioner was on the right path, and had the will
20 to being a law-abiding and productive person, that the interact-
21 ing with other human being is the most important thing. (H.T.71:
22 lines 5-28). Petitioner assured the panel that he would not harm
23 any other person if released. (H.T. 72).

24 B. CALIFORNIA BOARD OF PAROLE HEARINGS DECISION:

25 The panel found petitioner unsuitable for parole and based
26 it's reasons as follows: (1) the commitment offense, (2) prior
27 criminal record of violence, (3) Dr. Macomber's psychologist
28 report, (4) District Attorney's opposition. (H.T. 73-81).

QUESTION (6) vii.

CONTINUE QUESTION (6) SUPPORTING FACTS (a): GROUND ONE:

1    The panel found several factors to find unsuitability, (1)

2  offense carried out in an "especially cruel and callous manner",

3  "dispassionate and calculated manner", "manner that demonstrates

4  an exceptionally callous disregard for human suffering, " the

5  crime was very inexplicable", (2) conviction for manslaughter

6  as a juvenile, and criminal behavior connected with drug use,

7  noting the non-violent nature,(3) Dr. Macomber's risk assessment,

8  (4) District Attorney's opposition based upon statements and

9  reports by detective Josephson and witness Edna Gonzales that

10  petitioner alleged were falsely made and submitted. (H.T. 73-81).

11

12    C. DETECTIVE JOSEPHSON'S FALSE TESTIMONY AT THE PRELIMINARY

13        HEARING AND CONTRARY TESTIMONY AT TRIAL.

14    Pursuant to a special rule of law, Penal Code §872(b), a law

15  enforcement officer was allowed to establish the requirement of

16  'probable cause' for a felony criminal trial. On January 9,1991,

17  detective Brent Josephson gave sworn testimony at this petition-

18  er's preliminary 115 hearing that was false, specifically,as

19  follows:

20        Q. DID SHE SAY OR DID YOU DETERMINE WHETHER SHE WAS LOADED

21           DURING THE SHOOTING OR UNDER THE INFLUENCE OF ANYTHING?

22        A. NO, SIR.

23        Q. DID YOU ASK HER WHETHER SHE HAD TAKEN ANY TYPE OF DRUGS

24           OR NARCOTICS OR ALCOHOL THE NIGHT OF THE INCIDENT?

25        A. NOT THAT I RECALL, SIR.

26        Q. PARDON ME?

27        A. NOT THAT I RECALL, SIR, NO.

28                QUESTION (6) viii.

CONTINUE QUESTION (6) SUPPORTING FACTS (a): GROUND ONE:

1     (PRELINIMARY HEARING PAGE (14): 18-27, Appendix "2".)

2     The foregoing testimony shows that the detective denied that

3     the witness told him or that he asked the witness about her drug

4     or narcotic or alcohol use the night of the shooting. This was

5     sworn testimony, and the judge believed the detective, and held

6     this petitioner for trial based solely on the detective's sworn

7     testimony.

8     At the trial, the detective contradicted his prior testimony

9     as follows:

10        Q. AND AT THE TIME YOU INTERVIEWED HER, DID YOU QUESTION

11           HER ABOUT ANT RECENT DRUG USE?

12        A. YES, SIR, I DID.

13        Q. AND DID SHE ADMIT TO YOU THAT SHE HAD BEEN USING

14           DRUGS WITHIN 24 HOURS OF HER INTERVIEW WITH YOU?

15     A. As I Recall, sir, YES, SHE DID.
       ( TRIAL TESTIMONY PAGES 145: 26-28; 146: 1-3, App. "3".)

16     The foregoing testimony shows that the detective lied at the

17     preliminary 115 hearing, and noone impeached the evidence that

18     was being use to convict this petitioner. The sole evidence that

19     the state has, is the the alleged statement of Edna Gonzales that

20     was hand written by detective Josephson. (See App. "2", p. 11,

21     and compare App. "3", pp. 139, 141;.)Statement of Gonzales, App.

22     "1", police report.)

23     Petitioner is also including the Probation Report as, App."4"

24     to show that Dr. Macomber's statements in his report and response

25     to the (602) Appeal cannot be substantiated.

26     The information being relied on by prison officials is false

27     and needs to be corrected by someone or Court.

28                    QUESTION (6) ix.

CONTINUE QUESTION (6) SUPPORTING CASES, RULES, OR AUTHORITY:
GROUND ONE: (b).

The United States Supreme Court held in 1979, and reiterated
in 1987, that "a state's statutory scheme, if it uses mandatory
language, creates a presumption that parole release will granted
when or unless certain designated findings are made, and thereby
gives rise to a constitutional liberty interest." Greenholtz v.
Inmates of Nebraska Penal, 442 U.S. 1, 7 (1979) and Board of
Pardons v. Allen, 482 U.S. 369, 373 (1987).

California Courts analyze claims regarding denial of parole
under due process standards. See In re Dannenberg, 34 Cal.4th
1061, 1095-96 (2005); In re Scott, 133 Cal.App.4th at 590-91;
In re De Luna, 126 Cal.App.4th at 593-598; In re Smith, 114 Cal.
App.4th 343, 366-67 (2003).

California Penal Code §1473 (b)(1) provides that if, "False
evidence that is substantially material or probative on the
issue of guilt or punishment was introduced against a person at
any hearing or trial relating to his incarceration"--- may be
inquired into by prosecuting a writ of habeas corpus, to inquire
into the cause of such imprisonment or restraint. P.C. §1473.

Petitioner denied committing the current commitment offense,
and offered evidence of perjury by the state prosecutor and lead
detective at the preliminary hearing as new evidence of innocence
to the Board panel. The said they would review the evidence, but
failed to incorporate any decision on that evidence, (i.e.) the
preliminary hearing and trial transcripts showing sworn perjured
testimony by detective Josephson. The Board's Decision is based
on False evidence that was submitted pursuant to a special rule
of law Penal Code §872(b), and violates Due Process.

QUESTION (6) (b) i.

CONTINUE QUESTION (6) SUPPORTING CASES, RULES, OR AUTHORITY:
(b). GROUND ONE:

1

2    Petitioner squarely put at issue 'whether the evidence from

3   the state' was reliable. The panel declined to address whether

4   the veracity and accuracy of the evidence was in question, and

5   did not allow petitioner to fully dispute the circumstances by

6   newly presented evidence of perjury by the state prosecutor and

7   lead detective at the probable cause determinations and at the

8   trial court.  Petitioner put on the record that the police report

9   omitted material information, that the detective lied in court

10  at the preliminary hearing regarding the omitted material to the

11  judge in that court; and at trial failed to reveal that he had

12  misled the judge at the preliminary hearing.

13    Although parole proceedings are not part of the criminal pro-

14  secution, certain procedural protections still apply. Morrissey

15  v. Brewer, 408 U.S. 471, 481 (1972); Powell v. Gomez, 33 F.3d

16  39, 40 (9th Cir. 1994).

17    Petitioner is alleging that false reports and false testimony

18  is being relied on by the Board of Parole Hearings to deny this

19  petitioner parole, and that the Board members are knowingly and

20  recklessly failing to address this relevant and material facts.

21  See Monroe v. Thigpen, 932 F.2d 1437, 1441-42 (11th Cir. 1991);

22  also Johnson v. Rodriguez, 110 F.3d 299, 308-09 (5th Cir. 1997).

23    Petitioner has claimed 'innocence' and has produced evidence

24  in support of his innocence, i.e. duly certified state court

25  records showing that state representatives committed perjury to

26  obtain this conviction and that any parole decision denying this

27  petitioner parole based upon the circumstances of the gravity of

28  the crime violates due process under state and federal law.

QUESTION (6) (b) ii.

7. Ground 2 or Ground _____ (*if applicable*):

THE BOARD OF PAROLE HEARINGS DENIED PETITIONER THE RIGHT TO HAVE HIS
SUITABILITY DETERMINED BASED UPON ALL RELEVANT, RELIABLE INFORMATION
DISPUTING THE VERSION IN THE RECORD. California Code of Regulations,
Title 15, §2236 and §2249, relating to personal culpability.

a. Supporting facts:

Petitioner submitted written material to the panel showing that the
police report was falsified by deliberate omissions and perjury by the
lead detective. (H.T. 7-9). The panel assured petitioner that the
documents he submitted would be considered several times. (H.T. 8-9,66-
68. If fact both Board member assured petitioner that they saw the
point petitioner was making, "we got it", "and for the record, I'll
review it during deliberations" (H.T. 68-69). No where did the panel
mention what there findings were with respect to the documents that
petitioner submitted disputing the version in the record in their
Decision. The panel did not tell petitioner that his allegations were
unfounded, instead they told petitioner there is nothing they can do,
that's not there job. (H.T. 68: lines 10-26). Who are the right people
to tell my complaint to then, if not the people who have my life in
their hands?

b. Supporting cases, rules, or other authority:

Penal Code §3041.5. ; California Code of Regulations, Title 15, §2245;
§2236, §2249, §2402.   SCHLUP v. DELO, 513 U.S. 298 (1995); HOUSE v.
BELL, 547 U.S.    (2006). A parole decision supported by some evidence
may nonetheless abrogate due process if the Board did not consider and
weigh all favorable evidence. In re Capistran (2003) 107 Cal.App.4th
1299, 1306.

8. Did you appeal from the conviction, sentence, or commitment? ☒ Yes. ☐ No.    If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

     <u>California Court of Appeal</u>

   b. Result: <u>Affirmed</u>    c. Date of decision: <u>8-3-92</u>

   d. Case number or citation of opinion, if known: <u>B059483</u>

   e. Issues raised: (1) <u>Trial court failed to instruct on Lesser Included Offenses</u>.

     (2) <u>Trial court erred in sentencing enhancement term.</u>

     (3) _____

   f. Were you represented by counsel on appeal? ☒ Yes. ☐ No. If yes, state the attorney's name and address, if known:

     <u>Robert Derham, address unknown.</u>

9. Did you seek review in the California Supreme Court? ☐ Yes. ☒ No. If yes, give the following information:

   a. Result: _____    b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised: (1) _____

     (2) _____

     (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   <u>Petitioner did not possess the record on appeal, appointed counsel</u>

   <u>failed to uncover perjury in the state court record and was ineffective.</u>

11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

   <u>Petitioner currently has a (602) Appeal Form; C.D.C. Appeal Number</u>

   <u>06-01286, pending at the Third Level Review, regarding the false</u>

   <u>statements made by Dr. Macomber in his psychological report that</u>

   <u>was relied on by the Board to find unsuitability. See Exhibit "A".</u>

   b. Did you seek the highest level of administrative review available? ☒ Yes. ☐ No.
   *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  [X] Yes. If yes, continue with number 13.    [ ] No. If no, skip to number 15.

13. a. (1) Name of court:  Superior Court Of Los Angeles County

   (2) Nature of proceeding (for example, "habeas corpus petition"):  Habeas Corpus Petitions.

   (3) Issues raised: (a)  Petitioner has filed multiple petitions.

      (b) Raising many state and federal due process violations.

   (4) Result (Attach order or explain why unavailable):  All were summarily denied.

   (5) Date of decision:  Through this entire incarcerations 1992-2006.

   b. (1) Name of court:  California Court of Appeal; Second Appellate, Div. One.

   (2) Nature of proceeding:  Habeas Corpus Petitions.

   (3) Issues raised: (a)  See Chronological Listing attached.

      (b)

   (4) Result (Attach order or explain why unavailable):  All summarily denied.

   (5) Date of decision:  1992-2006.

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
   Petitioner has never been given a hearing at anytime during all of the
   prior filings, but formally request this Court order a hearing!

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
   Petitioner was deceived by the state courts because of incompetent
   counsel appointed by the state, in collusion with the prosecutor at trial.

16. Are you presently represented by counsel?  [ ] Yes.   [XX] No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?  [X] Yes.   [ ] No. If yes, explain:
   Petitioner has several other matters pending in several courts all in
   the federal courts, regarding this petitioner's "actual innocence".

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
   This is the proper court to refer this matter to, hopefully this court
   will do the right thing and order the proper procedure to resolve this case.

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date:  9/06/2006                          ▶ *Vonckel L. Lows*
                                            (SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 1999]          PETITION FOR WRIT OF HABEAS CORPUS                    Page six of six

# EXHIBIT "A"

Inmate Appeal Form (602), C.D.C. Appeal
Number 06-01286. Consisting of (4) pages.

Mental Health Evaluation For The Board
of Prison Hearings, May 2006, by
Dr. Macomber, Ph.D. Consisting of (4) pages.

**EMERGENCY APPEAL PURSUANT TO TITLE 15 §3084.7. (a) (1):**

| INMATE/PAROLEE APPEAL FORM | Location: Institution/Parole Region | | Category |
|---|---|---|---|
| CDC 602 (12/87) | 1. | 1. | 8-21 |
| | MAY 1 8 2006 | JUN 21 2006 | |

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| VONDELL LEWIS | #E-95947 | P.M. COOK (Central) | GW-307u |

A. Describe Problem: On April 24, 2006, I received a copy of my Life Prisoner Hearing Psychiatric Report. M. Macomber, Ph.D. Correctional Psychologist interviewed this prisoner on April 14, 2006, under XIV ASSESSMENT OF DANGEROUSNESS, Page (3) of the report, Dr. Macomber makes false statements regarding the evidence. Specifically, "Also, quite troubling in this case is the fact that he strongly denying his responsibility for the victim's death in the commitment offense. This is in spite of the fact that there were several witnesses that observed him shoot the victim with a gun and

If you need more space, attach one additional sheet.                              Con't next page.

B. Action Requested: _____ that the report be invalidated and that a new interview be conducted. I'm calendared for May 15, 2006, so these issues need to be dealt with before that scheduled parole hearing. THANK YOU, (note:) P. Zika, Ph.D., Senior Psychologist signed off on this report.

| Inmate/Parolee Signature: *Vondell Lewis* | Date Submitted: 4/25/06 |
|---|---|

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: _____

_____

_____

~~BYPASS~~

Staff Signature: _____ Date Returned to Inmate: _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

~~BYPASS~~

_____

_____

Signature: _____ Date Submitted: _____

Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

CDC Appeal Number: 06-01286

RECEIVED APR 20 2006 CTF APPEALS
RECEIVED MAY 17 2006
RECEIVED MAY 23 2006 CTF APPEALS
RECEIVED MAY 25 2006 CTF MEDICAL APPEALS

First Level   ☐ Granted   ☐ P. Granted   ☐ Denied   ☑ Other _REVIEW_

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned APR 3 0 2006   Due Date: JUN 0 8 2006

Interviewed by: _DR. MACOMBER WILL REVIEW THE SOURCE OF HIS INFORMATION REGARDING THE NUMBER OF WITNESSES TO THE CRIME AND MAKE ANY CORRECTIONS INDICATED BY HIS REVIEW._

Staff Signature: _____   Title: _____   Date Completed: 5/11/06

Division Head Approved:   _____   Title: C/80   Returned   MAY 1 8 2006

Signature: _____   Date to Inmate:

F. If dissatisfied, explain reasons for requesting a Second Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

I'm not satisfied. I was denied parole based upon the inaccurate report Dr. Macomber submitted in regards to my psychological profile, on May 5, 2006. It is unacceptable to have to go through a hearing knowing that the panel is relying of "false information", I've already been prejudiced by (con't page)

Signature: _Wendell Lewis_   Date Submitted: 5-22-06

Second Level: ☐ Granted   ☐ P. Granted   ☑ Denied   ☐ Other   MAY 2 3 2006

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: MAY 2 3 2006   Due Date: JUN 2 1 2006

☑ See Attached Letter

Signature: _____   Date Completed: 6/28/06

Warden/Superintendent Signature: _____   Date Returned to Inmate: JUN 30 06

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

Appellant is dissatisfied, first, Dr. Brzzika, Ph.D failed to fulfill his first level review statements specifically, "Dr. Macomber will review the source of his information (regarding the number of witnesses to the crime) and make any corrections indicated by his review." What is the number? This question is still outstanding. Dr. Zika, states his source of information is the Central File and Probation Report. What page? Where at in the C-File. (Con't

Signature: _Wendell Lewis_   Date Submitted: 6-21-06

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION: ☐ Granted   ☐ P. Granted   ☐ Denied   ☐ Other
☐ See Attached Letter
☐ RECEIVED

CDC 602 (12/87)

JUN 2 1 2006

CTF APPEALS

MENTAL HEALTH EVALUATION FOR
THE BOARD OF PRISON HEARINGS
May, 2006 Lifer Calendar


CORRECTIONAL TRAINING FACILITY SOLEDAD
APRIL, 2006


NAME:                  LEWIS, VONDELL
CDC#:                  E-95977
DOB:                  5/23/66
OFFENSE:            PC 187 MURDER, SECOND DEGREE
DATE OF OFFENSE:   8/30/90
SENTENCE:          20 YEARS TO LIFE
MEPD:                9/30/03
EVALUATION DATE:   4/14/06


I.     **IDENTIFYING INFORMATION:**

Mr. Vondell Lewis is a 40 year old, first term, married, but separated, African-American male. He has served 16 years on his sentence from Los Angeles County.

**SOURCES OF INFORMATION:**

This evaluation is based upon a single 1 hour interview, plus review of the central and medical files.

The psychological evaluation, dated 5/17/02, by Dr. Saindon, Psychologist at CTF-Soledad, contains a Psychosocial Assessment which is still current and valid. As a result, this information will not be repeated at this time.

LEWIS, VONDELL
E-95977
4/14/06
PAGE 2

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Lewis related in a charming, glib, talkative, and persuasive manner. Hygiene and grooming were good. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. His eye contact was good. Intellectually, he is functioning in the average ranges. His memory was intact. His judgment and insight cannot be determined, because he denies the crime.

Mr. Lewis openly confessed to his history of serious substance abuse problems as well as of sales, his gang involvement, and his criminal activities to support himself. He openly acknowledges that his lifestyle was wrong, and that he is striving to change his way of living and become a productive and constructive person.

### CURRENT DIAGNOSTIC IMPRESSION

Axis I:          Alcohol and drug dependence, by history
Axis II:         Antisocial personality disorder, by history, improving
Axis III:        Asthma
Axis IV:         Life term incarceration
Axis V:          Current GAF: 85

### XIII.    REVIEW OF LIFE CRIME

Mr. Lewis explained at length that he is appealing his conviction legally. He is claiming that the chief witness in his trial was intoxicated at the time she observed the crime, as well as when she was on the stand. She admitted to her use of cocaine. He stated that he was not the one that shot the victim, although he was arguing and fighting with the victim at the time he died. He does not know who shot the victim.

LEWIS, VONDELL
E-95977
4/14/06
PAGE 3

## XIV.  ASSESSMENT OF DANGEROUSNESS

A. In considering potential for dangerous behavior in the institution, he has done very well in obeying institutional rules. His only disciplinary was in 1993 for cutting in line ahead of others. There is no indication of participation in riots, violence towards others, possession of weapons, or threats toward others. As a result, his potential for dangerous behavior compared to other inmates appears to be below average.

B. In considering potential for dangerous behavior if released to the community, the prior psychologist noted that the troubling fact of this case was that Mr. Lewis has been convicted of this murder and manslaughter once in the past. This sequence of violence is well outside the average for the population on the outside of prison. Since past behavior is a strong predictor of future behavior, this fact must be considered. Also, quite troubling in this case is the fact that he is strongly denying his responsibility for the victim's death in the commitment offense. This is in spite of the fact that there were several witnesses that observed him shoot the victim with a gun and testify to the detective to that fact. There is an absence of remorse and sorrow for his behavior in the commitment offense. The Level of Service Inventory-Revised was administered. It is an actuarial measure that assesses criminal history, substance abuse history, current adjustment and other factors to determine current risk level on parole. His score on this actuarial measure is in the low to moderate risk level. His score indicated a 31.1 percent chance of recidivism. This score definitely places him higher than the average citizen in the community for potentially dangerous behavior.

C. The most significant risk factor in this case would be any return to alcohol, drugs, or gang affiliation.

Lewis            E-05524            CTF-Soledad            4/8/06

LEWIS, VONDELL
E-95977
4/14/06
PAGE 4

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

Although Mr. Lewis has no significant mental or emotional problems, he does have a very serious criminal history as reflected in his score under "Section B" above. He is functioning in the institution as the lead cook in culinary. Apparently, he has developed sophisticated cooking skills that he plans on pursuing when he is released. Research shows that individuals like Mr. Lewis with antisocial backgrounds, do improve with time, age and maturity. Hopefully, with continued ongoing good adjustment in the institution, participation in self-help programs dealing with substance abuse, and continued improvement, his risk level will diminish.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

**D:**    **4/13/06**
**T:**    **4/20/06**



ONE LETTER FROM LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE

DATED JULY 10, 2002, BY DAVID DAHLE, (A) HEAD DISTRICT ATTORNEY.

POLICE REPORT OF DETECTIVE BRENT JOSEPHSON, LOS ANGELES POLICE

DEPARTMENT OF 1990, WITH STATEMENTS OF WITNESSES CONSISTING OF

(22) PAGES.



# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF PROSECUTION SUPPORT OPERATIONS
### LIFER HEARINGS UNIT

STEVE COOLEY • District Attorney                                JOHN PAUL BERNARDI • Director
CURT LIVESAY • Chief Deputy District Attorney
SHARON J. MATSUMOTO • Assistant District Attorney

July 10, 2002

D. S. LEVORSE, C&PR
BOARD OF PRISON TERMS
CTF SOLEDAD
P. O. BOX 686
SOLEDAD, CA 93960

In Re: VONDELL LEWIS        E95977

The above inmate has a parole consideration hearing at your institution on 8-8-02.

This office would like the enclosed reports to be placed in the inmates Cfile to be considered at that hearing.    PLEASE DO NOT PLACE IN CONFIDENTIAL.

Thank you for your assistance.

Very truly yours,

STEVE COOLEY
DISTRICT ATTORNEY

*David Dahle jr*

DAVID DAHLE
ACTING HEAD DEPUTY DISTRICT ATTORNEY
213-974-3852

*7/25/02*
*noted I concur*
*c ect*

J7-304 Criminal Courts Building
210 West Temple Street
Los Angeles, CA 90012

LONG BEACH DISTRICT ATTORNEY'S OFFICE

COMPLAINT ASSIGNMENT CARD

(Please fill out one sheet per suspect)

☑ FILING                    ☐ LBPD          ☐ LASD

☐ REFERRAL                  ☐ LAPD          ☐ OTHER _____

☐ REJECTION                 DATE: 9-27-90

SUSPECT  LEWIS , VONDELL  LEFRAN√

        AKA: _____

IN CUSTODY:   YES   (NO)          ARREST DATE _____

CII ATTACHED _____      BOOKING NUMBER _____

PHI ATTACHED _____      MAIN NUMBER  D3740260

FINGERPRINT ID MATCH:  YES   NO   SSN _____

DATE OF BIRTH  5-23-66

RACE  BLK    SEX  MALE

CII NUMBER  06464111

CHARGES  187 (A) PC                    PRIORS UNIT

OFFICER(S) P.J. Morris 23371          REVIEWED FOR PRIORS  ftgh  9-27-9

        B. Josephson 21999            _____ ALLEGEABLE PRIORS

DETAIL  L.A.P.D.  SBH              ☑ NO ALLEGEABLE PRIORS

PHONE (213) 237-1310              ☐ NO HIT/NO CRIMINAL RECORD

                                 ☐ PENDING CASE _____

                                 ☐ ON PROBATION _____

                                 ☐ ON DIVERSION _____

HAS THIS CASE BEEN DISCUSSED WITH A D.D.A. BEFORE?

IF YES, WITH WHOM AND WHEN?  Scott / 9-27-90

**PRELIMINARY CASE SCR**

- ☐ SUSPECT / VEHICLE NOT SEEN
- ☐ PRINTS OR OTHER EVIDENCE NOT PRESENT
- ☐ NO HOT DISTINCT
- ☐ PROPERTY LOSS LESS THAN $3000
- ☐ NO SERIOUS INJURY TO VICTIM
- ☐ ONLY ONE VICTIM INVOLVED

**PRELIMINARY INVESTIGAT** of
**MURDER**

INVEST. DIV. **SBH**
DR **90-05-2504**

LAST NAME, FIRST, MIDDLE (FIRM IF BUSINESS)
**FAIRLEY, Curtis Marvin**
SEX **M** DESC. **Blk** AGE **23** 3/2

ADDRESS — ZIP **90802** PHONE —

**PREMISES** (SPECIFIC TYPE) **Residential walkway**

DR. LIC. NO. (IF NONE, OTHER ID IS NO) **A5171485**
FOREIGN LANGUAGE SPOKEN (IF APPLICABLE) OCCUPATION —

**ENTRY** POINT OF ENTRY POINT OF EXIT
- ☐ FRONT ☐ REAR ☐ SIDE ☐ ROOF ☐ FLOOR ☐ OTHER

LOCATION OF OCCURRENCE **315 Gulf Ave.** SAME AS V'S ☐ RES. ☐ BUS. R.D. **525**

DATE & TIME OF OCCURRENCE **8-30-90  0600**
DATE & TIME REPORTED TO PD **8-30-90  0606**

NOTIFICATIONS (PERSON & DIVISION) **J. Rinallo  #17147 – DHD**
CONNECTED REPORTS (TYPE & DR) **Death-Property same DR#**

**Suspect shot victim during a gang/narcotic related argument.**

**REPORTING EMPLOYEE(S)**
INITIALS, LAST NAME **B. Josephson** SERIAL NO. **21999** DIV./DETAIL **SBH**
**C. Tizano** **21682** **SBH**

PERSON REPORTING x

SEX **M** DESC. **Blk** HAIR **Blk** EYES **Brn** HEIGHT **6-4** WEIGHT **255** AGE **24**
CLOTHING **5-23-66**
NAME, ADDRESS, DOB, IF KNOWN: **Lewis, Vondell  22234 Dolores St. #1. Carson**

PERSONAL ODDITIES **Tattoos right hand, scars right arm & lt. wrist**
Weapon **.22 Caliber handgun**

**INVOLVED PERSONS**
W1 **Mendez, Esmeralda** SEX **F** DESC **Hisp** ADDRESS **C/O I/O**
W2 **Gonzales, Edna** **F Hisp** **C/O I/O**

Page  2                    WITNESS LIST          DR# 90-05-5042

| NAME | RESIDENCE/BUSINESS ADDRESS & ZIP CODE | PHONE # | TAPE # |
|------|----------------------------------------|---------|--------|
| 1. MENDEZ, Esmeralda | | | 126413 |
| 2. GONZALES, Edna | | | 126413 |
| 3. OGUNSEYE, Ade. | | | 126413 |
| 4. PENA, Patricia | | | 126413 |
| 5. ROMAN, Christina | | | 124029 |
| 6. VILLAVICENCIO, Francisco | | | |
| 7. LUZURIAGA, Catalina | | | |
| 8. DELANEY, Torrey | | | |
| 9. HORTON, Charles | | | |

Page  3        PRELIMINARY INVESTIGATION REPORT        DR 90-0525042

BRIEF SYNOPSIS:

On August 30, 1990, at approximately 0600 hours Victim Curtis
Fairley was standing on the sidewalk in front of 315
Gulf Avenue, which is located within the Wilmington area of
Los Angeles.  Victim Fairley was involved in an on going
argument/physical altercation with Suspect Vondell Lewis.
At this time Suspect Lewis removed a small handgun from his
pants pocket and with his left hand, fired one round striking
the victim in the head.  As the victim fell to the ground, the
suspect fled the location on foot.

Los Angeles Fire Department Paramedics R. Wintermute #RW4729
and J. Lovato #JL3345, (RA #98), responded to the crime scene
and transported the victim to the Harbor General Hospital.

On August 30, 1990, at 1808 hours, the victim succumbed to his
wound and was pronounced dead by Doctor Bergsneider.

This crime occurred at a narcotic/gang location frequented by
the Waterfront Piru Blood street gang.  Both victim and suspect
are associates/members of the Waterfront Piru gang and this
crime is categorized as a narcotic/gang related incident.

NOTIFICATION OF DETECTIVES:

On August 30, 1990, at 0800 hours, my partner Detective Charles
Tizano #21682 and I, Detective Brent Josephson #21999 were
notified that an attempt homicide had occurred at 309 Gulf
Avenue.  The victim had been transported by paramedic ambulance
to the Harbor General Hospital where he was currently on life
support systems and not expected to live.  The notification
was conducted by Detective Supervisor Paul Mize #11973 of the
South Bureau Homicide, who also advised that the crime appeared
to be gang related and that several witnesses were detained
at the Harbor Police Station.

CRIME SCENE:

On August 30, 1990, at 0855 hours, my partner and I arrived
at the crime scene, 315 Gulf Avenue and commenced the preliminary
investigation.  The climatic conditions were daylight, clear
with an environmental temperature in the mid 70 degree range.

> NOTE:  Weather information listed sun rise on August
> 30, 1990, at 0625 hours and an environmental
> temperature of 61 degrees at LAX.

Page    4    PRELIMINARY INVESTIGATION REPORT    DR 90-0525042

During the crime scene investigation it was learned that Sergeant
D. Sebenick #14860 of the Harbor Patrol Division was one of
the first units on the scene.  Sergeant Sebenick arrived at
the scene at approximately 0609 hours and observed a crowd of
people around the victim who was lying on the parkway at the
location.  Approximately one minute later the Fire Department
paramedic unit arrived and began to render medical aid to the
victim who had sustained a gun shot wound to the head.  The
paramedics advised Sergeant Sebenick that the victim would
probably not survive and Sergeant Sebenick requested additional
patrol units to assist with a homicide crime scene investigation.

Harbor Patrol Officers G. Ichikawa #16124 and T. Shannon #26422,
Unit 5X11, responded to the crime scene and assisted Sergeant
Sebenick with securing the area and locating witnesses.  The
officers learned from the witnesses that the victim had been
arguing/fighting with a suspect inside the yard area of the
residence located at 309 Gulf Avenue.

The officers and sergeant responded to the residence at 309
Gulf Avenue where they located several additional witnesses.
At this time Officer Shannon observed a male black exit a rear
sliding glass door and flee the residence on foot.

Officer Shannon subsequently identified this male black as
Markay Lewis, LA #1943420L from booking photo #1249539.

The general crime scene was located within a residential area
which consisted of numerous family dwellings.  These dwelling
ranged from single level single family structures to multi-level
multi-family units.

The immediate crime was located in front of 309 and 315 Gulf
Avenue.  Gulf Avenue extends north and south between "D" Street
to the north and "C" Street to the south.

A pool of blood was observed on the parkway in front of 315
Gulf Avenue which was located 132 feet north of the north curb
of "C" Street and 5.5 feet west of the west curb of Gulf Avenue.

Other items of evidence including a 22 caliber shell casing
were observed and recovered from this immediate area.

        NOTE:  For a list of evidence recovered and the
               respective locations, refer to the property
               report.

Page  5        PRELIMINARY INVESTIGATION REPORT       DR 90-0525042

Scientific Investigation Division Photographer G.Cormany #G8805
responded to the location and photographed the crime scene as
directed.


INTERVIEWS:

On August 30, 1990, at 1130 hours, my partner and I interviewed
Witness Esmeralda Mendez.

Witness Mendez advised that she arrived at the residence located
at 309 Gulf Avenue at approximately 2300 hours (August 29,
1990) with several of her friends who she identified as Christina
(Witness Christina Roman) and Patricia (Witness Patricia Pena).
The witness described the residence as a hangout for gang members
from the Waterfront Piru Blood gang as well as a drug sales
location. She believed that the residence belonged to or was
being rented by Witness Ade Ogunseye, who she knew by the name
of Reginald. She observed numerous members of the Waterfront
Piru gang going in and out of the residence that evening.

Witness Mendez advised that later that night (Thursday moring
August 30, 1990) she heard two male voices arguing outside the
residence. She recognized one of the male voices as that of
the victim who she had observed inside the residence earlier
in the evening. At that time Witness Ogunseye had referred
to him as Curtis. The other male voice she recognized as that
of a Waterfront Piru gang member known to her by the moniker
of "V". The arguing continued for sometime and the witness
stated she could hear other male voices encouraging "V" to fight
and the victim crying, "don't do it, don't do it!" The witness
stated she heard no one other than "V", arguing with the victim.
The arguing continuing at the front of the residence and a short
time later she heard a single shot come from the area to the
front of the residence. By the time the witness went to the
front of the residence the paramedics were treating the victim
and Witness Ogunseye advised her that Curtis had been shot in
the head.

Witness Mendez also stated that the male black who fled the
residence when the officers arrived, is a Waterfront Piru gang
member known to her by the moniker of "Black".

Witness Mendez viewed booking photo #1249539 and identified
Markay Lewis LA #1943420L as "Black", the Waterfront Piru gang
member who ran from the officers.

<u>NOTE</u>:    A query of automated Department sources
revealed that the brother of Markay Lewis,
Vondell Lewis LA #1673261L has a moniker of
"Big V".

Witness Mendez viewed Photo Display Folder "A" which contained
a booking photo of Suspect Vondell Lewis and five similar looking
male blacks.  Witness Mendez identified Suspect Vondell Lewis
as the Waterfront Piru gang member known to her as "V".

On August 31, 1990, at 1430 hours, my partner and I interviewed
Witness Edna Gonzales.

Witness Gonzales advised that she has been living at the
residence located at ░░░░░░░░░░░░░░ with Witness Ade Ogunseye
for approximately one month.

Witness Gonzales stated that Thursday morning (August 30, 1990)
"A-Day" (Witness Ogunseye) and Curtis (Victim Fairley) got into
a fight and "A-Day" through the Curtis out of the residence.
At this point a Waterfront Piru gang member known to the witness
as "Vondel" started to argue and fight with Curtis also.  She
observed "Vondel" wave a knife at the Curtis and she observed
Curtis throw a bottle at "Vondel".  "Vondel" then left the
residence and returned a short time later armed with a small
handgun.  According to the witness "Vondel" again began to fight
with Curtis in the front and side yards of the residence.  The
witness stated she was standing at the front window of the
residence watching "Vondel" fight Curtis.  The fight continued
out to the sidewalk in front of the residence where it appeared
to the witness that Curtis was "chilling down", but "Vondel"
was getting madder.  At this point the witness observed "Vondel"
remove the handgun from his pocket and shot the Curtis one time.
As Curtis fell to the ground the witness observed the "Vondel"
flee on foot through the houses.

Witness Gonzales viewed Photo Display Folder "A" and identified
Suspect Vondell Lewis as "Vondel" the Waterfront gang member
she observed shoot Victim Curtis Fairley.

LAPD 3.11.20 (7/87)

## STATEMENT FORM

Page 1 of 3

| Tape No. | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Wit. No. 1 | | | | | | | | DR No. 90-052504 | |

Name MENDEZ, ESMERALDA
NUNEZ YVONNE    Date/Time of Interview 8-30-90 1130    Location of Interview HARBOR STATION

Resid. Add.                    Zip Code    Phone

Bus. Add.            City            Zip Code    Phone

| Sex F | Desc. HIS | Hair BRN | Eyes BRN | Hgt. 5-8 | Wgt. 140 | DOB 13 | Age 21 | Drivers Lic. No./Other ID | State |
|---|---|---|---|---|---|---|---|---|---|

Interviewing Officer(s) JOSEPHSON    Serial No(s) 21999    Division SBH

(Other Person(s) Present)

Statements. Use first person.    Include who, what, where, when, why and how.

LAST NIGHT I WENT WITH MY GIRLFRIENDS CHRISTINA AND PATRICIA OVER TO CHRISTINA'S BOYFRIENDS HOUSE ON GULF STREET. HIS NAME IS KENNY GREEN. KENNY WASN'T HOME SO WE WENT DOWN THE STREET TO REGINALD'S HOUSE. HE LIVES ABOUT TWO HOUSES FROM KENNY'S HOUSE ON GULF STREET.

WE WERE KICKING IT IN REGINALD'S HOUSE PARTYING FOR AWHILE. IT WAS ME, CHRISTINA PATRICIA, REGINALD AND THIS OTHER BLACK GUY WHO WERE ALL IN THE HOUSE. WE GOT THERE AROUND 11:00 PM LAST NIGHT AND STAYED THE WHOLE NIGHT. EARLIER THIS MORNING I HEARD THIS GUY NAMED CURTIS OUT FRONT BANGING ON THE DOOR AND WANTING IN. HE WAS ARGUING WITH THIS GUY NAMED "V" ABOUT SOMETHING. REGINALD WOULDN'T LET HIM IN. I DON'T KNOW CURTIS, BUT I HEARD REGINALD CALL HIM THAT. THERE WERE ALOT OF GANGSTERS FROM THE WATER FRONT PYRU BLOOD GANG OUT FRONT WITH "V" AND CURTIS. ALL THE GUYS AROUND THERE ARE WITH THAT GANG WATER FRONT PYRUS. THERE WAS ALOT OF YELLING AND ARGUING GOING ON OUT IN FRONT. IT SOUND LIKE "V" WAS ARGUING WITH CURTIS ABOUT SMOKING UP THE DOPE ALTHOUGH IT SOUNDED LIKE "V" WAS THE ONLY ONE REALLY FIGHTING WITH CURTIS. THE OTHER GANGSTERS WERE YELLING FOR "V" OR SUPPORTING HIM. THE FIGHT WENT AROUND INTO THE BACKYARD. WE WERE IN THE BACK ROOM OF THE HOUSE AND THE WINDOWS WERE OPEN SO I COULD HEAR BETTER

Los Angeles Police Department

| PAGE NO. | TYPE OF REPORT | | | | BY / NO. | | DR NO. |
|---|---|---|---|---|---|---|---|
| 2/3 | STATEMENT ESMERALDA MENDEZ | | | | | | 90-05250 |

| ITEM NO. | QUAN. | ARTICLE | SERIAL NO. | BRAND | MODEL NO. | MISC. DESCRIPTION (EG. COLOR, SIZE, INSCRIPTIONS, CALIBER, REVOLVER, ETC) | DOLLAR VAL |
|---|---|---|---|---|---|---|---|

I HEARD "V" YELL, "I TOLD YOU I WANT MY
MONEY." THEN I HEARD CURTIS YELL, "DON'T
DO IT, DON'T DO IT." THE FIGHT AND EVERY-
BODY THEN WENT AROUND TO THE FRONT OF
THE HOUSE AGAIN. I (EM) COULD STILL HERE
THEM ARGUING AND ABOUT 10 TO 15
MINUTES LATER I HEARD A LITTLE
SHOT. IT SOUNDED LIKE A FIRECRAKER
AFTER THAT CHRISTINA WALKED TO THE
FRONT OF THE HOUSE AND LOOKED OUT
THE WINDOW. SHE CAME BACK AND TOLD
US SOME GUY NAMED EFRON HAD BEEN
SHOT. (EM) CHRISTINA WANTED US TO GO
LOOK AND WE DID. BY THE TIME I
LOOKED OUT THE FRONT WINDOW THE
PARAMEDICS WERE THERE AND THE SUN
HAD ALREADY COME OUT. IT GOT DAYLIGHT
FAST.
AROUND THAT TIME REGINALD WENT OUT-
SIDE THEN THE PARAMEDICS LEFT. REGINA
CAME BACK IN AND TOLD US THAT IT
WASN'T EFRON, BUT CURTIS AND THAT
HE WAS SHOT IN THE HEAD.
I HAVE KNOWN THIS GUY NAMED "V" FOR ABOUT
A MONTH. HE IS A TALL SOMEN WITH BUSH
AFRO HAIR. HE HAS A MUSTACHE, THIN BUILT
AND AROUND 30 YEARS OLD. HE IS FROM THE
WATER FRONT PYRU GANG (EM)
THAT OTHER BLACK GUY RAN OUT THE BACK
DOOR WHEN (EM) THE POLICE CAME TO THE
FRONT DOOR. I DON'T KNOW HIS NAME.
I THINK THEY CALL HIM "BLACK". THAT PHOT
YOU SHOWED ME WITH THE NUMBER #1249539 IS
THE GUY THEY CALL "BLACK" WHO RAN OUT THE
HOUSE WHEN THE POLICE CAME.
THERE WAS ALSO A GIRL NAMED "SHORTY" IN THE
HOUSE LAST NIGHT SHE RAN OUT THE HOUSE
BEFORE "BLACK" DID. "SHORTY" IS A MEXICAN

| Los Angeles Police Department | | | | | | |
|---|---|---|---|---|---|---|
| PAGE NO. 3/3 | TYPE OF REPORT STATEMENT ESMERALDA MENDEZ | | | BY NO. — | DR NO. 90-05256 | |
| ITEM NO. | QUAN. | ARTICLE | SERIAL NO. | BRAND | MODEL NO. | MISC. DESCRIPTION (EG. COLOR, SIZE, INSCRIPTIONS, CALIBER, REVOLVER, ETC) | DOLLAR VALU |

GIRL AROUND 21 YEARS AND I THINK SHE
LIVES IN THE HOUSE WITH REGINALD.

I DIDN'T GIVE YOU MY REAL NAME THE
FIRST TIME BECAUSE I DIDN'T WANT
MY BROTHER TO FIND OUT WHAT I'VE
GOT MYSELF INVOLVED IN. MY BROTHER
IS A COP FOR LAPD. MY REAL NAME
IS ESMERALDA MENDEZ.

THIS IS A TRUE STATEMENT OF WHAT
HAPPENED LAST NIGHT OR BETTER
THIS MORNING. I HAVE READ THIS
STATEMENT AND AGREE WITH IT.

X Esmeralda Mendez

WHEN I SAID THAT IT WAS ME,
CHRISTINA, PATRICIA, "BLACK" AND
REGINALD IN THE HOUSE, I MEANT
AT THE TIME OF THE SHOOTING.
EARLIER "I" AND THE REST OF THOSE
GUYS FROM WATER FRONT WERE IN AND
OUT OF THE HOUSE A LOT.

X Esmeralda Mendez

LAPD 3.11.20 (7/87)

**STATEMENT FORM**

8. 190
COUNT # 077-243
7:56 PM/8:48 PM Page 1 of 3

| Tape No. | | |
|---|---|---|
| Wit. No. 2 3 | | DR No. 90-0525842 |

| Name | Date/Time of Interview | Location of Interview |
|---|---|---|
| GONZALES, EDNA | 8-31-90 1430 | HARBOR STATION |

| Sex | Desc. | Hair | Eyes | Hgt. | Wgt. | DOB | Age | Drivers Lic. No./Other ID | State |
|---|---|---|---|---|---|---|---|---|---|
| F | HISP | BLCK | BRN | 4-11 | 120 | | 21 | | |

Interviewing Officer(s)   JOSEPHSEN - TIZANO   Serial No(s)   21999 - 21682   Division SBH

Other Person(s) Present

Statements: Use first person.   Include who, what, where, when, why and how.

I WAS AT "A-DAY'S" HOUSE YESTERDAY MORNING WHEN VONDEL SHOT CURTIS. I SAW VONDEL SHOT CURTIS WITH A LITTLE GUN, HE SHOT CURTIS OUT IN FRONT OF THE HOUSE NEXT DOOR TO "A-DAY" HOUSE.

IT ALL STARTED EARLIER WHEN "A-DAY" GOT IN A FIGHT WITH CURTIS AND THREW CURTIS OUT OF THE HOUSE. CURTIS DID NOT WANT TO LEAVE, BUT "A-DAY" THREW HIM OUT ANYWAY. VONDEL WAS FIGHTING WITH CURTIS TOO AND TRYING TO GET CURTIS TO LEAVE TOO. I SAW VONDEL HIT CURTIS A BUNCH OF TIMES. VONDEL GOT A KNIFE AND WAVED IT AT CURTIS AND CURTIS THREW A BOTTLE AT VONDEL. VONDEL RAN HOME AND CAME BACK WITH A LITTLE GUN THAT HE HAD IN A SOCK. VONDEL CAME IN THE HOUSE AND PLAYING WITH THE GUN, POINTING IT AT ME AND EVERYBODY IN THE HOUSE. THERE WERE OTHER PEOPLE IN THE HOUSE, LIKE MY BOYFRIEND "BLACK", THAT'S VONDEL'S BROTHER. "BLACK" WAS IN THE BACK ROOM WITH THIS GIRL NAMED CHRISTINA. CHRISTINA HAS A PATCH OF WHITE HAIR RIGHT IN FRONT. THERE WERE SOME OTHER MEXICAN GIRLS THERE AND "A-DAY" AND ANOTHER BOYFRIEND OF MINE NAMED EFRON. THERE WERE THOSE YOUNGER GUYS FROM WATERFRONT PIRU GANG AROUND IN FRONT OF THE HOUSE TOO.

VONDEL STARTED FIGHTING WITH CURTIS AGAIN IN FRONT OF THE HOUSE AND ON THE SIDE OF THE HOUSE WHERE THE STEPS AND SIDE DOOR IS. I WAS LOOKING OUT THE FRONT WINDOW

Los Angeles Police Department

CONTINUATION SHEET

| PAGE NO. | TYPE OF REPORT | | | | | R | IG NO. | OR NO. |
|---|---|---|---|---|---|---|---|---|
| 2/3 | STATEMENT EDNA GONZALES | | | | | | — | 90-05250 |

| ITEM NO. | QUAN. | ARTICLE | SERIAL NO. | BRAND | MODEL NO. | MISC. DESCRIPTION (EG. COLOR, SIZE, INSCRIPTIONS, CALIBER, REVOLVER, ETC) | DOLLAR VA |
|---|---|---|---|---|---|---|---|

WATCHING VONDEL FIGHT WITH CURTIS.
EFRON WAS MESSING WITH ME AND TRYING
TO MAKE TIME WITH ME WHILE I WAS
AT THE WINDOW WATCHING. BY THIS TIME
BOTH VONDEL AND CURTIS WERE OUT ON
THE SIDEWALK IN FRONT OF THE
HOUSE NEXT DOOR. VONDEL WAS FARTHER
UP THE STREET AND CURTIS WAS ABOUT
AT THE FRONT CORNER OF "A-DAY'S"
YARD. CURTIS WAS CHILLING DOWN, BUT
VONDEL WAS GETTING MADDER MADDER.
THAT'S WHEN I SAW VONDEL PULL THE
SOCK OUT OF HIS POCKET, PULL THE
GUN OUT OF THE SOCK AND POINT
THE GUN AT CURTIS. VONDEL HAD THE
GUN IN HIS LEFT HAND, BECAUSE HIS
RIGHT ARM, I THINK, WAS HURT. I
HEARD VONDEL YELL, "I'LL PUT THIS
THROUGH YOUR FUCKING HEAD!" THEN
VONDEL SAID, "PUNK," AND FIRED
THE GUN. I COULD SEE THE FIRE
FROM THE GUN. AND CURTIS FALL
TO THE GROUND. VONDEL RAN OFF
BETWEEN THE HOUSES, GOING AWAY
FROM WHERE "A-DAY'S" HOUSE IS. I
RAN OUT THE BACK OF THE HOUSE.
THERE WERE A BUNCH OF THOSE
YOUNG WATERFRONT GANGSTERS OUT
THERE WHEN THIS HAPPENED, BUT I
ONLY SAW VONDEL HITTING CURTIS
AND FIGHTING WITH CURTIS OUT IN
FRONT.
I HAVE READ THIS STATEMENT AND IT'S
CORRECT AS I TOLD DETECTIVES JOSEPHSON
AND TIZANO.

X Edna Gonzales



PHOTO IDENTIFICATION REPORT

| DETECTIVE | LOCATION | DATE |
|---|---|---|
| JOSEPHSON | HARBOR STA | 8-30-90 |

COMMENTS OF WITNESS: *I fully understand the admonition read to me regarding the viewing of these photos.*
ADDITIONAL COMMENTS REGARDING PHOTOGRAPHS –

NUMBER FIVE ON CARD "A" IS "V" THE GUY I HEARD ARGUING WITH THE GUY NAMED CURTIS.

| SIGNATURE OF WITNESS | INITIALS | DATE | TIME |
|---|---|---|---|
| X Esmiralda Mendez | | 8-30-90 | 1445 |

LAPD 3.30.4 ( 12-79)

PHOTO IDENTIFICATION REPORT

| DETECTIVE | LOCATION | DATE |
|---|---|---|
| JOSEPHSON #21999 | HARBOR STATION | 8-31-90 |

COMMENTS OF WITNESS:  I fully understand the admonition read to me regarding the viewing of these photos.
ADDITIONAL COMMENTS REGARDING PHOTOGRAPHS –

"NUMBER FIVE ON CARD "A" IS

VONDEL THE GUY I SAW FIGHT

WITH ~~THE~~ UP AND SHOOT CURTIS.

HE SHOT CURTIS YESTERDAY MORNIN

IN FRONT OF A-DAY'S HOUSE ON

GULF AVENUE.

| SIGNATURE OF WITNESS | INITIALS | DATE | TIME |
|---|---|---|---|
| Edra Gonzales | | 8-31-90 | 1434 |

LAPD 15.50.4 ( 12-78)

Photo Display Folder
(1½ X 1½)
I APD 15 50 1 (0.70)













LAPD 3.7.1.20 (7/87)

TIME, -1051 HOURS

**STATEMENT FORM**

Page 1 of 2

| Tape No. | | | | | | OR No. 90-0525042 |

Wit. No. 12

me COLLINS ESTHER

Date/Time of Interview 9-21-90 0945

Location of Interview HARBOR STATION

Re:

Bu:

| Sex | Desc. | Hair | Eyes | Hgt. | Wgt. | DOB | | | |
|-----|-------|------|------|------|------|-----|---|---|---|
| F | BLK | BLK | BRN | 5-11 | 190 | | /31 | | |

Interviewing Officer(s) JOSEPHSON, B.          Serial No(s) 21999          Division SBH

Other Person(s) Present MORRIS P.          23374          SBH

Statements: Use first person.    Include who, what, where, when, why and how.

CURTIS FAIRLEY IS THE COUSIN OF MY STEP-
DAUGHTER RENEE COLLINS AND VONDELL LEWIS IS
THE BROTHER OF MY NEPHEW MARKEY LEWIS.
I WAS AT HOME THE MORNING VONDELL SHOT
CURTIS. I REMEMBER THAT EARLIER THAT NIGHT
VONDELL AND CURTIS WERE OUT IN FRONT OF
MY HOUSE (930 W. "D" STREET) FUSSING OR ARGUING WITH
EACH OTHER. THEY WERE JUST CAPPING ON EACH
OTHER, I'M NOT REALLY SURE WHAT IT WAS ABOUT. THAT
THE WAY CURTIS WAS, HE WOULD ALWAYS PLAY
AROUND LIKE THAT, CAPPING ON PEOPLE UNTIL THEY
GOT MAD. I WENT BACK IN THE HOUSE AND THE
BOTH OF THEM LEFT.
    LATER THAT NIGHT, JUST BEFORE DAYLIGHT, VONDELL
CAME TO MY BEDROOM WINDOW AND ASKED ME TO GET
HIM A LITTLE PAPER BAG OUT OF HIS SUITCASE.
I WAS MAD AT VONDELL FOR WAKING ME UP LIKE
THAT, BUT I STILL LET HIM IN THE FRONT DOOR.
VONDELL WENT TO HIS SUITCASE WHICH WAS NEXT TO
THE COUCH WHERE HE SLEEPS. VONDELL TOOK OUT A
LITTLE PAPER BAG AND LEFT THE HOUSE FAST
LEAVING THE FRONT DOOR OPEN. I WENT BACK
TO BED AND ABOUT 10 OR 15 MINUTES LATER I
HEARD ONE SHOT. THE SHOT SOUNDED LIKE IT CAME
FROM THE AREA OF THAT EMPTY HOUSE OVER ON
GULF AVENUE. MY BEDROOM WINDOW FACES THAT
EMPTY HOUSE. A LITTLE LATER I HEARD A CAR
SQUEAL AWAY. I THINK I HEARD ANOTHER SHOT AFTER THAT
BUT I'M NOT SURE. A COUPLE OF MINUTES AFTER
THE FIRST SHOT, VONDELL CAME RUNNING UP TO
MY BEDROOM WINDOW AGAIN AND HE WAS ALL OUT

Staila Optional Photo Here

CONTINUATION SHEET

Los Angeles Police Department

| PAGE NO. | TYPE OF REPORT | | | | DG NO. | DR NO. |
|---|---|---|---|---|---|---|
| 2/2 | STATEMENT ESTHER COLLINS | | | | — | 90-05256 |

| ITEM NO. | QUAN. | ARTICLE | SERIAL NO. | BRAND | MODEL NO. | MISC. DESCRIPTION (EG. COLOR, SIZE, INSCRIPTIONS, CALIBER, REVOLVER, ETC) | DOLLAR V |
|---|---|---|---|---|---|---|---|

OF BREATH. VONDELL ASKED ME TO OPEN THE FRONT DOOR. I LET HIM IN AND HE WENT TO THE PHONE, THE KITCHEN HAD CALLED HIS WIFE TERI I COULD HEAR VONDELL TALKING TO TERI, TRYING TO GET HER TO WAKE UP AND COME OVER TO THE HOUSE AND PICK HIM UP. THAT'S WHE THAT SHORT MEXICAN GUY KNOCKED AT MY FRO DOOR. THE MEXICAN GUY ASKED ME IF VONDEL WAS THERE AND I TOLD HIM YES. THEN THE MEXICAN GUY TOLD ME THAT CURTIS HAD BEE SHOT. I TURNED AND LOOKED AT VONDEL. VONDELL WAS STILL ON THE PHONE AND HEAR WHAT THE MEXICAN GUY SAID. VONDELL LOOKED A ME AND SAID, "GO SEE QUEENIE." VONDELL THEN HE WANTED ME TO GO SEE ABOUT CURTIS. I WENT WITH THE MEXICAN GUY OVER TO WHER CURTIS WAS LAYING. CURTIS WAS LAYING IN FRONT OF THE HOUSE NEXT TO THE EMPTY HOUS ON GULF, OUT BY THE SIDEWALK. AS I WAS WALK ING WITH THE MEXICAN GUY, HE TOLD ME THAT VONDELL HAD SHOT CURTIS. I RAN TO CURTIS AND SAW MARKEY GIVING HIM MOUTH TO MOUTH, SHORTLY AFTER THAT THE POLICE AND THE FIREMAN CAME.

WHEN I GOT BACK TO THE HOUSE VONDELL WAS GONE AND HIS SUITCASE TOO.

*Esther Collins*

LOS ANGELES POLICE DEPARTMENT
FOLLOW-UP INVESTIGATION ☐ MULTIPLE

| DATE THIS REPORT | DATE ORIGINAL RPT. | SPL. FIC TYPE ORIG. RPT. (ADW. TFY. EVID., ARREST/BURG. ETC.) | R. D. | PCD DR |
|---|---|---|---|---|
| 9-27-90 | 8-30-90 | Murder | 525 | 90-0525042 |

| VICTIM/BOOKED TO/ARRESTEE (AS ON ORIGINAL REPORT) | IF RECLASSIFYING TO HOMICIDE SEX DESCENT-AGE VICT'S | BKG. NO. (SUPPL. TO ARREST) | WORK FOLDER PERIOD ORIG. RPT. INDI |
|---|---|---|---|
| Fairley, Curtis | | | |

CASE STATUS    1 CLEARED BY ARREST    2 CLEARED OTHER    3 REPORT UNFOUNDED    4 INVESTIGATION CONTINUED

| Use this section only to add or correct info - do not repeat info from previous reports. Exception: Complete entire suspect info if making final disposition. | INV. |
|---|---|
| DATE OCCURRED | CHANGE TO-ON OR BTWN MO DAY YEAR TIME & MO DAY YEAR TIME | TYPE ORIG RPT - CHG. TO RD-CHG. TO DR CHANGE TO | CHANG |
| PROPERTY VALUE | ADDITIONAL LOSS PARTIAL RECOVERY $ | TOTAL RECOVERY $ | DELETE FROM ORIG. RPT. | DESCRIPTION CHANGE ☐ | ITEM NOS. RECOVERED/DELETED (ON MULT. RPTS. USE NARRATIVE) |

| | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) |
|---|---|---|---|---|---|---|---|---|---|
| S-1 | M | Blk | Blk | Brn | 6-4 | 255 | 5-23-66 | 24 | Lewis, Vondell |
| | | | | | | | | | ACTION TAKEN |
| | | | | | | | | | LA OR BKG. NO. 1673261L |
| 2 | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) |
| | | | | | | | | | ACTION TAKEN |
| | | | | | | | | | LA OR BKG. NO. |
| 3 | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) |
| | | | | | | | | | ACTION TAKEN |
| | | | | | | | | | LA OR BKG. NO. |

NARRATIVE (USE BELOW COLUMNS FOR MULTIPLE REPORTS ONLY)

| P/T/O | MULTIPLE RPT: PCD & DR NOS. | TYPE OF CRIME | RD | VICTIM'S NAME | DATE ORIG. RPT. | VALUE |
|---|---|---|---|---|---|---|
| | | | | | | |

BRIEF SYNOPSIS:

On August 30, 1990, at 0600 hours, Victim Curtis Fairley, a
23 year old male Black and Suspect Vondell Lewis, a 24 year
old male Black were involved in an argument/physical altercation
in front of 315 Gulf Avenue, within the Wilmington area of Los
Angeles. During the argument Suspect Lewis removed a small
caliber handgun and shot the victim one time in the head. As
the victim fell to the ground Suspect Lewis fled through the
houses on foot.

Los Angeles Fire Department Rescue Ambulance #98 responded to
the crime scene and transported the victim to the Harbor General
Hospital in critical condition.

On August 30, 1990, at 1808 hours, the victim succumbed to his
wound and was pronounced dead by Doctor Bergsneider.

FOLLOW-UP INVESTIGATION:

On August 30, 1990, at 0800 hours, my partner, Detective C.
Tizano #21682 and I, Detective B. Josephson #21999 were notified
that an attempt homicide had occurred at 315 Gulf Avenue. The
notification was conducted verbally by Detective Supervisor
P. Mize #11973 of the South Bureau Homicide Unit. Detective
Mize advised that the crime occurred at approximately 0600 hours
and that the victim, Curtis Fairley, was on life support systems
at Harbor General Hospital and was not expected to live.

| WAS PROPERTY BOOKED IN CONJUNCTION WITH THIS REPORT OR INCIDENT | ☐ NO ☒ YES..... IF YES, HAS 10.6 BEEN COMPLETED | ☐ NO ☒ YES |
|---|---|---|
| SUPERVISOR APPROVING | SERIAL NO. | REPORTING OFFICER(S) Josephson, B. | SERIAL NO. 21999 | DIVISION SBH |
| DATE & TIME REPRODUCED | DIVISION CLERK | Morris, P. | 23374 | SBH |

My partner and I arrived at the crime scene at 0855 hours,
commenced the crime scene investigation and learned that several
witnesses had been located and detained at Harbor Police Station.

During the crime scene investigation I observed a single 22
caliber shell casing in the roadway approximately 22 feet east
of the location where the victim fell.  This casing and
additional items were recovered from the crime scene and booked
as evidence.  Please refer to the Property Report for a listing
of the recovered evidence and their respective location of
recovery.

My partner and I traveled to the Harbor Police Station and
interviewed Witness Esmeralda Mendez who advised that she was
inside the residence at                      at the time of the
shooting.  She described this residence as a gang hangout and
narcotic sales location.  The witness heard Suspect Lewis
fighting with the victim outside the location in the front and
side yards.  The witness heard the gunshot and there after
learned that the victim had been shot in the head.

Witness Mendez viewed Photo Display Folder "A" and identified
Suspect Lewis as the person she heard fighting with the victim
before the shooting.

Witness Mendez also supplied information regarding other
witnesses that were present at the time of the shooting.  One
such witness she described as a short female Hispanic with the
nickname of "Shorty".

The statement of Witness Mendez was preserved in written and
tape recorded form.

On August 31, 1990, my partner and I interviewed the victim's
father, Curtis Fairley Junior, (victim is Curtis Fairley).
Mr. Fairley advised that he had received information from a
family friend, that a female Hispanic named "Shorty" had
witnessed the shooting and observed Suspect Lewis shoot Victim
Fairley once in the head.

On August 31, 1990, at 1415 hours, my partner and I located
Witness Edna Gonzales, AKA, "Shorty" at the corner of Bayveiw
and "G" Streets.  During the subsequent interview Witness
Gonzales admitted being present at the crime and observing
Suspect Lewis shoot Victim Fairley once in the head.

Witness Gonzales viewed Photo Display Folder "A" and identified
Suspect Vondell Lewis as the shooter of Victim Curtis Fairley.

The statement of Witness Gonzales was preserved in written and
tape recorded from.

On September 2, 1990, at 1130 hours, my partner and I attended
the autopsy of victim Fairley, which was conducted by Doctor
Selser.  Doctor Selser determined the cause of death as a single
gunshot wound to the head.  Doctor Selser removed a single
expended bullet from the head of the victim, which appeared
to be of small caliber.

On September 7, 1990, at 1130 hours, I exchanged information
with Detective Mark Marquez #20424 of the Harbor Detective
Division.  Detective Marquez advised that on September 9, 1989,
Suspect Vondell Lewis was himself the victim of a shooting,
wherein he sustained a gunshot wound to the neck. The crime
and investigation was recorded under Los Angeles Police DR
#89-0521809.

On September 7, 1990, at 1230 hours, my partner and I interviewed
Witness Rudy Roldan, who stated that he was in his residence
at the time of the shooting of Victim Fairley and overheard
the fight between the victim and the suspect.  The witness
described the the suspect as a large black man with bushy long
hair.  During the fight the witness heard the suspect say to
the victim, "Get out of my house and if you come back, I'll
shoot you in the neck and see how you like it".

The statement of Witness Roldan was preserved in written form.

On September 10, 1990, at 1625 hours, I received an anonymous
telephone call, wherein the caller stated that the residents
of the house located at ▓▓▓▓▓▓▓▓▓▓▓t, know all about
the shooting of Victim Fairley and the whereabouts of Suspect
Lewis.  The caller further stated that these residents are
relatives of Suspect Lewis and that at one time, Lewis resided
at the location.

On Septmember 21, 1990, at 0700 hours, my partner and I served
the warrants at ▓▓▓▓▓▓▓▓▓▓reet in Wilmington.  Suspect
Lewis was not located during the warrant service, but family
members stated that he was residing at the residence the night
of the crime and fled with his wife minutes after the shooting.

My partner (Detective P. Morris #23374) and I, interviewed
Witness ▓▓▓▓▓Collins.  Witness Collins stated that the night
before the shooting, August 29, 1990, Victim Fairly and Suspect
Lewis were out in front of her residence (930 West "D" Street),
arguing with each other.  They both left and just before daybreak
Suspect Lewis returned to the rear bedroom window of the witness.
The suspect requested that the witness get up and get him a
little paper bag that was in his suitcase, which was in the
living room next to the couch.

Page 4                FOLLOW-UP INVESTIGATION            DR. 90-0525042

    NOTE:     The suspect was currently separated from his
              wife and residing at the residence on the couch.

Witness Collins let the suspect in the front door and observed
him remove a small paper bag from his suitcase and exit the
residence quickly leaving the front door open.

The witness returned to bed and approximately 10 to 15 minutes
later she heard a single gunshot emanate from the area of the
crime scene.  She then heard a car squeal away and what she
thought was a second shot.  A couple of minutes after the first
shot, Suspect Lewis came running back to her window, out of
breath and wanting back into the residence.  After letting him
in the suspect telephoned his wife and insisted that she come
immediately and pick him up.

At this point an unknown male Hispanic arrived at the front
door of the residence asking if Vondell, (Suspect Lewis) was
home and advised Witness Collins that the victim had been shot.
Witness Collins immediately turned to the suspect, who was still
on the phone and had overheard what the male Hispanic had said.
Suspect Lewis told Witness Collins to go see about the victim.
Enroute to the crime scene, the male Hispanic advised Witness
Collins that Suspect Lewis had shot the victim.

When Witness Collins returned to her residence, Suspect Lewis
and his belongings were gone and she has not seen him since.

The statement of Witness Collins was preserved in written and
tape recorded form.



ONE LETTER FROM JUDICIAL ASSISTANT LAURA TORRES OF JUDGE

MIRICH RE- WARRANT/WARRANT AFFIDAVIT.

PRELIMINARY 115 HEARING TRANSCRIPT CONSISTING OF (20) pages.



JOHN A. CLARKE
EXECUTIVE OFFICER/CLERK

SOUTH DISTRICT
505 So. Centre Street
San Pedro, California 90731

*Superior Court of California*
*County of Los Angeles*

January 23, 2006

Vondell Lewis
#E – 95977/GW-307
P. O. Box 689
Soledad, California 93960-0689

SUBJECT:   Case Number NA004741
        Your Request for Warrant/Warrant Affidavit and Forwarding
        Of Case to Attorney Peter Larkin

Dear Mr. Lewis:

The San Pedro Branch no longer handles criminal cases, and all felony files of cases handled at the San Pedro Courthouse have been transferred to the Long Beach Courthouse. Judge Mirich is no longer assigned to a criminal calendar for that reason.

As you requested, your letter to Judge Mirich dated January 16, 2006, and the contents thereof (preliminary hearing transcript, abstract, docket sheet, and Reporter's Transcript of Proceedings heard on January 9, 1991, and copies of 10 pages from a Reporter's Transcript of Proceedings heard on March 25, 26, 27, 28, 29, 1991; April 1, 1991; and May 6, 1991) have been forwarded to attorney Peter Larkin at 805 S. Gaffey Street, San Pedro, California 90731.

Sincerely,

LAURA TORRES
Judicial Assistant

LT:cw



1

1    IN THE MUNICIPAL COURT OF LOS ANGELES JUDICIAL DISTRICT

2      COUNTY OF LOS ANGELES, STATE OF CALIFORNIA

3

4   HONORABLE PETER J. MIRICH, JUDGE        DIVISION 85

5

6   THE PEOPLE OF THE STATE OF CALIFORNIA,    )

7                  PLAINTIFF,    )

8                          )

9          VS.            )   NO. NA004741

10                          )

      01 VONDELL LEWIS,          )

11                          )

12             DEFENDANT.    )

13

14            REPORTER'S TRANSCRIPT

15            PRELIMINARY HEARING    JAN 18 1991

16       WEDNESDAY, JANUARY 9, 1991   FRANK S. ZOLIN, COUNTY CLERK

17                          BY D.E. ISHMAN, DEPUTY

18

19

20   APPEARANCES:

21        FOR THE PEOPLE         SCOTT CARBAUGH
                             DEPUTY DISTRICT ATTORNEY

22        FOR THE DEFENDANT       PETER LARKIN

23                            987.2

24

25

26

27   HTA: 1-23-91                 VICTORIA MARANON
    DEPT. SOUTH E.               OFFICIAL REPORTER

28   RICHARD CHARVAT, JUDGE         C.S.R. NO. 4482

ORIGINAL

2

1

2

3                          I N D E X

4   <u>PEOPLE'S WITNESSES</u>      <u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>

5      JOSEPHSON, B.              4         9          17

6

7

8

9

10

11

12

13                          <u>NO EXHIBITS</u>

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

1          SAN PEDRO, CALIFORNIA; WEDNESDAY, JANUARY 9, 1991
2                    DIVISION 85; 2:00 P.M.
3                       --oOo--
4
5          THE COURT:  THIS IS THE CASE OF VONDELL LEWIS,
6     NA004741.
7               IS THAT YOUR TRUE FULL AND CORRECT NAME?
8          THE DEFENDANT:  YES.
9          THE COURT:  AND MR. LEWIS IS REPRESENTED BY
10    ATTORNEY PETER LARKIN.  THE PEOPLE ARE REPRESENTED BY
11    SCOTT CARBAUGH.  PEOPLE AND DEFENSE BOTH READY TO PROCEED;
12    IS THAT CORRECT?
13         MR. LARKIN:  YES.
14         MR. CARBAUGH:  SCOTT CARBAUGH, C-A-R-B-A-U-G-H, ON
15    BEHALF OF THE PEOPLE.
16         MR. LARKIN:  READY TO PROCEED.
17         THE COURT:  CALL YOUR FIRST WITNESS.
18         MR. CARBAUGH:  OFFICER BRENT JOSEPHSON.
19         MR. LARKIN:  MOTION TO EXCLUDE.
20         THE COURT:  ANY OTHER WITNESSES IN THIS CASE ARE
21    ORDERED TO REMAIN OUTSIDE IN THE HALL, NOT DISCUSS YOUR
22    TESTIMONY UNTIL THE CONCLUSION OF THIS MATTER.
23         MR. CARBAUGH:  THAT ORDER HAS BEEN COMPLIED WITH ON
24    BEHALF OF THE PEOPLE.
25         THE COURT:  VERY WELL.
26         THE CLERK:  YOU DO SOLEMNLY SWEAR THAT THE
27    TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW PENDING
28    BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE TRUTH, AND

4

```
 1    NOTHING BUT THE TRUTH, SO HELP YOU GOD?
 2         THE WITNESS:  I DO.
 3         THE CLERK:  THANK YOU.  YOU MAY BE SEATED.
 4              STATE AND SPELL YOUR FULL NAME FOR THE
 5    RECORD.
 6         THE WITNESS:  BRENT JOSEPHSON.  J-O-S-E-P-H-S-O-N.
 7         THE CLERK:  THANK YOU.
 8         MR. CARBAUGH:  MAY I INQUIRE?
 9         THE COURT:  YES.
10
11                   BRENT JOSEPHSON,
12    CALLED AS A WITNESS BY THE PEOPLE, HAVING BEEN FIRST DULY
13    SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:
14
15                   DIRECT EXAMINATION
16    BY MR. CARBAUGH:
17         Q    MR. JOSEPHSON, WHAT IS YOUR OCCUPATION AND
18    ASSIGNMENT?
19         A    I'M A DETECTIVE FOR THE CITY OF LOS ANGELES
20    ASSIGNED TO SOUTH BUREAU HOMICIDE UNIT.
21         Q    HOW LONG HAVE YOU BEEN A PEACE OFFICER WITH
22    THE CITY OF LOS ANGELES?
23         A    THIRTEEN YEARS.
24         Q    DIRECTING YOUR ATTENTION TO THE DATE OF
25    AUGUST 30TH, 1990, WERE YOU AND ANOTHER DETECTIVE ASSIGNED
26    TO INVESTIGATE THE DEATH OF MR. CURTIS, C-U-R-T-I-S,
27    FAIRLEY, F-A-I-R-L-E-Y?
28         A    YES, SIR, I WAS.
```

5

1      Q      WHO WAS YOUR PARTNER OFFICER OR DETECTIVE?

2      A      OFFICER DAVE ROOT.

3      Q      SPELL THAT FOR THE REPORTER.

4      A      R-O-O-T.

5      Q      THANK YOU.

6             AS PART OF THAT INITIAL INVESTIGATION DID YOU

7   GO TO A LOCATION?

8      A      EXCUSE ME.  I'M SORRY.  I'M GOING TO HAVE TO

9   CORRECT THAT.  IT WAS NOT OFFICER ROOT.  IT'S GOING TO BE

10  OFFICER CHUCK TIZANO, T-I-Z-A-N-O.

11     Q      AS PART OF THAT INVESTIGATION ON AUGUST 30TH,

12  1990, DURING THE MORNING HOURS DID YOU GO TO A LOCATION ON

13  GULF, G-U-L-F, AVENUE IN THE CITY OF LOS ANGELES,

14  WILMINGTON SECTION?

15     A      YES, SIR, I DID.

16     Q      WHERE SPECIFICALLY DID YOU GO?

17     A      TO THE ADDRESS OF I -- CORRECTION, 315 NORTH

18  AND 309 GULF.

19     Q      AND WHEN YOU ARRIVED AT THAT LOCATION DID YOU

20  LEARN FROM OTHER LOS ANGELES POLICE PERSONNEL WHERE MR.

21  FAIRLEY HAD BEEN FOUND?

22     A      YES, SIR, I DID.

23     Q      CAN YOU DESCRIBE THE LOCATION FOR US?

24     A      IT WAS IN THE PARKWAY AREA DIRECTLY TO THE

25  THE FRONT OF THE ADDRESS OF 309 NORTH GULF AND ALMOST IN A

26  SECTION BETWEEN THAT ADDRESS AND THE 315 ADDRESS WHICH

27  WOULD BE RIGHT NEXT DOOR.

28     Q      DID YOU LEARN ALSO THAT AFTER MR. FAIRLEY HAD

6

```
 1     BEEN APPARENTLY SHOT HE HAD BEEN TRANSPORTED AWAY BY

 2     PARAMEDICS?

 3            A     YES, SIR, I DID.

 4            Q     THANK YOU.

 5                  AS PART OF THIS INVESTIGATION CONCERNING THE

 6     DEATH OF MR. FAIRLEY DID YOU AND YOUR PARTNER OFFICER

 7     INTERVIEW A YOUNG WOMAN BY THE NAME OF EDNA GONZALEZ?

 8            A     YES, SIR, I DID.

 9            Q     WHAT DATE DID YOU INTERVIEW MISS GONZALEZ?

10            A     IT WOULD BE THE FOLLOWING DATE, AUGUST 31ST.

11            Q     AND WHERE DID THAT INTERVIEW TAKE PLACE?

12            A     AT THE HARBOR STATION.

13            Q     AND ABOUT WHAT TIME OF THE DAY OR EVENING DID

14     THAT OCCUR?

15            A     APPROXIMATELY 1400 HOURS, WHICH WOULD BE TWO

16     P.M.

17            Q     AND DURING THAT INTERVIEW DID MISS GONZALEZ

18     TALK ABOUT AMONG OTHER THINGS TWO PERSONS; THE VICTIM,

19     CURTIS FAIRLEY, AND SOMEONE SHE CALLED VONDELL?

20            A     YES, SIR, SHE DID.

21            Q     DID YOU DO SOMETHING TO ESTABLISH THE

22     IDENTITY OF THE PERSON SHE IDENTIFIED AS VONDELL?

23            A     YES, I DID.

24            Q     WHAT DID YOU DO?

25            A     I PREPARED A PHOTO DISPLAY FOLDER CONTAINING

26     A MUG SHOT, FACIAL PHOTO OF THE DEFENDANT, MR. LEWIS, AND

27     FIVE SIMILAR LOOKING INDIVIDUALS.

28            Q     AND DID YOU SHOW THAT GROUP OF PHOTOGRAPHS TO
```

1    HER AT SOMETIME TO SEE IF SHE COULD IDENTIFY THIS PERSON

2    THAT SHE CALLED VONDELL?

3           A     YES, SIR, I DID.

4           Q     WHAT, IF ANYTHING DID SHE SAY UPON VIEWING

5    THAT GROUP OF SIX PHOTOGRAPHS?

6           A     SHE IDENTIFIED THE DEFENDANT, MR. VONDELL

7    LEWIS, AS THE PERSON THAT SHE HAD OBSERVED SHOOT VICTIM

8    CURTIS FAIRLEY.

9           Q     SHE PICKED OUT ONE OF THE GROUP OF SIX

10   PHOTOGRAPHS; IS THAT CORRECT?

11          A     CORRECT.

12          Q     AND THE PICTURE THAT SHE PICKED OUT IS THAT

13   PERSON IN THE COURTROOM TODAY?

14          A     YES, SIR, HE IS.

15          Q     CAN YOU IDENTIFY HIM FOR US AT THIS TIME?

16          A     IT WILL BE THE DEFENDANT TO THE RIGHT OF

17   COUNSEL.

18          MR. LARKIN:  FOR THE RECORD THERE WOULD BE AN

19   OBJECTION TO THIS TYPE OF PRELIMINARY, 115.

20          THE COURT:  VERY WELL.  THAT OBJECTION IS

21   OVERRULED.  THE RECORD WILL REFLECT THE WITNESS HAS

22   IDENTIFIED THE DEFENDANT.

23          MR. CARBAUGH:  THANK YOU.

24          Q     WHAT SPECIFICALLY DID SHE SAY THAT LED UP TO

25   THE SHOOTING OF CURTIS FAIRLEY BY VONDELL LEWIS?

26          A     SHE SAID THAT AT THE LOCATION SHE WAS AT,

27   WHICH WOULD HAVE BEEN THE 309 LOCATION ON GULF, THERE HAD

28   BEEN A PARTY THAT NIGHT AND TOWARDS THE EARLY MORNING

1    HOURS OR DURING THE EVENING THERE HAD BEEN AN ALTERCATION

2    BETWEEN THE DEFENDANT AND THE VICTIM.  DURING THAT

3    ALTERCATION THERE WERE PUNCHES THROWN, A BOWL THROWN,

4    KNIVES THROWN.  IT CONTINUED WITH THE FACT THAT THE

5    DEFENDANT WANTED THE VICTIM TO LEAVE THE LOCATION.

6         Q    WHAT OCCURRED THEN ACCORDING TO MISS

7    GONZALEZ?

8         A    SHE SAID AT THAT POINT THINGS STARTED TO DIE

9    DOWN AND THE DEFENDANT LEFT THE LOCATION.  HE THEN

10   RETURNED SOMETIME LATER WITH A SOCK AND INSIDE THE SOCK

11   WAS A SMALL HANDGUN.

12        Q    WHAT IF ANYTHING DID MISS GONZALEZ SAY THAT

13   THE DEFENDANT DID WITH THE SMALL HANDGUN UPON RETURNING TO

14   THE LOCATION?

15        A    HE REENTERED THE LOCATION, WAS ACTUALLY

16   POINTING THE HANDGUN AT HER AND THE OTHER INDIVIDUALS

17   INSIDE THE HOUSE, PLAYING WITH IT.  AT SOME POINT AFTER

18   THIS THE ARGUMENT AGAIN STARTED BETWEEN THE DEFENDANT AND

19   THE VICTIM OUT ON THE FRONT PARKWAY SIDEWALK AREA IN FRONT

20   OF THE LOCATION, AT WHICH TIME --

21        Q    LET ME ASK YOU THIS QUESTION, DETECTIVE

22   JOSEPHSON.  DID SHE SAY AT THIS TIME SHE HEARD THE

23   DEFENDANT SAY SOMETHING TO CURTIS FAIRLEY?

24        A    YES, SIR.

25        Q    WHAT DID SHE HEAR THE DEFENDANT SAY?

26        A    WHEN -- AT THIS POINT OF THE ARGUMENT IN

27   FRONT SHE SAW THE DEFENDANT PULL THE GUN OUT, POINT IT IN

28   THE VICTIM'S DIRECTION AND STATED, "I'LL PUT THIS," EXCUSE

9

1    ME, "I'LL PUT THIS THROUGH YOUR FUCKING HEAD."

2         Q    THAT'S A QUOTE IN YOUR REPORT; IS THAT

3    CORRECT?

4         A    THAT IS CORRECT.

5         Q    THEN DID SHE SAY WHAT SHE OBSERVED DEFENDANT

6    VONDELL LEWIS DO WITH THE GUN?

7         A    FIRED ONCE AT THE DEFENDANT STRIKING HIM IN

8    THE HEAD.

9         Q    AT THE DEFENDANT OR VICTIM?

10        A    EXCUSE ME.   THE VICTIM.

11        Q    DID SHE THEN SAY WHAT SHE OBSERVED THE

12   DEFENDANT DO AFTER THE SHOT OCCURRED?

13        A    RUN FROM THE LOCATION THROUGH THE HOUSES.

14        MR. CARBAUGH:  THANK YOU, YOUR HONOR.  I HAVE NO

15   FURTHER QUESTIONS.

16        THE COURT:   THANK YOU.

17             CROSS-EXAMINATION, MR. LARKIN.

18        MR. LARKIN:   THANK YOU, YOUR HONOR.

19

20             CROSS-EXAMINATION

21   BY MR. LARKIN:

22        Q    DID SHE SAY SHE WAS IN 309 THE ENTIRE TIME

23   SHE SAW AND HEARD ALL THIS?

24        A    I CAN ONLY RECALL FROM THE INTERVIEW THE PART

25   THAT SHE SAID SHE WAS INSIDE THE HOUSE AT THE FRONT WINDOW

26   WHEN SHE SAW THE SHOOTING AND FIGHT, THE SECOND

27   ALTERCATION IN FRONT.  I DON'T RECALL EXACTLY WHERE SHE

28   WAS WHEN THE FIRST ARGUMENTS OCCURRED.

10

1    Q    OKAY.  SO WHAT SHE SAID IS WHEN SHE SAW THE

2  SHOOTING SHE WAS INSIDE OF THE HOUSE?

3    A    THAT'S CORRECT.

4    Q    HOW FAR AWAY WAS THE SHOOTING FROM WHERE SHE

5  WAS, IF YOU KNOW?

6    A    IT WOULD MERELY BE AN APPROXIMATION ON MY

7  PART.  I WOULD SAY WITHIN 20 FEET.

8    MR. LARKIN:   EXCUSE ME FOR JUST A MOMENT, YOUR

9  HONOR.

10

11                    (PAUSE.)

12

13    Q    WAS THE VICTIM FOUND OUT IN FRONT OF 309 OR

14  IN FRONT OF 315?

15    A    THE LOCATION WOULD BE RIGHT ON THE

16  BORDERLINE, SIR.

17    Q    IN BETWEEN THE TWO?

18    A    AN APPROXIMATION, YES.

19    Q    WHEN YOU INTERVIEWED HER HAD SHE BEEN IN

20  CUSTODY SINCE THIS HAD HAPPENED?

21    A    NO, SIR.

22    Q    WHERE DID YOU INTERVIEW HER AT?

23    A    AT THE HARBOR STATION.

24    Q    HOW IS IT THAT SHE GOT TO HARBOR STATION?

25    A    I DROVE HER THERE.

26    Q    YOU WENT OUT TO WHERE SHE LIVED AND PICKED

27  HER UP?

28    A    NO.  I FOUND HER WALKING ON BAYVIEW AVENUE.

11

```
1          Q      HOW LONG HAD SHE BE AT THE STATION BEFORE YOU
2    INTERVIEWED HER?
3          A      IT WAS IMMEDIATE UPON OUR ARRIVAL, SIR.
4          Q      WHEN YOU INTERVIEWED HER DID YOU JUST TALK
5    WITH HER?
6          A      THAT'S CORRECT.
7          Q      WAS THAT PART OF THE INTERVIEW TAPE-
8    RECORDED?
9          A      NO, SIR.
10         Q      DID YOU WRITE OUT A STATEMENT OR HAVE HER
11   WRITE ONE OUT?
12         A      I WROTE OUT A STATEMENT, SIR.
13         Q      WAS THAT AFTER YOU HAD SPOKEN WITH HER?
14         A      YES, SIR.
15         Q      AND YOU HAD HER SIGN THAT STATEMENT?
16         A      THAT'S CORRECT, SIR.
17         Q      WAS THAT TAPE-RECORDED?
18         A      YES, SIR.
19         Q      SO WHILE YOU WERE WRITING OUT THE STATEMENT
20   ALL OF THAT WAS TAPE-RECORDED?
21         A      NO, SIR.
22         Q      OKAY.  WAS THE TAPE RECORDING AFTER YOU WROTE
23   OUT THE STATEMENT?
24         A      THAT'S CORRECT, SIR.
25         Q      SO THIS TAPE-RECORDED STATEMENT, WAS THAT HER
26   READING HER WRITTEN STATEMENT OR JUST ANOTHER INTERVIEW?
27         A      THAT WOULD BE ANOTHER INTERVIEW, SIR.
28         Q      IN OTHER WORDS IT WASN'T READ WORD FOR WORD.
```

12

1    FROM THE STATEMENT THAT HAD BEEN WRITTEN OUT?

2         A    THAT'S CORRECT, SIR.

3         Q    HOW LONG DID THE ENTIRE INTERVIEW WITH HER

4    TAKE?

5         A    APPROXIMATELY TWO TO TWO AND A HALF HOURS.

6         Q    HAD YOU SEEN HER THE DAY BEFORE WHEN YOU WERE

7    INVESTIGATING THE CASE?

8         A    NO, SIR, I DID NOT.

9         Q    HOW IS IT THAT YOU KNEW TO PICK HER UP WHEN

10   YOU SAW HER WALKING ON BAYVIEW?

11        A    I RECEIVED INFORMATION FROM FAMILY MEMBERS

12   THAT SHE WAS A WITNESS TO AN ACTUAL CRIME.

13        Q    AND A DESCRIPTION?

14        A    THAT'S CORRECT, SIR.

15        Q    HAD SHE BEEN DETAINED THE DAY BEFORE WHEN THE

16   OFFICERS ARRIVED AT THE SCENE?

17        A    NO, SIR.

18        Q    NOW, YOU INTERVIEWED A NUMBER OF OTHER PEOPLE

19   IN THE CASE, DIDN'T YOU?

20        A    THAT'S CORRECT, SIR.

21        Q    HOW MANY OF THOSE INTERVIEWED WERE

22   TAPE-RECORDED, IF YOU KNOW?

23        A    I BELIEVE APPROXIMATELY THREE, SIR.

24        Q    YOUR TECHNIQUE ON INTERVIEWING PEOPLE WAS IT

25   ALL THE SAME ON ALL OF THEM?

26        A    IN REGARDS TO THE INDIVIDUALS THAT I

27   INTERVIEWED, YES, SIR.

28        Q    THERE'S A DRIVEWAY.  IS THE DRIVEWAY BETWEEN

13

1    309 AND 315, IS THERE A DRIVEBY BETWEEN THE TWO OF THEM?

2         A    NO, SIR.

3         Q    THE PHOTOGRAPHS THAT YOU HAVE OF THE SCENE,

4    DOES IT DEPICT WHERE THE BODY WAS FOUND?

5         A    YES, SIR, IT DOES.

6         Q    THE BODY IS NOT IN THE PHOTOGRAPH, IS IT?

7         A    NO, THE BODY WAS TAKEN TO THE HOSPITAL.

8         Q    WERE THERE BLOOD SPOTS TO IDENTIFY WHERE THE

9    BODY WAS FOUND?

10        A    THERE WAS SOME BLOOD STAINING, YES.

11        Q    DID YOU INVESTIGATE THE CRIME SCENE YOURSELF?

12        A    YES, SIR, I DID.

13        Q    AND DID YOU HAVE OTHER PEOPLE INVESTIGATING

14   IT AT YOUR DIRECTION?

15        A    YES, SIR.

16        Q    WHEN YOU SPOKE WITH EDNA GONZALEZ DID SHE

17   APPEAR TO BE UNDER THE INFLUENCE OF ANYTHING?

18        A    YES, SIR.

19        Q    WHAT DID SHE APPEAR TO BE UNDER THE INFLUENCE

20   OF, IF YOU KNOW?

21        A    I DON'T KNOW.

22        Q    IT APPEARED TO BE SOME TYPE OF NARCOTIC OR

23   ALCOHOL?

24        A    ONE OR THE OTHER, YES.

25        Q    COULD YOU TELL FROM HER SPEECH?

26        A    YES, SIR.

27        Q    AND HER ACTIONS?

28        A    YES, SIR.

14

1       Q    OUT OF ALL THE PEOPLE YOU SAW INTERVIEWED OR

2   HAD INTERVIEWED AT YOUR DIRECTION IN THIS INVESTIGATION

3   WAS THERE ANYONE ELSE THAT ACTUALLY SAW THE SHOOTING

4   BESIDES EDNA GONZALEZ?

5       A   NO, SIR.

6       Q   HOW MANY PEOPLE WERE INTERVIEWED IN THIS

7   CASE, IF YOU KNOW?  IF YOU CAN TELL FROM YOUR REPORTS?

8       A   JUST A MOMENT, SIR.

9

10          (PAUSE.)

11

12       A   THE ENTIRE INVESTIGATION APPROXIMATELY 12

13   PEOPLE.

14       Q   DID SHE SAY SHE HAD BEEN UP ALL NIGHT WHEN

15   THE SHOOTING OCCURRED?

16       A   I DON'T RECALL WHAT SHE SAID BUT FROM MY

17   INFORMATION SHE MUST HAVE BEEN.

18       Q   DID SHE SAY OR DID YOU DETERMINE WHETHER SHE

19   WAS LOADED DURING THE SHOOTING OR UNDER THE INFLUENCE OF

20   ANYTHING?

21       A   NO, SIR.

22       Q   DID YOU ASK HER WHETHER SHE HAD TAKEN ANY

23   TYPE OF DRUGS OR NARCOTICS OR ALCOHOL THE NIGHT OF THE

24   INCIDENT?

25       A   NOT THAT I RECALL, SIR.

26       Q   PARDON ME?

27       A   NOT THAT I RECALL, SIR, NO.

28       Q   DID SHE TELL YOU HOW MANY DIFFERENT PEOPLE

15

1    WERE OUTSIDE AROUND THAT AREA WHEN THE SHOOTING OCCURRED?

2          A    YES, SIR.

3          Q    HOW MANY PEOPLE WERE OUTSIDE THEN?

4          A    FROM HER INFORMATION THERE WERE A NUMBER OF

5    MEMBERS, GANG MEMBERS OF THE WATERFRONT PIRU GANG THERE IN

6    AND OUT OF THE HOUSE THE ENTIRE NIGHT.

7          Q    WHEN THE SHOOTING OCCURRED DID YOU ASK HER OR

8    DID SHE SAY WHETHER OR NOT THERE WERE ANY OTHER PEOPLE

9    AROUND CURTIS FAIRLEY OR VONDELL LEWIS AT THE TIME?

10          A    AROUND THEM, NO, SIR.

11          Q    YOU SAID THAT THERE WERE PUNCHES AND BOWLS

12    THAT WERE THROWN.  DID YOU DETERMINE WHO THEY WERE THROWN

13    BY?

14          A    YES, SIR.

15          Q    WHO?

16          A    ACCORDING TO WITNESSES' STATEMENTS THE

17    PUNCHES WERE THROWN BY DEFENDANT STRIKING THE VICTIM.  THE

18    BOWL WAS THROWN BY THE VICTIM TOWARD THE DEFENDANT AND IT

19    DIDN'T STRIKE HIM.

20          Q    WERE THERE ANY PUNCHES OR FIGHTS AGAINST THE

21    PERSON OF A-DAY AND THE VICTIM?

22          MR. CARBAUGH:  FOR THE RECORD, A, HYPHEN, D-A-Y.

23          THE WITNESS:  NOT BY THIS WITNESS, SIR.

24    BY MR. LARKIN:

25          Q    WERE THERE ANY OTHER WITNESSES THAT INDICATED

26    THERE HAD BEEN A FIGHT BETWEEN THOSE TWO?

27          A    I WOULD HAVE TO REFER TO MY NOTES AND

28    INFORMATION.

16

1      Q      IF THAT WOULD HELP.

2      A      IT WOULD.

3

4                    (PAUSE.)

5

6      A      NO, SIR, NOT THAT I'M AWARE OF.

7      Q      YOU SPOKE WITH A NUMBER OF PEOPLE THE MORNING

8  OF THE OCCURRENCE AT HARBOR STATION, DIDN'T YOU?

9      A      THAT'S CORRECT, SIR.

10     Q      WERE THOSE PEOPLE THAT HAD BEEN AT THE PARTY

11  OR AT THE HOUSE IN AND OUT BASICALLY THROUGHOUT THE

12  PREVIOUS NIGHT?

13     A      THOSE WERE INDIVIDUALS, YES, AT THE PARTY AT

14  THAT LOCATION.

15     Q      OKAY.  DO YOU RECALL HOW MANY PEOPLE YOU

16  SPOKE WITH THAT DAY AT THE STATION THAT WERE THERE THAT

17  NIGHT OR THAT MORNING?

18     A      APPROXIMATELY FIVE.

19     Q      DID THOSE PEOPLE INDICATE TO YOU THAT THEY

20  HAD TAKEN ANY TYPE OF DRUGS OR NARCOTICS, AND IF SO, WHO?

21     A      I CAN'T RECALL WHICH INDIVIDUALS MAY HAVE

22  GIVEN THAT INFORMATION, BUT THERE WAS NARCOTICS CONSUMED

23  THAT EVENING AT THAT LOCATION, YES.

24     Q      BY EVERYBODY THAT WAS THERE?

25     A      THAT'S THE INFORMATION THAT I HAVE.

26     Q      THAT YOU RECEIVED?

27     A      UM-HUM.

28     Q      DURING ANY OF THE INTERVIEWS THAT YOU

17

1    CONDUCTED THAT MORNING DID ANY OF THE PEOPLE APPEAR TO BE

2    UNDER THE INFLUENCE?

3         A    NO.

4         Q    DID EDNA GONZALEZ TELL YOU SHE EVER LEFT THE

5    HOUSE THAT EVENING OR THAT MORNING?

6         A    SHE LEFT -- YES, SIR.

7         Q    WHEN WAS THAT?

8         A    SHE LEFT THAT MORNING BEFORE THE POLICE

9    ARRIVED.

10        Q    OTHER THAN THAT DID SHE SAY SHE LEFT DURING

11   ANY OTHER OF THE ALTERCATIONS OR FIGHTS?

12        A    NO, SIR, NOT THAT I'M AWARE.

13        MR. LARKIN:  NOTHING FURTHER.

14

15                    REDIRECT EXAMINATION

16   BY MR. CARBAUGH:

17        Q    YOU DETERMINED THE SHOOTING HAPPENED DURING

18   THE MORNING HOURS OF AUGUST 30TH OF 1990; IS THAT CORRECT?

19        A    YES, SIR.

20        MR. CARBAUGH:  NOTHING FURTHER.  THANK YOU.

21        MR. LARKIN:  NOTHING FURTHER.

22        THE COURT:  YOU MAY STEP DOWN.

23        THE WITNESS:  THANK YOU, YOUR HONOR.

24        MR. CARBAUGH:  AT THIS TIME WE HAVE A STIPULATION.

25             COUNSEL, MAY IT BE STIPULATED THAT DR. SUSAN

26   SELSER BE DEEMED TO BE CALLED THIS DATE, DULY SWORN,

27   QUALIFIED AS AN EXPERT AUTOPSY SURGEON FAMILIAR WITH THE

28   NATURE AND CAUSES OF DEATHS IN HUMAN BEINGS AND OTHER

18

1    MEDICAL MATTERS GENERALLY;

2            ALSO THAT DR. SELSER IS LICENSED TO PRACTICE

3    MEDICINE WITHIN THE STATE OF CALIFORNIA AND IS EMPLOYED AS

4    A DEPUTY MEDICAL EXAMINER AT THE LOS ANGELES COUNTY

5    CORONER'S OFFICE;

6            FURTHER, THAT ON SEPTEMBER 2ND, 1990, DR.

7    SELSER PERFORMED AN AUTOPSY ON MR. CURTIS FAIRLEY, THE

8    GENTLEMAN DESCRIBED BY DETECTIVE JOSEPHSON EARLIER TODAY

9    AND THE PERSON DESCRIBED IN COUNT 1 OF THE COMPLAINT

10   CURRENTLY BEFORE THE COURT, AND AFTER PERFORMING THAT

11   AUTOPSY DR. SELSER DETERMINED THE CAUSE OF DEATH AS TO MR.

12   FAIRLEY TO BE A GUNSHOT WOUND TO THE HEAD?

13           MR. LARKIN:  SO STIPULATED FOR PURPOSES OF THE

14   PRELIMINARY HEARING ONLY.

15           MR. CARBAUGH:  JOIN.

16           THE COURT:  THE COURT ACCEPTS THAT.

17           MR. CARBAUGH:  PEOPLE REST.

18           THE COURT:  ANY AFFIRMATIVE DEFENSE?

19           MR. LARKIN:  NO AFFIRMATIVE DEFENSE.  MOTION TO

20   DISMISS FOR INSUFFICIENCY OF THE EVIDENCE.

21           THE COURT:  THAT MOTION IS DENIED.

22               SUBMITTED?

23           MR. CARBAUGH:  SUBMITTED.

24           MR. LARKIN:  YES.

25           THE COURT:  IT APPEARING TO ME FROM THE EVIDENCE

26   PRESENTED THAT VIOLATION OF SECTION 187(A) OF THE PENAL

27   CODE HAS BEEN COMMITTED, MURDER, AND THAT THERE IS

28   SUFFICIENT CAUSE TO BELIEVE THAT THE DEFENDANT IS GUILTY.

19

1    THEREOF, I ORDER THAT HE BE HELD TO ANSWER TO THEREFOR.

2    THERE WILL BEEN NO BAIL SET THIS THIS CASE.

3              THE MATTER WILL BE SET FOR ARRAIGNMENT IN

4    SUPERIOR COURT ON JANUARY 23, 1991, NINE A.M. IN

5    DEPARTMENT SOUTH C.  THIS MATTER WILL BE ASSIGNED TO JUDGE

6    RICHARD CHARVAT FOR ALL FUTURE PROCEEDINGS.

7         MR. CARBAUGH:  THANK YOU, YOUR HONOR.

8         MR. LARKIN:  THANK YOU, YOUR HONOR.

9         THE COURT:  EXCUSE ME.  FOR THE RECORD I ALSO FIND

10   THAT THERE IS SUFFICIENT CAUSE TO BELIEVE THAT SPECIAL

11   ALLEGATION UNDER SECTION 12022.5 OF THE PENAL CODE IS

12   TRUE.

13

14         (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

15

16                    --000--

17

18

19

20

21

22

23

24

25

26

27

28

20.

```
 1   IN THE MUNICIPAL COURT OF LOS ANGELES JUDICIAL DISTRICT

 2        COUNTY OF LOS ANGLES, STATE OF CALIFORNIA

 3   HON. Peter g Mirich, Judge              DIVISION 85


 5   THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                            )
 6                                          )
                              PLAINTIFF,    )
 7                                          )
                                            )
 8               VS.                        )   NO.
                                            )        NA004741
 9   Vondell Lewis                          )
                                            )
10                                          )
                                            )
11   _____DEFENDANT. )

12

13          I HEREBY CERTIFY THAT C.S.R., VICTORIA MARANON,

14   OFFICIAL REPORTER OF THE ABOVE-ENTITLED COURT, WAS

15   ASSIGNED AS SHORTHAND REPORTER TO REPORT THE TESTIMONY

16   AND PROCEEDINGS CONTAINED HEREIN AND WAS BY ME DIRECTED

17   TO REDUCE SAID SHORTHAND NOTES TO TYPEWRITING ON

18   January 9, 1994
                                    _____
19                                          JUDGE

20

21          I HEREBY CERTIFY THAT I AM AN OFFICIAL SHORTHAND

22   REPORTER OF THE ABOVE-ENTITLED COURT; THAT PURSUANT TO THE

23   JUDGE'S CERTIFICATE ABOVE, I DID CORRECTLY REPORT THE

24   PROCEEDINGS CONTAINED HEREIN; AND THAT THE FOREGOING IS A

25   TRUE AND CORRECT STATEMENT OF PROCEEDINGS AND

26   TRANSCRIPTION OF MY SAID NOTES.
                                    _____
27                                       OFFICIAL REPORTER
                                           C.S.R. 4482
28
```



REPORT'S TRIAL TRANSCRIPTS IN THE SUPERIOR COURT OF PORTIONS OF
DETECTIVE BRENT JOSEPHSON'S SWORN TESTIMONY. CONSISTING OF (9)
PAGES.

*Lodged*
*SEP 20 2005*
*P. Stahl*

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

THE PEOPLE OF THE STATE OF CALIFORNIA,           )
                                                 )
                      PLAINTIFF-RESPONDENT,       )
                                                 )   SUPERIOR COURT
            VS.                                   )   NO. NA 004741
                                                 )
VONDELL LEWIS,                                    )
                                                 )   AUG 0 7 1991
                      DEFENDANT-APPELLANT.        )
                                                 )

APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY

HONORABLE RICHARD F. CHARVAT, JUDGE PRESIDING

## REPORTER'S TRANSCRIPT ON APPEAL

APPEARANCES:

FOR PLAINTIFF-RESPONDENT:        DANIEL E. LUNGREN
                                 STATE ATTORNEY GENERAL
                                 300 SPRING STREET
                                 SECOND FLOOR
                                 NORTH TOWER
                                 LOS ANGELES, CALIFORNIA   90013

FOR DEFENDANT-APPELLANT:         IN PROPRIA PERSONA

COPY

VOLUME 1 OF 1 VOLUME             BARBARA MATSUKANE, CSR NO. 3618
PAGES 1 THROUGH 240, INCL.       JOSEPHINE MORA, CSR NO. 2707
                                 OFFICIAL REPORTERS

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT SOUTH "C"          HON. RICHARD F. CHARVAT, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA,          )
                                                )
                                     PLAINTIFF,  )
                                                )
                    VS.                         )  NO. NA 004741
                                                )
VONDELL LEWIS,                                  )
                                                )
                                    DEFENDANT.   )
                                                )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MARCH 25, 26, 27, 28, 29, 1991
APRIL 1, 1991
MAY 6, 1991

APPEARANCES:

FOR THE PEOPLE:          IRA REINER, DISTRICT ATTORNEY
                         BY:  SCOTT G. CARBAUGH DEPUTY
                         210 WEST TEMPLE STREET
                         ROOM 18-709
                         LOS ANGELES, CALIFORNIA 90012

FOR THE DEFENDANT:       KENNETH T. WELCH, APPOINTED 987.2
                         555 EAST OCEAN BOULEVARD
                         SUITE 620
                         LONG BEACH, CALIFORNIA 90802-5030

BARBARA MATSUKANE, CSR NO. 3618
JOSEPHINE MORA, CSR NO. 2707.
OFFICIAL REPORTERS

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT SOUTH "C"                    HON. RICHARD F. CHARVAT, JUDGE


THE PEOPLE OF THE STATE OF CALIFORNIA,    )
                                          )
                              PLAINTIFF,  )
                                          )
            VS.                           ) NO. NA 004741
                                          )
VONDELL LEWIS,                            ) REPORTER'S
                                          ) CERTIFICATE
                                          )
                              DEFENDANT.  )
                                          )


STATE OF CALIFORNIA      )
                         ) SS
COUNTY OF LOS ANGELES    )


        I, BARBARA MATSUKANE, OFFICIAL REPORTER OF THE

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS

ANGELES, DO HEREBY CERTIFY THAT THE FOREGOING PAGES 1 THROUGH

230 AND PAGES 235 THROUGH 240 COMPRISE A FULL, TRUE, AND

CORRECT TRANSCRIPT OF THE PROCEEDINGS AND TESTIMONY TAKEN IN

THE MATTER OF THE ABOVE-ENTITLED CAUSE ON MARCH 24, 26, 27,

28, 29, 1991, MAY 6, 1991.


        DATED THIS    24TH    DAY OF JULY, 1991.



                    _Barbara Matsukane_ CSR NO. 2336
                        OFFICIAL REPORTER

1    MAKE YOU AWARE OF ALL OF THAT.

2                    EVERYONE UNDERSTAND THE STIPULATION THEN?

3                    ALL RIGHT.

4                    THANK YOU VERY MUCH.

5            MR. CARBAUGH:  AND FURTHER, THAT FROM OUR KNOWLEDGE,

6    MISS GONZALES NEVER EVEN KNEW ABOUT THE IMMUNITY.

7            THE COURT:  YES.

8                    WE DISCUSSED THAT AT SIDE BENCH OUTSIDE OF

9    EVERYONE'S KNOWLEDGE.  SHE DID NOT HAVE KNOWLEDGE THAT

10   MR. CARBAUGH GRANTED IMMUNITY IN THAT CASE.

11                   THANK YOU ALL VERY MUCH.

12                   PEOPLE'S NEXT WITNESS?

13           MR. CARBAUGH:  BRENT JOSEPHSON.

14

15                        BRENT JOSEPHSON,

16   A PEOPLE'S WITNESS, HAVING BEEN FIRST DULY SWORN, TESTIFIED

17   AS FOLLOWS:

18           THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

19                   YOU DO SOLEMNLY SWEAR THAT THE TESTIMONY YOU

20   MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL BE

21   THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

22   HELP YOU GOD.

23           THE WITNESS:  I DO.

24           THE CLERK:  BE SEATED, PLEASE.

25                   AND PLEASE STATE AND SPELL YOUR NAME FOR THE

26   RECORD.

27           THE WITNESS:  BRENT JOSEPHSON.

28                   B-R-E-N-T.

```
 1        Q      WHEN DID YOU INTERVIEW EDNA GONZALES?

 2        A      APPROXIMATELY 2:30 IN THE AFTERNOON OR 2:30

 3   P.M. ON THE 31ST, THE FOLLOWING DAY.

 4        Q      THE DAY RIGHT AFTER THE SHOOTING?

 5        A      THAT'S CORRECT.

 6        Q      AND WHERE DID THE INTERVIEW TAKE PLACE?

 7        A      AT THE HARBOR POLICE STATION.

 8        Q      WAS SHE IN CUSTODY OR WAS SHE JUST BROUGHT DOWN

 9   FOR QUESTIONING AS A WITNESS?

10        A      SHE WAS BROUGHT DOWN FOR QUESTIONING AS A

11   WITNESS.

12        Q      ALL RIGHT.

13               AS A MATTER OF FACT, IN FRONT OF YOU, YOU HAVE

14   A WRITTEN STATEMENT PROVIDED BY EDNA GONZALES AS WELL AS --

15   AND THAT CONSISTS OF TWO PAGES AS WELL AS A THIRD PAGE WHICH

16   IS A DIAGRAM WITH HER WRITING ON THE DIAGRAM SHOWING THE

17   POSITION OF, ALLEGEDLY, THE DEFENDANT AND MR. FAIRLEY.

18        A      THAT'S CORRECT, SIR.

19        Q      ALL RIGHT.

20               I'M GOING TO ASK YOU FROM YOUR MEMORY AS BEST

21   AS YOU CAN, IF YOU NEED TO REFER TO HER WRITTEN STATEMENT,

22   LET US KNOW THAT YOU'RE DOING THAT, DESCRIBE WHAT SHE SAID

23   ABOUT THE INCIDENT.

24        A      SHE ADMITTED THAT SHE WAS AT, AS SHE PRONOUNCED

25   IT, A-DAY'S HOUSE, WHICH WAS THE LOCATION THERE ON GULF

26   STREET, AND THAT SHE HAD BEEN THERE THAT MORNING.

27               SAID ORIGINALLY THERE WAS AN ARGUMENT BETWEEN

28   A-DAY AND THE VICTIM, THAT THE DEFENDANT GOT INVOLVED IN.
```

1   REMOVE THE WEAPON AND WITH HIS LEFT HAND POINT IT AT THE

2   VICTIM, AND I'M QUOTING NOW FROM MISS GONZALES, THAT "I'LL

3   PUT IT THROUGH YOUR FUCKING HEAD."

4        Q    WHO DID SHE ATTRIBUTE THAT STATEMENT TO?

5        A    THE DEFENDANT.

6        Q    THANK YOU.

7        A    THE DEFENDANT THEN STATED OR CALLED THE VICTIM

8   A PUNK, AND FIRED ONE SHOT.

9        Q    WHAT DID SHE THEN SEE?

10        A    SHE ACTUALLY SAID THAT SHE SAW THE FLASH COME

11   FROM THE WEAPON AS THE SHOT WAS FIRED.

12              SHE THEN SAW THE VICTIM FALL TO THE GROUND AND

13   SAW THE DEFENDANT RUN OFF THROUGH THE BUILDINGS.

14        Q    THROUGHOUT THIS STATEMENT, SIGNED STATEMENT BY

15   MISS GONZALES, SHE REFERS TO OR IT'S WRITTEN DOWN THE VICTIM

16   IS CURTIS; IS THAT CORRECT?

17        A    THAT'S CORRECT.

18        Q    IS THAT HOW SHE REFERRED TO HIM AS CURTIS?

19        A    YES, SHE DID.

20        Q    AND SHE REFERRED TO THE DEFENDANT AS VONDELL;

21   IS THAT CORRECT?

22        A    THAT'S CORRECT, SIR.

23        Q    AND IS THAT THE WORD SHE USED TO DESCRIBE THE

24   PERSON WHO DID THE SHOOTING?

25        A    YES.

26        Q    DURING YOUR INTERVIEW WITH MISS GONZALES ON THE

27   31ST, THE DAY AFTERWARDS, HOW WOULD YOU DESCRIBE HER, AND YOU

28   HAD A CHANCE IT SEE HER HERE YESTERDAY; IS THAT CORRECT?

1                    CROSS-EXAMINATION

2    BY MR. WELCH:

3           Q       GOOD MORNING, DETECTIVE.

4           A       GOOD MORNING, SIR.

5           Q       THE CRIME, AS YOU KNOW, IT ACTUALLY OCCURRED ON

6    AUGUST 30TH; IS THAT CORRECT?

7                   THAT WAS A THURSDAY MORNING?

8           A       THAT'S CORRECT, SIR.

9           Q       AND AS I UNDERSTAND YOUR TESTIMONY, YOU

10   INTERVIEWED MISS GONZALES ON FRIDAY THE 31ST, THAT WOULD BE

11   24 HOURS LATER, ACTUALLY, SOME 36 HOURS LATER?

12          A       THAT'S CORRECT, SIR.

13          Q       NOW WAS SHE IN CUSTODY ALL THIS TIME?

14          A       NO, SIR, SHE WAS NOT.

15          Q       WAS SHE ORIGINALLY TAKEN TO THE STATION AS A

16   WITNESS AND HELD UNTIL YOU INTERVIEWED HER THE NEXT DAY, OR

17   WAS SHE ALLOWED TO GO AND COME BACK?

18          A       NO, SIR.  SHE WAS NOT TAKEN IN CUSTODY.  SHE

19   WAS NOT AT THE CRIME SCENE WHEN WE ARRIVED.  WE DID NOT

20   LOCATE HER UNTIL THE FOLLOWING DAY.

21          Q       WHERE DID YOU INTERVIEW HER?

22          A       AT THE HARBOR POLICE STATION.

23          Q       DID YOU LOCATE HER SOMEPLACE AND BRING HER TO

24   THE POLICE STATION?

25          A       YES, SIR, I DID.

26          Q       AND AT THE TIME THAT YOU INTERVIEWED HER, DID

27   YOU QUESTION HER ABOUT ANY RECENT DRUG USE?

28          A       YES, SIR, I DID.

1          Q        AND DID SHE ADMIT TO YOU THAT SHE HAD BEEN

2    USING DRUGS WITHIN 24 HOURS OF HER INTERVIEW WITH YOU?

3          A        AS I RECALL, SIR, YES, SHE DID.

4          Q        YOU HEARD HER TESTIMONY HERE IN COURT

5    YESTERDAY; IS THAT CORRECT?

6          A        YES, SIR, I DID.

7          Q        YOU RECALL THE PART THAT WHEN SHE WAS TELLING

8    US THAT SHE WAS IN THE LIVING ROOM OF A-DAY'S HOUSE LOOKING

9    OUT THE WINDOW, AND SHE SAID NO ONE ELSE WAS THERE WITH HER.

10               DO YOU RECALL THAT PORTION OF HER TESTIMONY?

11         A        SIR, I RECALL THE PORTION WHERE SHE WAS AT THE

12   WINDOW.

13               I DON'T RECALL THE PART WHERE SHE SAID THERE

14   WAS NO ONE THERE WITH HER.

15               AS I RECALL, I BELIEVE SHE SAID EFRAM WAS WITH

16   HER.

17         Q        DO YOU RECALL WHEN SHE SAID EFRAM AND ONE OF

18   THE OTHER GIRLS WAS IN THE BACK ROOM?

19         A        NO, I DON'T.

20         Q        WHEN YOU TALKED TO HER, ISN'T IT A FACT SHE

21   TOLD YOU THAT WHILE SHE WAS WATCHING OUT THE WINDOW, THAT

22   EFRAM WAS TRYING TO GET FRESH WITH HER?

23         A        THAT'S CORRECT, SIR.

24         Q        AND I THINK SHE USED ANOTHER TERM OTHER THAN

25   THAT.

26               WAS THAT THE MEANING?

27         A        THAT'S CORRECT, SIR.

28         Q        SHE SAID "MESSING WITH ME"?

```
 1          A       THAT IS CORRECT, SIR.

 2          Q       DID YOU INTERPRET THAT TO MEAN -- I THINK SHE

 3   EVEN SAID TRYING TO MAKE TIME WITH ME; IS THAT CORRECT?

 4          A       THAT'S CORRECT, SIR.

 5          Q       THAT WAS GOING ON WHILE SHE WAS WATCHING OUT

 6   THE WINDOW?

 7          A       THAT'S CORRECT, SIR.

 8          Q       NOW IN THE PHOTOS THAT YOU HAVE IN FRONT OF

 9   YOU, I BELIEVE YOU HAVE PEOPLE'S 10, WHICH IS THE FRONT VIEW

10   OF 309 GULF STREET; IS THAT CORRECT?

11          A       THAT'S CORRECT, SIR.

12          Q       THAT'S THE RESIDENCE OR THE HOUSE THAT WE REFER

13   TO THROUGHOUT THE TRIAL AS A-DAY'S HOUSE?

14          A       THAT'S CORRECT, SIR.

15          Q       AND THAT SHOWS THE WINDOWS OF THE FRONT OF THE

16   HOUSE; IS THAT CORRECT?

17          A       IT SHOWS THE FAR SOUTH WINDOW.  YES, IT DOES.

18          Q       DID YOU EVER GO IN THAT HOUSE?

19          A       NO, SIR, I DID NOT.

20          Q       SO YOU DON'T KNOW WHETHER THOSE WINDOWS, WHAT

21   ROOMS THEY REFER TO FROM THE OUTSIDE OF THE HOUSE.

22          A       NOT ON PERSONAL KNOWLEDGE, NO, SIR.

23          Q       YOU NEVER ENTERED THE HOUSE AT ALL?

24          A       I DID NOT.

25          Q       DID YOU EVER GO IN THE HOUSE NEXT DOOR, 315?

26          A       NO, I DID NOT.

27   MR. WELCH:    THANK YOU.

28          I HAVE NO FURTHER QUESTIONS.
```



SUPERIOR COURT PROBATION OFFICER'S REPORT. CONSISTING OF (14) PAGES.

SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

PROBATION OFFICER'S REPORT

REPORT SEQUENCE NO.  1

| DEFENDANT'S NAME(S) | COURT | JUDGE | COURT CASE NO |
|---|---|---|---|
| VONDELL LEWIS | SO-C | CHARVAT | NA004741 |

| ADDRESS (PRESENT/RELEASE) RELEASE ADDRESS UNK. CURRENTLY RESIDING IN L.A. COUNTY JAIL | HEARING DATE | DEFENSE ATTY. | PROSECUTOR |
|---|---|---|---|
| | 5-6-91 | WELCH | CARBAUGH |

| BIRTHDATE 5-23-66 | AGE 24 | SEX MALE | RACE BLACK | DPO | AREA OFFICE | PHONE NO. |
|---|---|---|---|---|---|---|
| CITIZENSHIP STATUS U.S. | | DRIVER'S LICENSE/EXP. DATE U3012555/92 | | PALAEOLOGUS | LONG BEACH | 491-5869 |

| PROBATION NO X- 409103 | CII NO. A06464111 | BOOKING NO 2327620 | TYPE REPORT |
|---|---|---|---|
| DAYS IN JAIL THIS CASE ☒ ESTIMATED ☐ VERIFIED 142 DAYS | | CUSTODY STATUS/RELEASE DATE REMANDED | _X_ Probation and sentence ___ Pre-Conviction (131.3 CCP) ___ Post sentence ___ Diversion (Specify) _____ |

PRESENT OFFENSE: LEGAL HISTORY

CHARGED with the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)

187(A) PC (MURDER), COUNT I WITH 12022.5(C)-1203.06.

CONVICTED of the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)

SECOND DEGREE MURDER.  SPECIAL ALLEGATIONS FOUND TRUE.

| CONVICTED BY JURY | DATE OF CONVICTION/REFERRAL 4-1-91 | COUNT(S) CONTINUED TO P & S FOR DISPOSITION NONE |
|---|---|---|
| PROPOSED PLEA AGREEMENT N/A | | SOURCES OF INFORMATION N/A |
| DATE(S) OF OFFENSE 8-30-90 | | TIME(S) 0600 HOURS |

| DEFENDANT: (SEE PRIOR RECORD SECTION) | ☒ N/A ☐ ON PROBATION ☐ ON PAROLE-REMAINING TIME _____ | ☐ SENTENCED TO STATE PRISON/COUNTY JAIL ON CASE _____ ☐ PENDING PROBATION VIOLATION ☐ PENDING NEW CASE | HOLD/WARRANTS: ☐ YES ☒ NO |
|---|---|---|---|

RECOMMENDATION:

| ☐ PROBATION | ☒ DENIAL | ☐ DIAGNOSTIC STUDY | ☐ CYA | ☐ OTHER _____ |
|---|---|---|---|---|
| | ☐ COUNTY JAIL | ☐ 707.2 WIC | | |
| | ☒ STATE PRISON | ☐ 1203.03 PC | | |

| PRESENT OFFENSE: (CONTINUED) | SOURCES OF INFORMATION (this page) BOOKING |
|---|---|

| ARREST DATE | TIME | BOOKED AS | OFFENSE | LOCATION OF ARREST | ARREST IN AGENCY |
|---|---|---|---|---|---|
| 12-12-90 | 1326 HRS | VONDELL LEWIS | 187(A) PC | | LAPD |

| CO-DEFENDANT(S) NONE | CASE NO. | DISPOSITION |
|---|---|---|

**ELEMENTS AND RELEVANT CIRCUMSTANCES OF THE OFFENSE:**

ON AUGUST 30, 1990, THE DEFENDANT SHOT AND KILLED CURTIS FAIRLEY.

ACCORDING TO THE POLICE REPORT REGARDING THE PRESENT OFFENSE, AT 6:00 A.M., THE VICTIM AND DEFENDANT WERE STANDING ON THE SIDEWALK IN FRONT OF A RESIDENCE, WHEN THEY BEGAN A VERBAL ARGUMENT WHICH EVOLVED INTO A PHYSICAL ALTERCATION. AT THIS TIME, THE DEFENDANT REMOVED A SMALL HANDGUN FROM HIS PANTS POCKET, FIRED ONE ROUND, STRIKING CURTIS FAIRLEY IN THE HEAD. AS THE VICTIM FELL TO THE GROUND, THE DEFENDANT FLED THE SCENE. THE VICTIM WAS TRANSPORTED TO A HOSPITAL AND PRONOUNCED DEAD LATER THAT EVENING.

THE AREA WHERE THE CRIME OCCURRED WAS A HEAVILY NARCOTIC AND GANG LOCATION, FREQUENTED BY WATERFRONT PIRU BLOOD STREET GANG. BOTH THE DEFENDANT AND THE VICTIM WERE KNOWN TO ASSOCIATE WITH THE WATERFRONT PIRU GANG.

-2- (LEWIS)

76P725B—Prob. 19SC (Rev. 6/85)  8/87

0004

| VICTIM: | SOURCES OF INFORMATION (this page) |
|---|---|
| | D.A. FILE, VICTIM'S FATHER |

| NAME | COUNT(S) |
|---|---|
| CURTIS FAIRLEY | COUNT I |

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)

DEATH.  VICTIM'S FATHER SUFFERED A LOSS OF APPROXIMATELY $6000.00
IN FUNERAL EXPENSES.

INSURANCE COVERAGE

NONE.

| LOSS: ☒ YES ☐ NO | ESTIMATED LOSS $6000.00 | RESTITUTION ALREADY MADE NO | APPLIED FOR VICTIM RESTITUTION FUND ☐ UNK ☐ YES ☒ NO |
|---|---|---|---|

VICTIM STATEMENT:

THE VICTIM'S FATHER STATES THAT A PERSON LIKE THE DEFENDANT SHOULD NOT BE ALLOWED ON THE STREETS, AS HE NOT ONLY KILLED HIS SON, BUT OTHER PEOPLE.  HE POINTS OUT THAT UNFORTUNATELY THE DEFENDANT WAS NOT CONVICTED ON THE OTHER CHARGES, AS THE POLICE WERE UNABLE TO ACCUMULATE ENOUGH EVIDENCE FOR A CONVICTION.  IN HIS OPINION THE DEFENDANT IS A MENACE TO SOCIETY, CONSTANTLY MURDERING PEOPLE.  ADDITIONALLY, HE STATES THAT THE DEFENDANT NEVER HELD A JOB, RELYING ON THE SALES OF NARCOTICS FOR HIS SUPPORT.  HE FEELS THAT THE DEFENDANT HAS FAILED TO CONTRIBUTE ANYTHING TO HELP HIMSELF OR OTHERS.

IN REGARDS TO HIS SON'S DEATH, MR. FAIRLEY STATES THAT THE LOSS OF HIS SON HAS AFFECTED THE ENTIRE FAMILY.  HE CLARIFIES THAT HIS SON WAS A WELL LIKED PERSON, WORKING HARD TO REHABILITATE HIMSELF.  ADDITIONALLY, HE POINTS OUT THAT HIS SON HAS BEEN CONTRIBUTING TO THE COMMUNITY BY COMPLETING VOLUNTEER

(CONTINUED, PAGE 4)

| RESTITUTION | TOTAL NUMBER OF VICTIMS | ESTIMATED LOSS TO ALL VICTIMS | VICTIM(S) NOTIFIED OF P&S HEARING ☐ YES ☐ NO |
|---|---|---|---|
| DOES DEFENDANT HAVE INSURANCE TO COVER RESTITUTION: ☐ YES ☐ NO | | INSURANCE COMPANY NAME/ADDRESS/TELEPHONE NO. | |

-3- (LEWIS)

_____ VICTIM LIST CONTINUES NEXT PAGE

76P725B—Prob. 19SC : Rev. 6 85) 8-87

VICTIM STATEMENT:   (CONTINUED)

WORK.  HE STATES THAT HE NEVER KNEW HIS SON HAD ANY TYPE OF INVOLVEMENT WITH GANG ACTIVITY, AS HE ALWAYS WORE APPROPRIATE CLOTHES DISPLAYING RESPECT.  MR. FAIRLEY PLANS ON ATTENDING    THE SENTENCING HEARING IN SUPPORT OF HIS SON, HOWEVER, HE POINTS OUT THAT THE ENTIRE INCIDENT HAS BEEN VERY DIFFICULT FOR HIM TO TALK ABOUT.

~4~  (LEWIS)

75C692G. — PROB. 5A

1    PRIOR RECORD:

```
┌─────────────────────────────────────────────────┐
│ SOURCES OF INFORMATION (this page)                │
│   CII, LASO, PROBATION, DEFENDANT                 │
└─────────────────────────────────────────────────┘
```

3    AKA'S:

### JUVENILE HISTORY:

10-21-80          LAPD - 187 PC (MURDER).  10-22-80 PETITIONED AND
                  DETAINED.  ON 1-27-81 DEFENDANT WAS COMMITTED TO
                  THE  CALIFORNIA  YOUTH  AUTHORITY  WHEN  HE  WAS
                  CONVICTED OF 192.1 PC (VOLUNTARY MANSLAUGHTER).
                  ON 6-9-87 THE DEFENDANT WAS DISCHARGED.

          (THE DEFENDANT INDICATES THAT THIS ARREST OCCURRED AT AGE
          14 WHEN HE GOT INTO A FIGHT WITH AN ADULT MALE WHO PULLED
          A KNIFE ON HIM.  HE EXPLAINS THAT ONCE THE KNIFE WAS
          PULLED,  HE  PROTECTED  HIMSELF  BY  SHOOTING   THE  MAN.
          DEFENDANT ADMITS TO VIOLATING HIS PAROLE FOR ABSCONDING
          AND THE USE OF ILLEGAL DRUGS.)

### ADULT HISTORY:

3-13-84           LAPD   -   11379.5   H&S   (TRANSPORT/SALE/ETC
                  PHENCYCLIDINE).  DEFENDANT WAS REFERRED TO THE
                  CALIFORNIA YOUTH AUTHORITY.

          (THE DEFENDANT INDICATES THAT ALTHOUGH HE WAS ARRESTED AND
          HELD IN CUSTODY, HE STATES THE CASE WAS A REJECT AND WAS
          NOT A CONVICTION.)

5-15-85           LAPD - 148.9 PC (FALSE IDENTIFICATION TO A PEACE
                  OFFICER).  ON 5-30-85 SAN PEDRO MUNICIPAL COURT
                  CASE NO. 851082, THE DEFENDANT WAS CONVICTED,
                  SENTENCED TO 24 MONTHS PROBATION WITH 15 DAYS IN
                  JAIL.

          (DEFENDANT STATES THAT HIS APARTMENT WAS RAIDED AND HE
          GAVE THE POLICE A FALSE NAME.)

6-28-87           LAPD - 602(E) PC (REFUSE TO LEAVE PROPERTY).  ON
                  9-8-87 SAN PEDRO MUNICIPAL COURT CASE NO.
                  87S02872, THE DEFENDANT WAS CONVICTED, PLACED ON
                  12 MONTHS PROBATION WITH 4 DAYS IN JAIL, OR A
                  FINE.

          (DEFENDANT STATES THAT THIS ARREST AND HIS OTHER ARREST
          FOR TRESPASSING OCCURRED WHEN HE WAS SPENDING TIME IN THE
          "PROJECTS" AND THE POLICE HARASSED HIM BY ORDERING HIM TO
          LEAVE.)

7-7-88            LAPD - 148 PC (OBSTRUCTS/RESISTS PUBLIC
                  OFFICER).   ON  8-17-88 CASE NO. 88S03047
                  DEFENDANT WAS CONVICTED OF 148 PC AND SENTENCED
                  TO 24 MONTHS PROBATION WITH A FINE.
```

-5- (LEWIS)

1       (AGAIN, THIS ARREST OCCURRED WHEN THE DEFENDANT WAS
2       HANGING OUT IN THE PROJECTS AFTER HE WAS TOLD TO LEAVE BY
      THE POLICE.)

3   1-5-89           LAPD - 602(E) PC (TRESPASS: REFUSE TO LEAVE
      PROPERTY). ON 1-6-89 SAN PEDRO MUNICIPAL COURT
4       CASE NO. 89S00096, THE CASE WAS DISMISSED IN THE
      FURTHERANCE OF JUSTICE.

5

6       (THE DEFENDANT INDICATES THAT HE WAS ARRESTED WHEN HE WAS
      IN THE PROJECTS WHERE HE REFUSED TO LEAVE.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

    -6- (LEWIS)

1  PERSONAL HISTORY:

SOURCES OF INFORMATION (this page)
DEFENDANT

2

3  SUBSTANCE ABUSE:

4  _____ No record, indication, or admission of alcohol or controlled substance abuse.

5   X   Occasional social or experimental use of ___ALCOHOL_____ acknowledged.

6   X   See below: Indication / admission of significant substance abuse problem.

7      Referred to Narcotic Evaluator ☐ Yes ☒ No          _____ Narcotic Evaluator's report attached

8

Additional information

9          THE  DEFENDANT  STATES  THAT  HE  BEGAN  USING

10  MARIJUANA  AND  COCAINE  IN  1984  AND  CONTINUED  TO  USE  SEVERAL  TIMES

11  A  MONTH.  HE  STATES  THAT  HE  HAS  NEVER  RECEIVED  TREATMENT  FOR  DRUG  OR

12  ALCOHOL  USE.

13

14

15

16

17

18

19

20

21

22

23

24

25

26  PHYSICAL / MENTAL / EMOTIONAL HEALTH:

27  _____ No indication or claim of significant physical/mental/emotional health problem.

28   X   See below:  Indication / claim of significant physical/mental/emotional health problem.

29

-7-  (LEWIS)
76P7258—Prob 19SC (Rev. 6/85)  8/87

1  PHYSICAL/MENTAL/EMOTIONAL HEALTH:  (CONTINUED)

2              THE DEFENDANT STATES THAT DURING LAST YEAR, HE

3  WAS SHOT IN THE NECK WHERE A BULLET IS LODGED.  HE STATES THAT HE

4  IS PARTIALLY PARALYZED AND ONLY HAS PARTIAL USE OF HIS RIGHT

5  SIDE.  ADDITIONALLY, HE SUFFERS FROM ASTHMA, CHEST PAINS, AND

6  HEART PROBLEMS.  HE CURRENTLY IS NOT TAKING ANY TYPE OF

7  MEDICATION.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

-8- (LEWIS)

76C692G — PROB. 5A

| PERSONAL HISTORY:<br>(CONTINUED) | SOURCES OF INFORMATION (this page)<br>DEFENDANT | | | |

| RESIDENCE | TYPE RESIDENCE<br>HOUSE | LENGTH OF OCCUPANCY<br>ON AND OFF SINCE BIRTH | MORTGAGE/RENT<br>0 | RESIDES WITH/RELATIONSHIP<br>GRANDMOTHER, GRANDFATHER, AND DEFENDANT'S MOTHER |
|---|---|---|---|---|
| RESIDENTIAL STABILITY LAST FIVE YEARS<br>FAIR | | CAME TO STATE / FROM<br>BIRTH | | CAME TO COUNTY / FROM<br>BIRTH |

Additional information

| MARRIAGE / PARENTHOOD | MARITAL STATUS<br>MARRIED | NAME OF SPOUSE / PRESENT COHABITANT<br>THERESA IAKOPO |
|---|---|---|
| LENGTH OF UNION<br>1989 THRU PRESENT | NO. OF CHILDREN THIS UNION<br>2 | SUPPORTED BY<br>AFDC |
| NO. PRIOR MARRIAGES / COHABITATIONS<br>NONE | NO. OF CHILDREN THESE UNIONS<br>NONE | SUPPORTED BY<br>N/A |
| NO. OF OTHER CHILDREN<br>NONE | SUPPORTED BY<br>N/A | |

Additional information

FORMAL EDUCATION:    THE DEFENDANT STATES THAT HE GRADUATED FROM
CENTENNIAL HIGH SCHOOL AND COMPLETED ONE YEAR OF COLLEGE AT HAWAII
PACIFIC COLLEGE LOCATED IN HONOLULU.   HE EXPRESSED A DESIRE TO CONTINUE
HIS GENERAL EDUCATION AND IS PRIMARILY INTERESTED IN THE FIELD OF
COMPUTERS.

-9- (LEWIS)

0011

| PERSONAL HISTORY:<br>(CONTINUED) | SOURCES OF INFORMATION (this page)<br>DEFENDANT |
|---|---|

| EMPLOYMENT STATUS | ☐ EMPLOYED<br>☒ UNEMPLOYED | REFERRED TO WORK FURLOUGH<br>☐ YES ☒ NO | EMPLOYER AWARE OF PRESENT OFFENSE<br>☒ N/A    ☐ YES    ☐ NO |
|---|---|---|---|

| PRESENT/~~LAST~~ EMPLOYER / ADDRESS / PHONE<br>GILBERT BAKER<br>MATES LIQUOR STORE<br>COMPTON, CA<br><br>☐ VERIFIED    ☐ UNVERIFIED | OCCUPATION<br>CLERK | PERIOD OF EMPLOYMENT<br>1984-1985 | GROSS MONTHLY WAGE<br>$1,000 |
|---|---|---|---|
| | EMPLOYMENT STABILITY<br>LAST 5 YEARS<br>POOR | TYPES OF PREVIOUS EMPLOYMENT<br>JANITOR | |

Additional information

| FINANCIAL STATUS | INCOME STABILITY<br>POOR | NET MONTHLY INCOME<br>0 |
|---|---|---|

| PRIMARY INCOME SOURCE<br>NONE | SECONDARY INCOME SOURCE(S)<br>NONE | EST. TOTAL ASSETS<br>NONE | EST. TOTAL LIABILITIES<br>NONE |
|---|---|---|---|

MAJOR ASSETS / ESTIMATED VALUE

NONE

MAJOR LIABILITIES / ESTIMATED AMOUNT (MONTHLY)

NONE

Additional information

GANG ACTIVITY    ☒ YES    ☐ NO      Name of Gang _____

-10- (LEWIS)

76P725B—Prob 19SC (Rev 6 85) 8 87

GANG ACTIVITY:

        THE DEFENDANT STATES THAT FROM AGE 14 THROUGH 17 HE WAS NOT INVOLVED IN GANG ACTIVITY AS HE HAD BEEN LOCKED UP IN THE CALIFORNIA YOUTH AUTHORITY. MORE RECENTLY, HE HAS BECOME INVOLVED WITH THE WATERFRONT PIRU. THE DEFENDANT IS KNOWN AS BIG "V".

-11- (LEWIS)

76C692G - PROB. 5A

DEFENDANT'S STATEMENT:

     REGARDING THE PRESENT OFFENSE, THE DEFENDANT CLAIMS THAT HE WAS ARGUING WITH THE VICTIM WHEN SOMEONE DROVE BY AND SHOT THE VICTIM. HE DENIED HARMING THE VICTIM IN ANY WAY. THE DEFENDANT EXPLAINS THAT THE PERSON WHO OWNED THE HOUSE WHERE THE ARGUMENT TOOK PLACE, WANTED THEM TO LEAVE. HE IS NOT CERTAIN AS TO WHO FIRED THE SHOT. ALTHOUGH HE DOES NOT KNOW WHY THE WITNESS LIED ABOUT SEEING HIM FIRE THE GUN, HE SUSPECTS THAT THE FEMALE WITNESS WAS PRESSURED BY THE POLICE, OR GIVEN DRUGS. HOWEVER, HE OFFERS NO EXPLANATION AS TO WHY THE POLICE WOULD WANT TO PRESSURE THE WITNESS INTO LYING EXCEPT THAT THE VICTIM'S FATHER HAD BEEN PRESSING THE ISSUE SO THAT AN ARREST WOULD BE MADE. FURTHER, HE CLAIMS THAT IN THE PAST HE HAS AIDED THE POLICE WITH GANG ACTIVITY, AS THEY WOULD CALL ON HIM TO HELP WHEN THERE WERE PROBLEMS IN THE AREA. IN HIS OPINION, HE WAS RAILROADED, HOWEVER, HE STATES THAT HE HAS ACCEPTED THE FACT THAT HE WAS FOUND GUILTY AND THAT HE WILL HAVE TO LIVE WITH IT.

INTERESTED PARTIES:

     THE INVESTIGATING OFFICER STATES THAT THE DEFENDANT HAS A REAL PROBLEM AS HE HANDLES ALL OF HIS COMPLAINTS WITH OTHER INDIVIDUALS BY KILLING THEM. HE IS CONCERNED FOR THE SAFETY OF THE MEMBERS OF THE COMMUNITY, CLARIFYING THAT A HIGH-BASE TERM OF STATE PRISON IS WARRANTED. HE FEELS THAT THE

-12- (LEWIS)

76C692G — PROB. 5A

0014

1   DEFENDANT SHOULD BE SENTENCED TO AS MUCH TIME AS POSSIBLE.

2   FURTHER, HE POINTS OUT THAT THE DEFENDANT IS AN ACTIVE DRUG USER,

3   DRUG DEALER AND GANG MEMBER WHO HAD BEEN HIDING OUT, PRESSURING

4   OTHERS AND CONTROLLING OTHERS' LIVES TO DO WHAT HE WANTED.

5   EVALUATION:

6            AS INDICATED BY THE DEFENDANT'S PRIOR RECORD,

7   THE PRESENT OFFENSE IS NOT AN ISOLATED INCIDENT.  THE DEFENDANT

8   HAS A PRIOR ARREST FOR MURDER, CLEARLY ESTABLISHING A PATTERN OF

9   VIOLENT BEHAVIOR.  HE IS A KNOWN GANG MEMBER, ADMITTING TO

10  REGULAR DRUG USE.  BEING UNEMPLOYED, THE DEFENDANT HAS FAILED TO

11  CONTRIBUTE ANYTHING POSITIVE TO THE COMMUNITY RELYING ON THE

12  COUNTY WELFARE SYSTEM TO SUPPORT HIS DEPENDENCE.

13           THE DEFENDANT HAS CLEARLY PROVEN TO POSE A

14  THREAT TO THE COMMUNITY.  THE PRESENT OFFENSE IS THE DEFENDANT'S

15  SECOND CRIMINAL CONVICTION WHICH HAS RESULTED WITH THE LOSS OF

16  HUMAN LIFE.  THE VICTIM AND HIS FAMILY'S LOSS CAN NEVER BE

17  RESTORED.  THE DEFENDANT FAILS TO SHOW REMORSE FOR HIS ACTIONS,

18  LACKING CONCERN FOR THE VICTIM OR VALUE FOR HUMAN LIFE.  HE HAS

19  BEEN UNABLE TO LEARN FROM HIS PAST MISTAKES, PRIOR TIME SPENT

20  IN CUSTODY HAS FAILED TO MOTIVATE THE DEFENDANT TO MODIFY HIS

21  BEHAVIOR.  THE MOST APPROPRIATE SOLUTION TO OFFER PROTECTION TO

22  THE COMMUNITY IS TO SENTENCE THIS DEFENDANT TO STATE PRISON FOR

23  THE LONGEST PERIOD OF TIME POSSIBLE.

    -13- (LEWIS)

76C692G – PROB. 5A

SENTENCING CONSIDERATIONS:

THE DEFENDANT IS INELIGIBLE FOR PROBATION PURSUANT TO SECTION 1203.06(E)(1) PC.

CIRCUMSTANCES IN AGGRAVATION:

1. THE CRIME INVOLVED GREAT VIOLENCE, GREAT BODILY HARM, THREAT OF GREAT BODILY HARM, OR OTHER ACTS DISCLOSING A HIGH DEGREE OF CRUELTY, VICIOUSNESS OR CALLOUSNESS, WHETHER OR NOT CHARGED OR CHARGEABLE AS AN ENHANCEMENT UNDER SECTION 12022.7.

2. THE PLANNING, SOPHISTICATION AND PROFESSIONALISM WITH WHICH THE CRIM WAS CARRIED OUT, OR OTHER FACTS, INDICATE PRE-MEDITATION.

3. THE DEFENDANT HAS ENGAGED IN A PATTERN OF VIOLENT CONDUCT WHICH INDICATES A SERIOUS DANGER TO SOCIETY.

4. THE DEFENDANT'S PRIOR CONVICTIONS AS AN ADULT OR THE ADJUDICATIONS OF COMMISSIONS OF CRIMES AS A JUVENILE ARE NUMEROUS OR OF INCREASING SERIOUSNESS.

5. THE DEFENDANT'S PRIOR PERFORMANCE ON PAROLE WAS UNSATISFACTORY.

CIRCUMSTANCES IN MITIGATION:

NONE.

THE OVERWHELMING CIRCUMSTANCES IN AGGRAVATION WARRANT THE HIGH-BASE TERM OF STATE PRISON.

RECOMMENDATION:

IT IS RECOMMENDED THAT PROBATION BE DENIED AND THAT DEFENDANT BE SENTENCED TO STATE PRISON WITH THE

-14- (LEWIS)

76C692G — PROB. 5A

0016

1  PRE-IMPRISONMENT CREDIT OF 142 DAYS; THAT THE COURT ORDER THE

2  DEFENDANT TO PAY A RESTITUTION FINE OF $100. AS PROVIDED IN

3  SUBDIVISION (A) OF SECTION 13967 OF THE GOVERNMENT CODE.

4  RESPECTFULLY SUBMITTED,

5  BARRY J. NIDORF,
   PROBATION OFFICER
6

7

8  BY _____
      G. PALAEOLOGUS, DEPUTY
9     LONG BEACH AREA OFFICE
      (213) 491-5869

10 READ AND APPROVED:              I HAVE READ AND CONSIDERED
                                   THE FOREGOING REPORT OF THE
11                                 PROBATION OFFICER.

12 _____

13    FRANK COOKE, SDPO

14 (SUBMITTED 4-29-91)             _____
   (TYPED 4-29-91)                 JUDGE OF THE SUPERIOR COURT
15 GP:TXRX:CS (8)

16            IF PROBATION IS GRANTED, IT IS RECOMMENDED THAT

17 THE COURT DETERMINE DEFENDANT'S ABILITY TO PAY COST OF PROBATION

18 SERVICES PURSUANT TO SECTION 1203.1B PENAL CODE.  COST OF

19 PRESENTENCE INVESTIGATION AND PRESENTENCE REPORT — (412.00.  COST

20 OF SUPERVISION - $28.00 PER MONTH.

21

22

23

      -15- (LEWIS)

76C692G — PROB. 5A