# EXHIBIT 3
# Part 2 of 2

7

1    packet, did you not?

2         INMATE LEWIS:  Yes, sir.

3         PRESIDING COMMISSIONER GARNER:   For this

4    Hearing.

5         INMATE LEWIS:  Get that out.

6         PRESIDING COMMISSIONER GARNER:   What I'd

7    like for you to do when you get it out, you

8    should have a form similar to that and I just

9    want to make sure that you've got everything

10   that we have.

11        INMATE LEWIS:  Yes, it's the same.

12        PRESIDING COMMISSIONER GARNER:   Okay.   If

13   you'll just push it off to the side there and

14   the Officer will give it to me, thank you.

15   Okay, Mr. Lewis, do you have any additional

16   documents you'd like to submit to the Board

17   today?

18        INMATE LEWIS:  Yes, I do.  I'd like to

19   submit (indiscernible) transcript and relevant

20   portions of the trial transcript.   There we go.

21   This is a (indiscernible) transcript of hearing

22   held January 9, 1991 in this court before Judge

23   Peter J. March (phonetic) which was the probable

24   cause hearing to hold me for the crime that I'm

25   currently before this Panel for.   And in

26   addition, I'd like to submit trial transcripts

27   of hearings in Superior Court of Los Angeles,

8

1    dated January 23, 1991, February 20, 1991, March

2    6, 1991, March 14, 1991, March 20, March 25, 26,

3    27, 28th, 1991.

4            PRESIDING COMMISSIONER GARNER:    Is that

5    it, sir?

6            INMATE LEWIS:    Yes.

7            PRESIDING COMMISSIONER GARNER:    All

8    right.  Any objections, preliminary objections?

9            INMATE LEWIS:    Yes, I have a question

10    regarding 3041, of the reliance on 3041.    In

11    particular, under subsection (b).    Is that --

12    the focus of this question is, is that the focus

13    of the suitability that's going to be discussed

14    today?

15            PRESIDING COMMISSIONER GARNER:    The --

16    we're going to use and in the entirety and

17    relevant sections of both 3041 and 3042, so it's

18    not being tailored to any one specific

19    subsection.  It's all incorporated.

20            INMATE LEWIS:    Okay, 3042, with respect

21    to notices and outside information regarding my,

22    you know, threat or harm to society.    That's

23    what you mean.

24            DEPUTY COMMISSIONER BLONIEN:    Your

25    suitability for parole?

26            PRESIDING COMMISSIONER GARNER:

27    Suitability for parole, yes.  And all relevant

9

1   documents that are available to the Board will

2   be considered, including the ones that you

3   provided to us today.

4        INMATE LEWIS:  Okay, see I'm trying to

5   clarify the reasons in 3041(b), because my

6   understanding is that 3041(a) is in applicable

7   until the Panel first decides whether I fit

8   within the criteria of 3041(b).

9        PRESIDING COMMISSIONER GARNER:  Well, you

10  have to be found suitable before any other

11  findings can be made.

12       INMATE LEWIS:  I know, that's what I'm

13  understanding.  I'm not understanding, that's

14  why I'm trying to ask for clarification with

15  respect to the Panel's view of 3041(b).  Does

16  3041(b) authorize this Panel to go outside the

17  reasons set forth within that Penal Code

18  statute?  That's my question.

19       PRESIDING COMMISSIONER GARNER:  I'll

20  repeat myself one more time, that it is we're

21  going to be using 3041 and 3042 in its entirety.

22  If we were only going to be using portions of it

23  then what we would do is we would say that.

24       INMATE LEWIS:  Okay, really I'm sorry.

25       PRESIDING COMMISSIONER GARNER:  That's

26  okay.

27       INMATE LEWIS:  I've got to -- I beg the

10

 1  Panel's pardon.  Oh, I know, this is my first

 2  time representing myself and this is new to me.

 3  So, I'm not trying --

 4          DEPUTY COMMISSIONER BLONIEN:  And it

 5  maybe helpful in representing yourself, rather

 6  than trying to sound like an attorney, just in

 7  plain language ask us your question.

 8          INMATE LEWIS:  Okay.

 9          DEPUTY COMMISSIONER BLONIEN:  And we'll

10  answer you in plain language.

11          INMATE LEWIS:  Thank you.

12          DEPUTY COMMISSIONER BLONIEN:  And in that

13  way, there's no -- you just don't have to cite

14  code sections and all that, just ask us the

15  question and we'll answer it.

16          INMATE LEWIS:  All right, thank you.

17          PRESIDING COMMISSIONER GARNER:  All

18  right, we're okay.  Let's -- let me ask you now,

19  do you want to speak with the panel today?

20          INMATE LEWIS:  Yes, of course.

21          PRESIDING COMMISSIONER GARNER:  Do you

22  want to speak about the life crime?  It's your

23  right to or not to do it.

24          INMATE LEWIS:  It's my -- I was speak

25  about life crime but I will -- note tell the

26  Panel and I've already claimed innocence for my

27  entire incarceration, so, if the Panel is going

11

1    to, you know, require that I admit to any

2    crimes, then I will not be admitting to any

3    crimes.  But with respect to the facts of the

4    case, yes, I will gladly discuss those.

5            PRESIDING COMMISSIONER GARNER:  Okay.

6    Can I get you to raise your right hand then,

7    sir.  Do you solemnly swear or affirm that the

8    testimony you give at this hearing will be the

9    truth, the whole truth and nothing but the

10    truth?

11            INMATE LEWIS:  Yes, I do.

12            PRESIDING COMMISSIONER GARNER:  All

13    right, thank you.  All right, what I will start

14    with is a summary of the life crime and I'm

15    going to be reading this, since it was for a

16    more recent Board reports was referenced back to

17    the August 2002, and this was the report that

18    was done by Correctional Counselor I, T. Boles,

19    B-O-L-E-S, and that will be under the tab of

20    Board reports.  At about 6:00 a.m. on August 30,

21    1990, the victim Curtis, C-U-R-T-I-S, Fairley,

22    F-A-I-R-L-E-Y, and Lewis were standing on the

23    sidewalk in Los Angeles in front of a residence

24    when they began a verbal argument which

25    escalated into a fist -- into a physical

26    altercation.  The witness said Lewis removed a

27    small handgun from his pants pocket and fired

12

1   one round striking Curtis Fairley in the head.

2   As Fairley fell, Lewis fled the scene.  Fairley

3   was transported to the hospital and died the

4   same evening.  The area where the crime occurred

5   was a heavy narcotic and gang location.  Bot

6   Lewis and Fairley were known to associate with

7   the Waterfront Piru, P-I-R-U, gang.

8   That's a pretty short summary of the events, and

9   let me just start by asking a question, is it a

10  fairly accurate version, and if not, we'll

11  rebuild it and give you an opportunity to

12  respond to particular questions.

13          INMATE LEWIS:  It's not accurate.

14          PRESIDING COMMISSIONER GARNER:  All

15  right, let's rebuild it.  Were you on a sidewalk

16  in Los Angeles at about 6:00 a.m. on August 30,

17  1990?

18          INMATE LEWIS:  Oh, yes, I was.

19          PRESIDING COMMISSIONER GARNER:  So, you

20  were there.  What -- sidewalk in Los Angeles is

21  kind of a wide description for a city that size.

22  Do you remember exactly where you were at that

23  time?  The name of the street?

24          INMATE LEWIS:  (indiscernible) Street,

25  east, yeah, (indiscernible) Street

26  (indiscernible).  I was there.

27          PRESIDING COMMISSIONER GARNER:  Okay.

13

1    Did you know a Mr. Curtis Fairley?

2         INMATE LEWIS:  Yes, I did.

3         PRESIDING COMMISSIONER GARNER:  And was

4    Mr. Fairley in the same vicinity with you at

5    that approximate time?

6         INMATE LEWIS:  Yes, he was.

7         PRESIDING COMMISSIONER GARNER:  Did an

8    argument develop?

9         INMATE LEWIS:  I have to explain that.

10   An argument developed between me and Fairley.

11   regarding him wanting some drugs to use.  That

12   argument was outside, and it was a whole lot of

13   people out there, so -- and it was a lot of

14   drinking and I was paralyzed at that time.  So,

15   we were verbally arguing, and it didn't escalate

16   into a physical altercation because I was

17   paralyzed.  So --

18        PRESIDING COMMISSIONER GARNER:  Let me

19   stop you for a second.  What was the nature of

20   your paralysis?

21        INMATE LEWIS:  I was -- had a gunshot

22   wound by a 22 and the bullet lodged in my 4th

23   and 5th vertebrae.

24        PRESIDING COMMISSIONER GARNER:  And what

25   portion of your body was paralyzed?

26        INMATE LEWIS:  My right arm.

27        PRESIDING COMMISSIONER GARNER:  Your

14

1    right arm.  What was the nature of the

2    paralysis?  You had no movement, partial

3    movement?

4           INMATE LEWIS:  Partial movement, yes.

5           PRESIDING COMMISSIONER GARNER:  So --

6           INMATE LEWIS:  So, we were out there on

7    the sidewalk and it was an argument but this

8    record don't reflect that it was twenty people

9    out there.

10          PRESIDING COMMISSIONER GARNER:  All

11   right, well it does now.

12          INMATE LEWIS:  Okay.

13          PRESIDING COMMISSIONER GARNER:  So,

14   you've got that on there.  Let me ask you, were

15   there other people that were involved in the

16   verbal argument or was it just you and Mr.

17   Fairley?

18          INMATE LEWIS:  Well, my verbal argument

19   with him was regarding the --

20          PRESIDING COMMISSIONER GARNER:  His need

21   to buy drugs.

22          INMATE LEWIS:  -- Yeah, his need.

23   That's, that's it.

24          PRESIDING COMMISSIONER GARNER:  Okay.

25   So, at some point it did escalate into the

26   physical altercation.

27          INMATE LEWIS:  It never escalated into a

15

1   physical altercation.  It almost escalated into

2   a physical altercation but I was paralyzed, and

3   he knowed that I can't fight him.

4           PRESIDING COMMISSIONER GARNER:  Did Mr.

5   Fairley strike you?

6           INMATE LEWIS:  No, he did not.

7           PRESIDING COMMISSIONER GARNER:  Did he

8   have any body contact with you at all?

9           INMATE LEWIS:  No, he did not.

10          PRESIDING COMMISSIONER GARNER:  None at

11  all.  Did you happen to know if Mr. Fairley was

12  armed?

13          INMATE LEWIS:  No, I did not.

14          PRESIDING COMMISSIONER GARNER:  Did you

15  ever see an occasion where you'd been with him

16  previously that he was armed?

17          INMATE LEWIS:  Well, we were associates,

18  and, you know, we were involved in criminal

19  activity, sell drugs.  You know, we would do

20  that daily.  We were young.  We grew up together

21  so I'd seen him with weapons before, yes.

22          PRESIDING COMMISSIONER GARNER:  Okay,

23  thank you.  And this was an area where narcotics

24  transactions occurred?

25          INMATE LEWIS:  Yes, it was.

26          PRESIDING COMMISSIONER GARNER:  And it

27  was also an area of gang activity?

16

1          INMATE LEWIS:  Yes, it was.

2          PRESIDING COMMISSIONER GARNER:  Would

3   this area have been within the territory of any

4   definition of your Waterfront Piru?

5          INMATE LEWIS:  It's all the -- it would

6   be the west side of Wilmington.

7          PRESIDING COMMISSIONER GARNER:  And is it

8   correct that this is six in the morning?  Is

9   that a correct time when this occurred?

10         INMATE LEWIS:  All this was leading up to

11  six in the morning when he was actually shot.

12         PRESIDING COMMISSIONER GARNER:  All

13  right.  So all you were out there fairly early

14  is what I'm getting at?

15         INMATE LEWIS:  We were out there all

16  night.

17         PRESIDING COMMISSIONER GARNER:  Oh.

18         INMATE LEWIS:  From the previous, when it

19  got dark the previous night, leading all the way

20  up to the morning.  This was a crack house with

21  -- where drugs were being sold under the guise

22  of night.  So, everything was done during that

23  time, drinking, using drugs, selling drugs, all,

24  you know, under the guise of darkness.

25         PRESIDING COMMISSIONER GARNER:  I'm with

26  you now.  Mr. Fairley using any drugs or alcohol

27  during the course of that evening leading up to

17

1   the morning?

2          INMATE LEWIS:  I didn't witness any of --

3          PRESIDING COMMISSIONER GARNER:  That's

4   fine.  How about yourself?

5          INMATE LEWIS:  Yes, I had used drugs or

6   alcohol.

7          PRESIDING COMMISSIONER GARNER:  What did

8   you (indiscernible)?  Specifically.

9          INMATE LEWIS:  Marijuana and beer.

10          PRESIDING COMMISSIONER GARNER:  Okay.

11   We've got the dispute over Mr. Fairley wanting

12   to buy the drugs.  We had the indication that he

13   did not have any body contact with you.  Did you

14   have any contact with his body?

15          INMATE LEWIS:  No, sir.

16          PRESIDING COMMISSIONER GARNER:  Okay.

17   That then leads us to this --

18          INMATE LEWIS:  Oh, I would like to

19   interject -- I did have body contact with him.

20   Once he was shot, I was in the street, he was

21   shot, I ran over there and I picked him up so I

22   did have body contact with him.

23          PRESIDING COMMISSIONER GARNER:  Yeah, we

24   can get to that.  I was speaking prior to the

25   shooting?

26          INMATE LEWIS:  Oh, no, prior to the

27   shooting.

18

1          PRESIDING COMMISSIONER GARNER:  Okay.

2    And at this point, the indication is that there

3    was a witness and we don't have any more than

4    that, saw you remove a small handgun from pants

5    pocket and fire one round striking Mr. Fairley

6    in the head.  And is that an accurate --

7          INMATE LEWIS:  No, sir, that is not

8    accurate.

9          PRESIDING COMMISSIONER GARNER:  Well,

10   let's just indicate -- you indicate that you did

11   go and pick Mr. Fairley up after he had been

12   shot.

13          INMATE LEWIS:  Yes, sir, I did.

14          PRESIDING COMMISSIONER GARNER:  Where

15   were you before you heard the shot?

16          INMATE LEWIS:  I was standing in the

17   street.

18          PRESIDING COMMISSIONER GARNER:  About how

19   far away from him?

20          INMATE LEWIS:  I was ten feet away from

21   him.  The cars would drive up and we would sell

22   drugs to the customers that drive up in the

23   street.  And I just happened to be standing in

24   the street when he -- the shot was rang off and

25   he fell.  And I ran over there and picked him up

26   and saw that he was shot, and then I ran to Ms.

27   Collins' house and asked her to call an

19

1  ambulance, and then I called my wife to come

2  pick me up.

3          PRESIDING COMMISSIONER GARNER:  When you

4  picked him up was he conscious?

5          INMATE LEWIS:  His eyes were moving side

6  to side.

7          PRESIDING COMMISSIONER GARNER:  Did he

8  say anything?

9          INMATE LEWIS:  He didn't say anything.

10          PRESIDING COMMISSIONER GARNER:  So, you

11  picked him up and then you put him back down and

12  ran to house to summon aid?

13          INMATE LEWIS:  Yes, sir.

14          PRESIDING COMMISSIONER GARNER:  Okay.

15  How long was the period of time from when you

16  were standing next to Mr. Fairley to the point

17  when he was shot?  Or you heard the sounds of

18  the bullet?

19          INMATE LEWIS:  How long?

20          PRESIDING COMMISSIONER GARNER:  In

21  minutes?

22          INMATE LEWIS:  Could you repeat that

23  question?

24          PRESIDING COMMISSIONER GARNER:  All

25  right.  We had you initially with Mr. Fairley,

26  there was a verbal argument, you indicated that

27  there was no physical contact as a result of

20

1   that, so the issue of altercation as you're

2   indicating, there was none. So, at some point,

3   you moved some distance. I think you said about

4   ten feet away into the street. How long was

5   that --

6       INMATE LEWIS: Relative to the argument,

7   verbal argument?

8       PRESIDING COMMISSIONER GARNER: When the

9   argument -- from the time you left the argument

10  to the time you heard a gun fire --

11      INMATE LEWIS: It was like maybe within a

12  half hour.

13      PRESIDING COMMISSIONER GARNER: So, it

14  wasn't just a few minutes?

15      INMATE LEWIS: Yeah, it was maybe even

16  longer than a half hour. Maybe an hour.

17      PRESIDING COMMISSIONER GARNER: At any

18  point during that time did you return and have

19  any other contact with Mr. Fairley?

20      INMATE LEWIS: No, I did not.

21      PRESIDING COMMISSIONER GARNER: So, what

22  you're telling us today is that there was a

23  period of time that could have been anywhere

24  from a half hour to an hour where you weren't in

25  the same immediate proximity, you were in the

26  same area, maybe ten, fifteen feet away?

27      INMATE LEWIS: Well, I was getting out of

21

1   the house.  But Fairley never entered the house.

2        PRESIDING COMMISSIONER GARNER:  Okay.

3        INMATE LEWIS:  So, yes, I was in and out

4   around the area.

5        PRESIDING COMMISSIONER GARNER:  Okay, did

6   you have a weapon on you that day?

7        INMATE LEWIS:  No, sir.

8        PRESIDING COMMISSIONER GARNER:  All

9   right.  Did you own a weapon?

10        INMATE LEWIS:  No, sir.

11        PRESIDING COMMISSIONER GARNER:  Had you

12   ever used a weapon previously in any of your

13   gang pursuits?

14        INMATE LEWIS:  In my gang activity, I

15   possessed weapons at times but I never use a

16   weapon against anybody during my gang

17   activities, no.  I possessed a weapon but I

18   never used it against any other human person.

19        PRESIDING COMMISSIONER GARNER:  Okay,

20   understand that.  And just to get on the record,

21   what was the gang affiliation again?

22        [both talking over each other —

23   indiscernible]

24        PRESIDING COMMISSIONER GARNER:  Okay.

25   Here it just said you were known to associate

26   with them.

27        INMATE LEWIS:  Well, that's what I'm --

22

1    that's truth.  I was just associating.

2        PRESIDING COMMISSIONER GARNER:   All

3    right.  And how long was it from the time of the

4    offense -- let me just ask it differently.  When

5    were you arrested?

6        INMATE LEWIS:  December 12th I believe,

7    1990.

8        PRESIDING COMMISSIONER GARNER:   So, it

9    was a little bit of time that elapsed?

10        INMATE LEWIS:  Yes, sir.

11        PRESIDING COMMISSIONER GARNER:   Did you

12    go to the hospital after Mr. Fairley was shot?

13        INMATE LEWIS:  I sent my brother,

14    Markatos.

15        PRESIDING COMMISSIONER GARNER:   Is there

16    some reason you sent your brother instead of

17    going yourself?

18        INMATE LEWIS:  No, no particular reason.

19    I was -- I was afraid because I was over his

20    body and he was shot.  And I had been verbally

21    -- I had altercation with him, so, I've had

22    previous killings on my record and I was afraid

23    to come forward.

24        PRESIDING COMMISSIONER GARNER:   So, you

25    figured they might identify you pretty quickly

26    as a suspect?

27        INMATE LEWIS:  Yes, that was it.  And I

23

1    was involved in criminal activity and, you know,

2    he was not -- at that time, I didn't, you know,

3    feel that it would be in my best interests to

4    come forward.  I was wrong but my state of mind

5    was not (indiscernible)

6         PRESIDING COMMISSIONER GARNER:   Was Mr.

7    Fairley a friend?

8         INMATE LEWIS:  Yes, sir.

9         PRESIDING COMMISSIONER GARNER:   How long

10   had you known him?

11        INMATE LEWIS:  It depends on what you

12   define friend, but we grew up together from like

13   12 years old, so, you know, it's somebody that

14   you know your life and even though you do right

15   and wrong things with that person, you have a

16   bond with him.  So, I had a bond with Curtis

17   then.  It might now show because of my smile or

18   my expression might say something different, and

19   -- but I'm sorrowful for what happened to him.

20   A human life was taken and it was tragic.  And I

21   wouldn't have ran over there and tried to help

22   him if I didn't care for him.

23        PRESIDING COMMISSIONER GARNER:   Okay.

24   Well, lets move on from that for the time being,

25   we may come back.  But speak now and what I'm

26   going to be doing now is taking a look at your

27   prior record and I'm going to be looking at two

24

1    different places.  I'm going to be looking under

2    the very first tab, which is called cumulative

3    summary and about three or four pages or more of

4    that is your rap sheet.  It starts Bureau of

5    Identification -- Bureau of Criminal

6    Identification, criminal history transcript.

7         INMATE LEWIS:  Yes, sir, I've read it.

8         PRESIDING COMMISSIONER GARNER:  Okay.

9    What I'm going to do is I'm going to be going

10   between that and the same correctional

11   counselor's report.  Kind of -- sometimes the

12   dates are wrong and it's good to just look at

13   both sources, but let me go ahead and start by

14   the --

15        INMATE LEWIS:  That's the 2002

16   counselor's report?

17        PRESIDING COMMISSIONER GARNER:  Yes, sir.

18   Same thing, same one.  And it looks like the

19   first arrest was January 25, 1979, LAPD, and

20   this was for a -- this was for burglary, and a

21   petition was requested and you see what I do,

22   there's nothing else there to indicate whether

23   it was granted.  April 29, 1980, LAPD, a 211 PC,

24   which is the robbery, and again it noted that a

25   petition was requested and what it looks like is

26   that the petition and warrant on July 18th of

27   '80 was associated with that April -- the April

25

1  arrest, is that correct, sir?

2        INMATE LEWIS:  Yes.

3        PRESIDING COMMISSIONER GARNER:  Okay.

4  What kind of robbery was that?

5        INMATE LEWIS:  Excuse me, when I smile,

6  I'm not trying to be insincere or ingenuine.

7  That was -- I was in junior high school and I

8  was truant and we were pressuring other mates,

9  you know, for lunch money (indiscernible).  So,

10  the person that pressured out of his money

11  identified me in a photo thing and that was what

12  that was about.

13        PRESIDING COMMISSIONER GARNER:  Did you

14  have a weapon?

15        INMATE LEWIS:  No, sir.

16        PRESIDING COMMISSIONER GARNER:  So, that

17  was a good old strong arm, that's what it's

18  called.

19        INMATE LEWIS:  Well, verbal strong armed.

20        PRESIDING COMMISSIONER GARNER:

21  (indiscernible)

22        INMATE LEWIS:  Yes.

23        PRESIDING COMMISSIONER GARNER:  Okay.

24  And then we have the one that you previously

25  discussed that was (indiscernible) and your

26  apprehension about being near a person that had

27  been shot, and that was the October 21, 1980,

26

1  which was originally charged as a murder, and it

2  was then either reduced or bargained down to the

3  manslaughter, January 27, '81, you went to CYA

4  in Norwalk?

5       INMATE LEWIS:  Yes, sir.

6       PRESIDING COMMISSIONER GARNER:  And how

7  long were you in Norwalk?

8       INMATE LEWIS:  From the end of '80 to the

9  end of '83.

10      PRESIDING COMMISSIONER GARNER:  So

11  somewhere toward the end of '83?

12      INMATE LEWIS:  December '83 is when I was

13  paroled from that.

14      PRESIDING COMMISSIONER GARNER:  All

15  right.  And you were still on active parole, it

16  looks like until about June of '87, when you

17  were discharged?

18      INMATE LEWIS:  Yes, sir.

19      PRESIDING COMMISSIONER GARNER:  March of

20  '84, LAPD, a H&S violation, looks like you went

21  to juvenile hall over that?

22      INMATE LEWIS:  Yes, sir.  That's when my

23  initial gang association began.  I was not

24  convicted but I was admittedly selling drugs, so

25  I had PCP and when the police rode up, we threw

26  it on the ground (indiscernible).  And so they

27  just took us down and arrested us, you know,

27

1  processed us.

2          PRESIDING COMMISSIONER GARNER:   So, how

3  long were you in the hall?

4          INMATE LEWIS:   Not long, 30 days.

5          PRESIDING COMMISSIONER GARNER:   All

6  right.  And you didn't get a visit from the

7  parole people at that time?

8          INMATE LEWIS:   Yes, I did.  At that time,

9  I was split.  I was involved in criminal

10  activity and I was involved in school still,

11  high school.  I was playing basketball.  I was

12  trying to juggle criminal life and social life,

13  real living.  I succeeded in obtaining the

14  scholarship so that was part of the split life

15  that I was living.  That arrest and retention,

16  they released me because I was doing good in

17  school, I had support from the school and member

18  of society.

19          PRESIDING COMMISSIONER GARNER:   So, you

20  got another chance?

21          INMATE LEWIS:   I got another chance.

22          PRESIDING COMMISSIONER GARNER:   All

23  right.  May 15th of '85, false ID to a peace

24  officer and it looks like you got convicted for

25  that and got some probation, says jail, it

26  doesn't say how long.  Did you do any time on

27  that?

28

1        INMATE LEWIS:  No.

2        PRESIDING COMMISSIONER GARNER:  So, it

3   was --

4        INMATE LEWIS:  Just had fine or something

5   like that.

6        PRESIDING COMMISSIONER GARNER:  All

7   right.  June of '87, there was a trespass,

8   refusing to leave property, and there was

9   misdemeanor conviction on that.  Looks like the

10  sentence was twelve months probation or four

11  days jail or five.  Did you pay the fine or do

12  the time?

13       INMATE LEWIS:  I paid the fine.

14       PRESIDING COMMISSIONER GARNER:  All

15  right.  And then the -- have another July 7 of

16  '88, obstructing a peace officer, obstructing or

17  resisting, and also the trespass and it looks

18  like the trespass was dismissed but you were

19  convicted of the 148, got 24 months probation

20  and a fine?

21       INMATE LEWIS:  Yes, but can I -- I mean,

22  this is deceiving -- it's kind of misleading

23  with respect to my activities.  If we could go

24  back to the May 30, 1985 conviction for false

25  identification to a police, that conviction was

26  upon me returning from a scholarship that I had

27  received and went to Hawaii, and so that part of

29

1  my life is not being reflected within these, you

2  know, this transcript. And all my activity

3  wasn't just --

4        PRESIDING COMMISSIONER GARNER: Well, let

5  me share it. This is not about happy stuff

6  we're reading about now. I know -- you'll have

7  an opportunity later.

8        INMATE LEWIS: Okay.

9        PRESIDING COMMISSIONER GARNER: All

10  right. They normally don't put happy faces on

11  rap sheets so, okay?

12        INMATE LEWIS: Okay.

13        PRESIDING COMMISSIONER GARNER: And then

14  the, I think we're down now to the 12/27/88 and

15  this was -- looks like it was a warrant that was

16  issued around the previous 148, and January 5,

17  '89, another trespass -- what' with all these

18  trespasses?

19        INMATE LEWIS: Okay. The location where

20  I was receiving these trespasses was the project

21  location where they had posted signs, no

22  loitering, you know. The city was trying to

23  deal with the --

24        PRESIDING COMMISSIONER GARNER: Trying to

25  do the drug-free zone stuff.

26        INMATE LEWIS: Exactly. They were trying

27  to, you know, get us out of there so they posted

30

1  those signs and so the officers would come, we

2  would take off running in all kind of different

3  directions.  They would catch us and put us, you

4  know, arrest us for trespassing when they caught

5  us.

6          PRESIDING COMMISSIONER GARNER:   All

7  right.  Were these trespasses associated with

8  the drug side of you?

9          INMATE LEWIS:  Yes, yes, they were.

10         PRESIDING COMMISSIONER GARNER:   These

11 weren't the basketball scholarship side?

12         INMATE LEWIS:  These were not the

13 basketball scholarship.

14         PRESIDING COMMISSIONER GARNER:   All

15 right, and May 10th of 1990, another -- this was

16 another H&S but this one was a detention only,

17 and that you were released and then that brings

18 us to the 12/12/90, the commitment offense that

19 we've already discussed.  All right, I'm going

20 to go back to the same Board report now, and go

21 back a little bit further and there's a section

22 in there called pre-conviction factors, and they

23 talk about your personal life.  And that's again

24 from the 2002 Board.

25         INMATE LEWIS:  2002 Board, pre-

26 convictions?

27         PRESIDING COMMISSIONER GARNER:   Um hmm.

31

1           INMATE LEWIS:  Okay.

2           PRESIDING COMMISSIONER GARNER:  Got it?

3           INMATE LEWIS:  Yes.

4           PRESIDING COMMISSIONER GARNER:  Okay.

5   Born in Hollywood, California, on May 23, 1966,

6   is that correct?

7           INMATE LEWIS:  Yes, sir.

8           PRESIDING COMMISSIONER GARNER:  Okay.

9   And you, at the time you talked to the

10  counselor, you said you had a very unstable home

11  life, and that your mother was very young, she

12  was 16, and your father was also very young at

13  28.  And it indicates involved in criminal

14  activity.  Were both your mom and father?

15          INMATE LEWIS:  No, sir, just my father.

16          PRESIDING COMMISSIONER GARNER:  Just your

17  father?

18          INMATE LEWIS:  And that is just an image

19  that I perceived as a child of him, black

20  leather.  I may have seen him with weapons.  I

21  never actually witnessed him committing any

22  crimes so.

23          PRESIDING COMMISSIONER GARNER:  Did you

24  ever have knowledge of one of the reasons that

25  he wasn't home, cause he was in jail?

26          INMATE LEWIS:  Oh, I've been to jail and

27  seen him, yes.

32

1         PRESIDING COMMISSIONER GARNER:    All

2    right.    So, better indicator.

3         INMATE LEWIS:    Yes, yes.

4         PRESIDING COMMISSIONER GARNER:    All

5    right.    Your mother divorced your father when

6    you were fairly young, about six years old, is

7    that correct?

8         INMATE LEWIS:    Yes.

9         PRESIDING COMMISSIONER GARNER:    And she

10   remarried?    And your stepfather was an alcoholic

11   and was abusive to your mother and treated you

12   and your brother differently from his own child.

13   So, he brought a child or children into the

14   relationship?    Your stepfather?

15        INMATE LEWIS:    He brought one child, my

16   sister.

17        PRESIDING COMMISSIONER GARNER:    A sister.

18        INMATE LEWIS:    Yes.

19        PRESIDING COMMISSIONER GARNER:    Older,

20   younger.

21        INMATE LEWIS:    Younger.

22        PRESIDING COMMISSIONER GARNER:    Younger.

23   And apparently the -- how was the treatment

24   different with you and your brother and his own

25   child?

26        INMATE LEWIS:    Well, favorably, he would

27   -- I guess she's a girl, so she -- it might have

33

1    seemed to me like she was given favorable

2    treatment.  She might have not been.  She was a

3    girl and we were the boys.  We had to, you know,

4    do all the work so --

5              PRESIDING COMMISSIONER GARNER:  Did he

6    single you guys out?

7              INMATE LEWIS:  It might be a

8    misconception.

9              PRESIDING COMMISSIONER GARNER:  All

10   right, did he single you guys out for more

11   discipline?

12             INMATE LEWIS:  Yes, yes, yes, more

13   discipline.

14             PRESIDING COMMISSIONER GARNER:  Was any

15   physical abuse associated with the discipline or

16   was it just spankings and whippings?

17             INMATE LEWIS:  Yeah, just -- yeah.  Back

18   then, you could whip your boy and, you know,

19   split a belt and stuff, but he was never, you

20   know, he wouldn't sock us or beat us like that.

21             PRESIDING COMMISSIONER GARNER:  And drank

22   a lot?

23             INMATE LEWIS:  Yes, that's where I picked

24   up, you know, my alcohol tendencies, watching

25   other members of my family drink.

26             PRESIDING COMMISSIONER GARNER:  What time

27   did you -- what age did you start drinking?

34

1          INMATE LEWIS:  Well, I started real

2    young.  We would get a beer for mowing the lawn,

3    (indiscernible) beers.

4          PRESIDING COMMISSIONER GARNER:  How old

5    were you then?

6          INMATE LEWIS:  That was eight.

7          PRESIDING COMMISSIONER GARNER:  That is

8    real young.

9          INMATE LEWIS:  Yes.

10         PRESIDING COMMISSIONER GARNER:  Did the

11   frequency of the alcohol consumption increase

12   over time?

13         INMATE LEWIS:  Yes.

14         PRESIDING COMMISSIONER GARNER:  Did

15   you --

16         INMATE LEWIS:  But not, you know, yes, on

17   my own accord.  It numbed me and, you know, it

18   made me woozy.  It was a different feeling that

19   it wasn't -- it was a different feeling.

20         PRESIDING COMMISSIONER GARNER:  And for

21   some reason the family moved to Washington when

22   you were about eight or nine, and that was

23   Washington State or D.C.?

24         INMATE LEWIS:  State.

25         PRESIDING COMMISSIONER GARNER:  State,

26   okay.  What was involved in the move?  Why did

27   your family move?

35

1        INMATE LEWIS:  Well, once she divorced my

2    father and she remarried, the person she married

3    was a sailor.  He was in the service.

4        PRESIDING COMMISSIONER GARNER:  All

5    right.

6        INMATE LEWIS:  An engineer.  And, you

7    know, they posted him out there in Washington.

8        PRESIDING COMMISSIONER GARNER:  All

9    right, so the indication here is your mother met

10   someone else and basically, the order is she met

11   somebody else, and then she went to Washington.

12       INMATE LEWIS:  (indiscernible)

13       PRESIDING COMMISSIONER GARNER:  Got ya.

14   All right.  And how did you get along with this

15   individual, the (indiscernible - voice over)

16       INMATE LEWIS:  That's the one I'm talking

17   about.

18       PRESIDING COMMISSIONER GARNER:  Yeah.

19   Now, he wasn't the alcoholic?

20       INMATE LEWIS:  Yes, he is -- he was.

21   That's the one I'm talking about.

22       PRESIDING COMMISSIONER GARNER:  All

23   right.  So, the fellow that your mom divorced

24   your father from was the guy in the Navy?

25       INMATE LEWIS:  Yes.

26       PRESIDING COMMISSIONER GARNER:  All

27   right.  Okay, I'm with you now.  And when you

. 36

```
1    were 14, you got committed to the YA, we already
2    talked about that. 'You got discharged and got a
3    scholarship and began attending Hawaii Pacific
4    College. And it says here that you got so
5    involved in the drugs and alcohol that you lost
6    the scholarship. And that you continued your
7    involvement until the time of your arrest.
8           INMATE LEWIS: Yes, sir.
9           PRESIDING COMMISSIONER GARNER: So, the
10   time things were going pretty good for you,
11   getting a basketball scholarship, and you're
12   over in Hawaii Pacific College, how much of your
13   life was drugs and how much was basketball?
14          INMATE LEWIS: Over there?
15          PRESIDING COMMISSIONER GARNER: Yeah.
16          INMATE LEWIS: It was the same.
17          PRESIDING COMMISSIONER GARNER: It was
18   the same.
19          INMATE LEWIS: Half -- well, I was 18,
20   fresh out of CYA. I hadn't even been out nine -
21   - a year. I was like only out nine months and
22   they transferred me over there so I had already
23   begun to use drugs and alcohol when I had
24   initially got out of CYA. And that's how I got
25   those arrests earlier in 1984. So, everybody,
26   you know, they put me on a plane to go over
27   there to Hawaii, and I wanted that. I worked to
```

37

1  get that, schooling and everything.  When I got

2  over there, I was placed in a condo with two

3  other guys who had been in college already four

4  years, so they were 23 and I was 18.  Now, they

5  were drinking, you know, we had a lot of -- this

6  certain amount of money so I wasn't guided

7  properly when I did arrive over there.  And I

8  didn't have the knowledge to appreciate the

9  opportunity that I was given.  And so, when they

10  bought a six-pack and started cracking the beer

11  and drinking, I joined in too the college

12  (indiscernible)

13        PRESIDING COMMISSIONER GARNER:  Were they

14  athletes, your roommates?

15        INMATE LEWIS:  Yes, they was part of the

16  team.

17        PRESIDING COMMISSIONER GARNER:  So, they

18  were part of the team?

19        INMATE LEWIS:  Yes.

20        PRESIDING COMMISSIONER GARNER:  Who --

21        INMATE LEWIS:  But I chose the role part,

22  and I -- the psychologist said I was prone to

23  the illegal part.  There were other basketball

24  players that went to church, and got jobs, so

25  I'm not making any excuses.  I make the wrong

26  choice.

27        PRESIDING COMMISSIONER GARNER:  Did the

38

1   coach ever talk to you about this?

2       INMATE LEWIS:  Well, they were aware that

3   I had been convicted of voluntary manslaughter,

4   and we never really discussed it openly --

5       PRESIDING COMMISSIONER GARNER:  I'm not

6   concerned about that.  It just -- did your coach

7   at any time, while you were over there ever

8   approach you about any indications that you may

9   have been using alcohol or --

10      INMATE LEWIS:  No, he never approached

11  me.

12      PRESIDING COMMISSIONER GARNER:  Did the

13  coach ever give any expectations of his athletes

14  about what they ought to be doing?  Health wise

15  and training?

16      INMATE LEWIS:  Yes, he did.  He gave us

17  expectation and it was one that I failed to

18  meet.  And I believe was the turning point.  We

19  had what they called hell week, two weeks of,

20  you know, intense training.  And on my last day,

21  I had to run three miles and it was in the hot

22  sun.  And I ran -- I was on my last lap, but I

23  couldn't make it, and I don't know, from that

24  point on, it seemed like -- I wasn't in favor

25  with the coach any longer.  I had, you know, the

26  teammates had to come and grab me because I

27  couldn't breath and I had been surviving without

39

1   my inhaler and it hadn't really been bothering

2   me.  But that day it just stopped me in my

3   tracks.

4        PRESIDING COMMISSIONER GARNER:  Had you

5   partied the night before that last day?

6        INMATE LEWIS:  I may have.  I can't

7   recall that.  I just recall that incident.

8        PRESIDING COMMISSIONER GARNER:  You

9   mentioned a gunshot wound.

10       INMATE LEWIS:  Yes.

11       PRESIDING COMMISSIONER GARNER:  How old

12  were you when that happened?

13       INMATE LEWIS:  Twenty-three.

14       PRESIDING COMMISSIONER GARNER:  And where

15  did you get shot?

16       INMATE LEWIS:  In the neck.

17       PRESIDING COMMISSIONER GARNER:  In the

18  neck.  And what were the circumstances?  What

19  were you doing?

20       INMATE LEWIS:  I was, again, in the

21  projects.  I'd been standing post on the turf

22  out there or the lawn, and guy walked up and I

23  believe he was trying to rob me, but I moved my

24  hand and the gun went off and it shot me in the

25  neck, and I fell.

26       PRESIDING COMMISSIONER GARNER:  Did they

27  ever catch him?  The suspect who shot you?

40

1       INMATE LEWIS:  I believe they did.

2       PRESIDING COMMISSIONER GARNER:  Did you

3 ever go to court on it?

4       INMATE LEWIS:  I believe -- yes.  I went

5 to court on it and --

6       PRESIDING COMMISSIONER GARNER:  Testified

7 against him?

8       INMATE LEWIS:  Yes.

9       PRESIDING COMMISSIONER GARNER:  Did you

10 identify him?

11       INMATE LEWIS:  Yes.  Yes, I identified

12 him.

13       PRESIDING COMMISSIONER GARNER:  Any gang

14 association?  Think it was a rival gang person?

15       INMATE LEWIS:  I don't know if he was a

16 rival gang person or not.

17       PRESIDING COMMISSIONER GARNER:  Did you

18 know him?

19       INMATE LEWIS:  I didn't now him.

20       PRESIDING COMMISSIONER GARNER:  Ever see

21 him before?

22       INMATE LEWIS:  No, never seen him before.

23       PRESIDING COMMISSIONER GARNER:  Okay.

24       INMATE LEWIS:  I mean, I was told who he

25 was.  So, I don't really know him.

26       PRESIDING COMMISSIONER GARNER:  Did he

27 say anything to you before he shot you?

41

1          INMATE LEWIS:  I don't think he did.  I
2   don't think he said anything to me.
3          PRESIDING COMMISSIONER GARNER:  Older
4   guy, younger?
5          INMATE LEWIS:  Young guy.  Yeah, young
6   guy.
7          PRESIDING COMMISSIONER GARNER:  Your
8   size?
9          INMATE LEWIS:  Smaller than me.
10          PRESIDING COMMISSIONER GARNER:  You're a
11   pretty big guy so, okay.  All right, let's go to
12   your parole plans, that's about two more pages
13   behind this.
14          DEPUTY COMMISSIONER BLONIEN:  Let me
15   change the tape.
16          PRESIDING COMMISSIONER GARNER:  Okay.
17                    (Off the Record)
18          DEPUTY COMMISSIONER BLONIEN:  Okay, we're
19   back on tape, Side 2.
20          PRESIDING COMMISSIONER GARNER:  I'll go
21   ahead and read these but, you know, we're
22   talking about a period that's about three and a
23   half years old and there may be some letters in
24   here that will change this.  But in August of
25   2002, when you met with the counselor, the
26   indicating was you were going to live with your
27   mother, Cecelia, C-E-C-E-L-I-A, Lewis, and

42

1    address is provided at an apartment house in

2    Santa Monica, California, and there's a

3    telephone number provided.  So far as

4    employment, the indication was you had a verbal

5    job offer to work as a mechanic at the Avalon,

6    is it Care or Carve, C-A-R-V-E?

7         INMATE LEWIS:  It was Avalon Carver Drug

8    Abuse Center.

9         PRESIDING COMMISSIONER GARNER:  Carver, I

10   missed the "R".  Avalon Carver, C-A-R-V-E-R,

11   Drug Abuse Center in Los Angeles, California.

12   There's an indication of an address and

13   telephone number and a Tony, T-O-N-Y Rushing, R-

14   U-S-H-I-N-G, is the counselor.  Okay.  I'm now

15   going to go back to the section number five,

16   which is notices and responses.  And all those

17   first documents you see, those are the 3042

18   Notices.  They went to all the agencies that had

19   anything to do with your case and there are

20   probably -- usually about five or six of them.

21   And then the first one that I come on in a

22   letter, is the letter that is hand, at the top,

23   saying to Parole Board Members, it's July 26,

24   2005, and it's from a Freddie, F-R-E-D-D-I-E,

25   Mae, M-A-E, Hill, H-I-L-L, address in Los

26   Angeles, and she's your great aunt, and she's

27   writing, she wants to support you in any way

43

1    possible and known you all of your life, watched

2    you grow up, always offered her support and

3    words of encouragement to you, and a few years

4    ago, she started a business, and she employed

5    you as a maintenance worker. You were a good

6    worker. Thinks you've had a long time to think

7    about the events that led to your incarceration,

8    speaks to the regret and remorse, and that if

9    you're given a chance, you'll be a productive,

10   law-abiding citizen. And that you know that you

11   got to avoid any situations that lead you to

12   being incarcerated again. The next letter is a

13   handwritten letter dated June 30, 2005, and it

14   is from Michelle Walker, and again, it's

15   handwritten, and signed, 27 years old at the

16   time it was written, single parent of two little

17   girls, and I never had like brothers and

18   sisters, just my mom, my oldest brother is

19   Vondell Lewis, he's the eldest and she's the

20   youngest. We all need my brother and can't wait

21   till he comes home. Went away at the most

22   important time of our lives, please let Vondell

23   come home, important to us, and has all of my

24   support he needs. Another handwritten letter

25   that is dated June 19th of 2005, and it's from a

26   Beverly Grant, G-R-A-N-T, another great aunt,

27   and she's a licensed day care provider and along

44

1    with her husband, they've lived in Compton at

2    the present address for 40 years, been working

3    with children aged 6 weeks to 12 for the past 15

4    years, and apparently this was the great aunt

5    that named you when you born.  That's what she

6    puts in here.  Spent a lot of time -- you spent

7    a lot of time with her family and you were very

8    attached to her son.  During the summer, they'd

9    go camping and fishing.  Even though you

10   suffered asthma, you were a happy child.  She

11   went to your high school graduation, speaks to

12   you going to college in Hawaii for a while,

13   didn't complete his education because of

14   financial hardships.  Returned to California,

15   made some bad decisions and mistakes, which he

16   is very, very remorseful, in talking to Vondell

17   and writing to him over the years, we know he's

18   changed his life, and given a chance, he can be

19   a productive citizen.  And if he's released,

20   we'll help and support him any way that we can.

21   The next letter I have is a handwritten letter

22   and it's from Cecelia Lewis, and I don't see any

23   address on it but it's your mother.  And she's

24   -- four children, two boys, two girls, eleven

25   grandchildren.  She got a mother, your

26   grandmother, that would be about 83 in 2005,

27   fairly good health.  She's apparently worked for

45

1  the postal service for seven years.  She grieves
2  for both the -- sorrow and loss, very young when
3  I gave birth to Vondell, she was only 16, didn't
4  have many resources to turn to cause she lost
5  her father when she was 17.  Her mother worked
6  and was tired most of her life.  So, that you
7  can see just how much Vondell -- his help is
8  needed and to do whatever he has to do to set
9  things, situations right.  His children are 16,
10  a girl, an 18-year old boy, not easy living away
11  from one's family.  Their mother's never tried
12  to make a home for them, try to do the best I
13  can, that speaks to the two jobs if you're
14  released, as a caretaker for the in-home
15  supportive services and one with his 83-year
16  grandmother that's paid $7.50 an hour part time,
17  the other with his father, $7.50 part time.  His
18  father had two strokes and feels that you made a
19  huge turnaround in your attitude towards life,
20  that your thinking and your state of mind, it
21  speaks to the state of mind, it's a miracle
22  (indiscernible) first, love, financial,
23  listening and (indiscernible) to be caring is
24  what she's going to offer to you.  The last one
25  that I see in here is from a Maxine Henderson
26  and she lives in Compton, it's June 30, 2005,
27  another one of your great aunts.  She's a

46

1   retired civil service worker, obviously, that
2   she's known you all your life and been in
3   contact with each other, phone and letters,
4   through the years you've been incarcerated.
5   She's raising two grandsons and you're always
6   talk to them so they won't wind up in the same
7   situation you're in.  Speaks to your remorse
8   about the events that led to your incarceration.
9   Had time to think and she says you don't think
10  -- she doesn't think you'll make the same
11  mistakes again.  I'll support you or
12  (indiscernible) in any way she can, helping him
13  to be self-sustaining so he can lead a
14  productive life and also other relatives that
15  will support him (indiscernible).
16  Those were all the letters that were in the
17  File, and did we get a letter from any agency?
18  I'm not seeing any response to 3042's.
19          DEPUTY COMMISSIONER BLONIEN:  I didn't
20  see any.
21          PRESIDING COMMISSIONER GARNER:  All
22  right.  As previously noted, these legal notices
23  that are at the beginning of that section, sir,
24  we do have a representative from the Los Angeles
25  County District Attorney who will be speaking
26  later in the Hearing, but for the record, we did
27  not receive responses from anyone else.  So,

47

1   right now, Mr. Lewis, I'm going to ask you to

2   direct your attention over here to Commissioner

3   Blonien, who's going to talk to you about your

4   post-conviction factors.

5       DEPUTY COMMISSIONER BLONIEN:  Mr. Lewis,

6   this is your first Subsequent Hearing, and your

7   last appearance before the Board at your Initial

8   Hearing was on 8/8/02, and the decision was for

9   a three-year denial.  And the Panel recommended

10  that you become and remain disciplinary free,

11  upgrade vocationally and participate in self-

12  help.  You did have an appearance before the

13  Board on January 25th of '03, but that was

14  postponed for a new psych.  So, your current

15  custody level is Medium A.  Your classification

16  score is 19, which is the lowest possible for a

17  lifer inmate.  So in order to do this report, I

18  read your counselor's report by Counselor

19  Ellison David, 5/18/05, and I read Dr.

20  Macomber's new psych report dated 4/14/06.  I've

21  gone through your C File and I've gone through

22  the Board report.  You've only had one 115 since

23  you've been in prison and that was in 1993.

24  You've had two 128s and those were both in 1996.

25  Did you complete your vocational welding?

26      INMATE LEWIS:  Well, I -- it's seven or

27  eight years to be a complete welder.

48

1          DEPUTY COMMISSIONER BLONIEN:  You were in

2  there two.

3          INMATE LEWIS:  I was just in there two

4  years so I just got basic training in welding.

5          DEPUTY COMMISSIONER BLONIEN:  Okay.  I

6  didn't see any certificate.  But you are a cook.

7          INMATE LEWIS:  Oh, yes.

8          DEPUTY COMMISSIONER BLONIEN:  And you've

9  been in culinary for a long time.  You're in PIA

10  bakery.  Before that, I noted that when you were

11  in PIA bakery, you even helped rebuild the oven.

12          INMATE LEWIS:  Oh, yes.

13          DEPUTY COMMISSIONER BLONIEN:  Where was

14  that, (indiscernible)

15          INMATE LEWIS:  Yes.

16          DEPUTY COMMISSIONER BLONIEN:  That was

17  quite a bakery on that.  A lot of action.  So,

18  if you're a cook, tell me about it.

19          INMATE LEWIS:  Well, I love that

20  occupation of cooking.

21          DEPUTY COMMISSIONER BLONIEN:  You've got

22  all above-average work reports.

23          INMATE LEWIS:  And I read that when you

24  love something, that you try -- need to stick

25  with that, yeah.  That's what I've tried to do

26  is try to maintain good relations with people.

27          DEPUTY COMMISSIONER BLONIEN:  So, what's

49

1    your role?  What do you do in the culinary?

2         INMATE LEWIS:  Well, I'm a lead cook so

3    I --

4         DEPUTY COMMISSIONER BLONIEN:  So, do they

5    tell you what to do or?

6         INMATE LEWIS:  Oh, I tell everybody else

7    what to do.

8         DEPUTY COMMISSIONER BLONIEN:  So how do

9    you plan the menu?

10        INMATE LEWIS:  The menu is planned by the

11   supervisor cook, and he places people in certain

12   job descriptions.

13        DEPUTY COMMISSIONER BLONIEN:  But he

14   gives you the menu?

15        INMATE LEWIS:  No, he fills it out

16   himself and places it in the window.  So when we

17   come into work, you look on there and see where

18   your name is.  Say for example, yesterday they

19   had beef stew.  Even had three or four guys home

20   made beef stew that put the meat in the pot,

21   cooked the meat, put all the vegetables,

22   ingredients, over the course of the day, and

23   we'll have one free cook supervise us, free

24   person on that main course meal.  Then you would

25   have some other cooks cooking the vegetables,

26   preparing the salad, preparing for -- they had

27   corn bread yesterday, prepared the corn bread.

50

1  I don't make corn bread, beans, so it's the

2  crew.

3        DEPUTY COMMISSIONER BLONIEN:  Are you

4  allowed any creativity in your cooking?

5        INMATE LEWIS:  Oh, yes, yes, well, our

6  supervisor likes quality.  He likes it hot, he

7  likes it good and spicy, so he gives us latitude

8  with that.

9        DEPUTY COMMISSIONER BLONIEN:  So, what's

10 your best dish?

11       INMATE LEWIS:  My best dish, I'll have to

12 think about that one.  Because I have all of

13 them, I mean --

14       DEPUTY COMMISSIONER BLONIEN:  You do a

15 good job.  You cook for a lot of people.

16       INMATE LEWIS:  Yes.  And that satisfies

17 -- 3,000, satisfying right there.

18       DEPUTY COMMISSIONER BLONIEN:  Yeah.  You

19 know, I am really happy for you that you found

20 this profession, and I would suggest that you

21 look into going to a culinary school when you

22 get out.  Junior colleges have it so they're

23 inexpensive.  There's some really good ones out

24 there, and it's a wonderful profession.  You

25 also have participated in AA, NA for a long

26 time.  I see chronos back in '97, '98, but

27 pretty steady from '02 to present.  Do you work

51

1  through the Steps?

2       INMATE LEWIS:  Yes, ma'am.  Eventually I

3  -- the transformation back in '90s.  And it's no

4  coincidence that it started in '97, because I

5  went before a Panel.  It was a single

6  Commissioner and, you know, she asked me some

7  things about, you know, about my future plans.

8  I also doing it before that Hearing, I went to

9  this first psychologist, and you don't know --

10 they were talking to me so I was listening, and

11 they said, you know, you have drug issues, you

12 need to get in self-help, and you need to, you

13 know, find something, you know, vocationally

14 that you can, you know, do good and, you know,

15 comparable to -- so I took heed to what they was

16 telling me and that's when I begun NA, AA,

17 and --

18       DEPUTY COMMISSIONER BLONIEN:  So, you've

19 worked through the Steps?  How far are you?

20       INMATE LEWIS:  Yes.  Well, I believe I've

21 worked mostly all of them.  With exception to

22 notifying the people that I've harmed and trying

23 to make amend to them.

24       DEPUTY COMMISSIONER BLONIEN:  What Step

25 is that?

26       INMATE LEWIS:  Well, I think that one is

27 Number 8.  And it's been difficult for me

52

1  because when I was doing criminal stuff, I was

2  hurting myself and a lot of people, and the

3  society.  I haven't really been able to get that

4  to them, you know, but I've tried to do my best

5  in my situation that I'm in in here.

6      DEPUTY COMMISSIONER BLONIEN:  How do you

7  see this, you know, looking at your life, a lot

8  of your young life, formation years, were spent

9  at CYA.  And I know at Nellis, they really had

10  an emphasis on youth and on drug programming and

11  school.  So, then you get out, you know, go to

12  Hawaii and drugs ruined your life there.  You

13  weren't able to make the right -- alcohol ruined

14  your life there.  You weren't able to make the

15  right decisions.  So, when you get out again,

16  there's more drugs out there than you've ever

17  even heard of.  Alcohol is more available than

18  ever.  What's strikes are you going to draw on,

19  and what's going to be your support so that you

20  don't revert to drugs or alcohol?

21      INMATE LEWIS:  Well, this experience is

22  foremost --

23      DEPUTY COMMISSIONER BLONIEN:  It fades.

24  It all fades.

25      INMATE LEWIS:  Yes, this will and I've

26  thought about that.  I've thought about that.

27  One day I could be right back out there in

53

```
 1   society and be exposed to all of the things that
 2   I were formerly exposed to.  But my maturity and
 3   the way that I -- at home inside has
 4   strengthened me.  I've always cared about people
 5   and sometimes, like I said, it might not show
 6   but I found love for myself, and I found joy in
 7   every day that I live, even though it's in
 8   prison.  I have motivation.  I don't need
 9   somebody to guide me, I'm guiding myself.  Just
10   knowing like the Commissioner was reading the
11   letters of support from my family.  You know it
12   tear me up because those people, they haven't
13   seen me in all these years and especially, those
14   that are elderly in their life, and they still
15   remember back when I was small and how I was
16   back then in their eye.  That's how I feel now.
17   So, I know that my life will not consist of
18   drugs, alcohol or harm to anybody ever again.
19       DEPUTY COMMISSIONER BLONIEN:  Are you
20   going to continue with AA or NA when you get
21   out?
22       INMATE LEWIS:  Yes.  I believe that
23   that's mandatory.  That I attend a place where I
24   can draw from others' experiences that are
25   similar to mine and see the changes in their
26   lives.  And then evaluate the changes in my
27   life, you know, as compared with them.  I've did
```

54

1   a lot of moral inventory and a lot of searching,

2   soul searching.

3        DEPUTY COMMISSIONER BLONIEN:  It really

4   seems like when you were younger, you really

5   didn't like yourself or your situation, and you

6   allowed yourself to be not a priority at all.

7   What projects did you live in?

8        INMATE LEWIS:  Well, it was

9   (indiscernible).  We lived in a couple

10  (indiscernible) and Rancho San Pedro.  We were

11  -- our mother was socializing with sailors so we

12  were close to the Terminal Island, you know the

13  Naval base down there.

14       DEPUTY COMMISSIONER BLONIEN:  Right.

15       INMATE LEWIS:  And you're right, that's

16  how I felt.

17       DEPUTY COMMISSIONER BLONIEN:  Well, in

18  here, you finished the Impact program since your

19  last Board Hearing.  You got a certificate for

20  participating in Operation Courage, which was a

21  fund raising event, right?

22       INMATE LEWIS:  Yeah.

23       DEPUTY COMMISSIONER BLONIEN:  You got

24  good chronos for your Thanksgiving and Christmas

25  preparation in the culinary, making those two

26  holidays good for everyone.  You've done the

27  FEMA, started the FEMA with the building earth

55

1    quakes for tomorrow, emergency preparedness.    I

2    know there's over a hundred of those available.

3    You might be working on other ones right now.

4    Is that correct?

5            INMATE LEWIS:  Yes, I have several of

6    them (indiscernible – voice fade)

7            DEPUTY COMMISSIONER BLONIEN:   You

8    participated in peer tutoring.  What else you

9    doing?  What are you reading?

10           INMATE LEWIS:   Lately I've (indiscernible

11    – voice fade)

12           DEPUTY COMMISSIONER BLONIEN:   The law?

13           INMATE LEWIS:   Yes.

14           DEPUTY COMMISSIONER BLONIEN:   That's good

15    thing for someone like you.

16           INMATE LEWIS:   Yes.

17           DEPUTY COMMISSIONER BLONIEN:   Are you

18    learning a lot?

19           INMATE LEWIS:   Yes, ma'am.

20           DEPUTY COMMISSIONER BLONIEN:   You also

21    completed the standard courses on tuberculosis,

22    hepatitis and sexually transmitted diseased.

23    Anything else I should talk about what you're

24    doing before I talk about the psych?

25           INMATE LEWIS:   I think covers it pretty

26    much.

27           DEPUTY COMMISSIONER BLONIEN:   Well, the

56

1  psych says, this is Dr. Macomber, that you are

2  charming, glib, talkative and persuasive, that

3  you're thinking is rational, logical, coherent,

4  that you openly confessed to a history of

5  serious substance abuse problems as well as

6  sales, your gang involvement, and your criminal

7  activities to support yourself.  You openly

8  acknowledge that you lifestyle was wrong, and

9  that you're striving to change his way of living

10  and become a productive and constructive person.

11  Your diagnosis is your alcohol and drug

12  dependence by history under AXIS I.  Your anti-

13  social personality disorder by history, which is

14  improving.  You physical condition of asthma.

15  You have other physical things though too don't

16  you?  Don't you have --

17         INMATE LEWIS:  Yeah, I have the bullet in

18  me.

19         DEPUTY COMMISSIONER BLONIEN:  Yeah.  Is

20  that giving you any trouble?

21         INMATE LEWIS:  I haven't had it checked

22  in a few years, but I'm pretty mobile.

23         DEPUTY COMMISSIONER BLONIEN:  You have a

24  Global Assessment Functioning score of 85, which

25  is a highly functioning score.  And you talk to

26  the psychiatrist/psychologist about your legal

27  work that you're doing.  And that in assessing

57

1    your potential for violence, he noticed that
2    you've done very well in obeying institutional
3    rules and that you're only disciplinary was in
4    1993 for cutting in line ahead of others.
5    There's no indication of participation in riots,
6    violence towards others, possession of weapons
7    or threats towards others.  And as a result,
8    your potential for dangerous behavior compared
9    to other inmates appears to be below average,
10   but then in considering potential for dangerous
11   behavior if released to the community, prior
12   psychologists noted the troubling fact of this
13   case was that Mr. Lewis has been convicted of
14   this murder and manslaughter once in the past.
15   The sequence of violence -- while outside the
16   average for population on the outside of prison.
17   Since past behavior is a strong predictor of
18   future behavior, this fact must be considered.
19   Also quite troubling in this case is the fact
20   that he's strongly denying his responsibility
21   for the victim's death in commitment offense.
22   This is in spite of the fact that there were
23   several witnesses that observed him shoot the
24   victim with a gun and testified to the detective
25   to that fact.  There's an absence of remorse and
26   sorrow for his behavior in the commitment
27   offense.  He administered the level of service

58

1    inventory revised, it's an actuarial measurement

2    that assesses criminal history, substance abuse

3    history, current adjustment and other factors to

4    determine current risk on parole.  And his score

5    on this actuarial measure is in the low moderate

6    risk level.  His score indicate 31.1 percent

7    chance of recidivism.  This score definitely

8    places him higher than the average citizen in

9    the community for potentially dangerous

10   behavior.  And in essence, sir, that 31.1 means

11   if 100 men were released into the community, 69

12   of them would do better than you.  So, that's

13   how he gets that assessment.

14   So, the most significant risk factor in this

15   case would be any return to alcohol or drugs or

16   gang affiliation.  Although Mr. Lewis has had no

17   significant mental or emotional problems, he

18   does have a very serious criminal history as

19   reflected in the score under Section B above.

20   He is functioning in the institution as the lead

21   cook in culinary.  Apparently he has developed

22   sophisticated cooking skills that he plans on

23   pursuing when he is released.  Research shows

24   that individuals like Mr. Lewis with anti-social

25   backgrounds do improve with time, age and

26   maturity.  Hopefully with continued ongoing good

27   adjustment in the institution, participation in

59

1   self-help programs dealing with substance abuse,

2   and continued improvement, his risk level will

3   diminish.

4   I thought that was a fairly good psyche report

5   because the reality is that you do have a

6   terrible criminal history, and that's never

7   going to go away from you.  The commitment

8   offense is never going to go away unless through

9   a court action, which you're pursuing.  Your

10  institutional history is what you can build your

11  success on and you're doing very well in the

12  institution.  And continued work applies to you

13  in that for a long period, you need to show your

14  excellence in work, which you've attained, your

15  ongoing self-help and commitment to improving

16  yourself, probably Anger Management would be

17  great for you cause there had to be a lot of

18  anger in an individual that acted out the way

19  you did, and you're your own best advocate

20  because of your social skills.  So, with that,

21  I'm going to return it back to the Chair.

22          PRESIDING COMMISSIONER GARNER:  Okay,

23  thank you.  Let me ask you a couple of other

24  questions.  The address that was provided in the

25  2002 Board report for your mother, I note that's

26  now in Santa Monica, so she's moved since you

27  were incarcerated?

60

1    INMATE LEWIS:  Yes.  She's moved again

2  too.

3    PRESIDING COMMISSIONER GARNER:  So, where

4  is she living now?

5    INMATE LEWIS:  1181 West 38th Street,

6  Apartment 5.

7    PRESIDING COMMISSIONER GARNER:  What

8  city, sir?

9    INMATE LEWIS:  Los Angeles.

10    PRESIDING COMMISSIONER GARNER:  Los

11  Angeles.

12    INMATE LEWIS:  California, 90037.

13    PRESIDING COMMISSIONER GARNER:  And

14  anyone living with her?

15    INMATE LEWIS:  My grandma.

16    PRESIDING COMMISSIONER GARNER:  Your

17  grandmother.  Anyone else?

18    INMATE LEWIS:  No.

19    PRESIDING COMMISSIONER GARNER:  And it's

20  an apartment house?

21    INMATE LEWIS:  Yes.

22    PRESIDING COMMISSIONER GARNER:  And you

23  don't have any bedrooms (indiscernible) there?

24    INMATE LEWIS:  No, I believe it's two

25  bedrooms, I'm not sure.

26    PRESIDING COMMISSIONER GARNER:  All

27  right.  I can't think of any other questions I

61

1  have.  Do you have any follow-ups you'd like to

2  ask?

3          DEPUTY COMMISSIONER BLONIEN:  No, I asked

4  everything I wanted.

5          PRESIDING COMMISSIONER GARNER:  Okay.

6  Mr. Morrison, do you have question?

7          DEPUTY DISTRICT ATTORNEY MORRISON:  Did

8  the inmate testify at his trial?

9          PRESIDING COMMISSIONER GARNER:  Did you

10  testify at your trial?

11          INMATE LEWIS:  No, sir.

12          DEPUTY DISTRICT ATTORNEY MORRISON:  Where

13  the other people out there in the street at 6:00

14  a.m. engaged in selling PCP

15          INMATE LEWIS:  No.

16          DEPUTY DISTRICT ATTORNEY MORRISON:  What

17  were all these people doing out in the street at

18  that hour of the morning?

19          INMATE LEWIS:  It was a narcotic related

20  area.  They -- it wasn't specifically PCP that

21  was being sold.  It was crack cocaine.  And,

22  yes, it was (indiscernible) people selling drugs

23  out there at (indiscernible) in the morning,

24  night, morning.

25          DEPUTY DISTRICT ATTORNEY MORRISON:  Were

26  any of them the inmates homies in the same gang?

27          INMATE LEWIS:  Yes.

62

1          DEPUTY DISTRICT ATTORNEY MORRISON:   Did

2     they testify against the inmate?

3          INMATE LEWIS:   No.

4          DEPUTY DISTRICT ATTORNEY MORRISON:   Does

5     the inmate have any explanation for the facts as

6     reported in the official version that he was mad

7     at the victim for smoking up the dope,

8     threatened him and pulled out the gun, and shot

9     him.

10         INMATE LEWIS:   Do I have an explanation

11    for that?

12         DEPUTY DISTRICT ATTORNEY MORRISON:   Yes.

13         INMATE LEWIS:   That is false.  I did note

14    do that what they're alleging in the complaint,

15    and I mean, if you want me to present my

16    disputes regarding the accuracy veracity of the

17    facts, I can do that.

18         PRESIDING COMMISSIONER GARNER:   Mr.

19    Lewis, let me -- that's not the way to go.  What

20    we're going to do is let him ask you questions,

21    you answer the questions and when you do your

22    closing, you can certainly present your own case

23    then.

24         INMATE LEWIS:   Okay, all right.

25         DEPUTY DISTRICT ATTORNEY MORRISON:   Does

26    the inmate accept responsibility for the

27    victim's death in this case?

63

1          INMATE LEWIS:  No, sir.

2          DEPUTY DISTRICT ATTORNEY MORRISON:   Thank

3    you, I have nothing further.

4          PRESIDING COMMISSIONER GARNER:   All

5    right.  And I don't suspect you want to ask

6    yourself any questions?  If your attorney was

7    here, the attorney would be in a position to do

8    that.  I'm only mentioning that because that's

9    one of the anomalies that comes when you

10   represent yourself.  So, what we will do now is,

11   I'm going to go ahead and let the District

12   Attorney do his closing, and then at that point,

13   it'll be your time to do your closing and you

14   can present your material that you wish to have

15   the Panel consider.  The only thing I will

16   encourage you to do is consider that you're

17   talking about parole suitability today, sir.

18   So, Mr. Morrison, would you like to close now?

19         DEPUTY DISTRICT ATTORNEY MORRISON:   It's

20   interesting to read the police reports in the

21   case describing that the witnesses described

22   that the inmate was accusing the victim of

23   smoking up all the dope and was (indiscernible)

24   money from the victim.  The inmate first

25   threatened the victim with a knife.  The victim

26   threw a bottle at the defendant.  The defendant

27   entered his house, brought out a --

64

1        INMATE LEWIS:  Excuse me.  I'm sorry, but

2  the District Attorney has not identified

3  specifically what document he's referring to.

4        PRESIDING COMMISSIONER GARNER:  Let me

5  help you out.  He's not required to do that but

6  what I'm going to encourage you to do, you also

7  have the opportunity when you do your closing,

8  to dispute anything that the District Attorney

9  is saying for your (indiscernible).  But at this

10  point, this is his opportunity to do his whole

11  closing, okay.

12        INMATE LEWIS:  Thank you.

13        PRESIDING COMMISSIONER GARNER:  Okay.

14  Thank you Mr. Morrison.

15        DEPUTY DISTRICT ATTORNEY MORRISON:  The

16  defendant entered his house, brought out a small

17  bag or a sock containing a small handgun.

18  Witnesses earlier heard the inmate tell the

19  victim, get out of my house, and if you come

20  back, I'll shoot in the neck and see how you

21  like it.  And then he did, shot the victim once

22  in the head with a 22 hand -- 22 caliber

23  handgun.  Witness, Edna Gonzales, said she was

24  at the window watching the confrontation and saw

25  the defendant -- the inmate, point the gun at

26  the victim, stating, quote, I'll put this

27  through your fuckin head, punk, and then he

65

1   fired.  The inmate had a previous shooting,

2   claiming that the victim of voluntary

3   manslaughter had attacked him with a knife.  So,

4   he knew what handguns could do, resulting in

5   death.  The investigating officer was quoted in

6   the probation officer's report, at page 12,

7   saying, the inmate had a real problem as he

8   handled all of his complaints with other

9   individuals by killing them.  The man was

10  paroled from CYA, by his own admissions here,

11  violated the terms and conditions of his parole

12  (indiscernible) drugs.  We feel that this is of

13  great concern in terms of his ability to comply

14  with parole conditions in the future.  We don't

15  believe society should take another risk in

16  releasing him in a second death, this time

17  having been convicted of murder.  We note that

18  the psychological report is not in favor of

19  releasing him on parole at this time because of

20  the risk assessment.  I would commend the inmate

21  for programming pretty well here (indiscernible)

22  individual and enjoyed listening to some of his

23  remarks.  But we believe he's still a danger and

24  should not be released at this time.  Thank you.

25            PRESIDING COMMISSIONER GARNER:  All

26  right, thank you.  Mr. Lewis, normally at this

27  time what occurs is that you have an opportunity

66

1    to respond to anything the District Attorney

2    says.  It's not questions and answers, it's just

3    your reaction to it, and then anything you've

4    prepared in preparation for addressing the Panel

5    with respect to your suitability for parole.

6    Got an idea of that.

7         INMATE LEWIS:  Thank you, sir.  Yes, I do

8    have a closing and I beg the pardon of the

9    Panel.  The Deputy District Attorney, Mr.

10   Morrison, specifically referred to the police

11   report, and that is of particular concern to me

12   because that is part of my legal challenge, and

13   that's part of my legal disputes.  And

14   specifically pointed to Ms. Edna Gonzalez's

15   statement as -- in reference to my activities or

16   what, you know, what she viewed as happened that

17   night.  So, I'm going to read from that

18   statement and I would like to note that this

19   statement is handwritten by Detective Josephson,

20   Serial Number 21999, and it occurred on August

21   30, 1990 at 2:30 in the afternoon at Harvard

22   Police Station in Los Angeles County.  That

23   Panel has that.  The detective writes for the

24   witness that I was at  (indiscernible − name)

25   house yesterday when Vondell shot Curtis.  I saw

26   Vondell shoot Curtis with a little gun.  He shot

27   Curtis out in front of the house next door to

67

1    (indiscernible - name) house.  Okay, that's the

2    just of the case, is that she says she saw me

3    shoot and the detective clearly points that out

4    in his first paragraph.  The word is omitted is

5    the adverse facts to this statement.  Nowhere

6    within the context of this statement is it

7    identified that the witness, Edna Gonzalez was

8    under the influence of drugs, alcohol and

9    cocaine during with witnessing of this shooting.

10   As I can recall, nowhere in this statement is

11   it, and it wasn't written by Edna Gonzalez so

12   the detective omitted it.  I don't know whether

13   he did it intentionally or negligently, I don't

14   know.  But that brings me to the preliminary

15   transcript, page 14.  On page 14, the detective

16   was asked specifically, whether any other

17   witnesses had seen me shoot -- actually seen the

18   shooting.  And the detective responded, he said

19   no.  The detective was further asked, at the

20   preliminary hearing under oath, whether or not

21   the witness said, or he determined, whether she

22   was under the influence of drugs at the time of

23   the shooting or loaded.  He said no.  He was

24   asked a follow-up question, and that was whether

25   she said she had used drugs, alcohol or

26   narcotics the night of the incident, and he

27   said, I don't recall.  He denied knowledge of

68

1   material facts under oath and --

2        PRESIDING COMMISSIONER GARNER:   Mr.

3   Lewis.  I'm going to have to stop you.  I let

4   you stray a little while to see if you were

5   framing something that goes toward suitability.

6        INMATE LEWIS:  Well, I was just going

7   towards what the prosecutor referred to as

8   correct.  So, I wanted to dispute that is not

9   totally correct.

10       PRESIDING COMMISSIONER GARNER:  Well, I

11  think you've already put on the record the issue

12  that you've got an (indiscernible) and that

13  there's -- and we have all the same documents

14  but see, the only things we can rely on are the

15  documents that are before us.  Issues that

16  you're bringing up about any drug use by the

17  witnesses, if there's nothing before us, we have

18  nothing to go on.  So, what I'm going to

19  encourage you to do is use your time

20  productively today, because we can't help you

21  with your legal argument.  That's not our job.

22  We're here to see if you're an okay person who

23  is suitable for parole, so, I know you got all

24  this built up in you and you want to tell

25  somebody, I'm just telling you we're not the

26  right people.

27       DEPUTY COMMISSIONER BLONIEN:  We do see

69

1    your point, and I did see in here what you're

2    saying, and I don't -- do know you're going to

3    refer in here.

4              INMATE LEWIS:  Oh, okay.

5              DEPUTY COMMISSIONER BLONIEN:  So, we got

6    it.

7              INMATE LEWIS:  All right.

8              PRESIDING COMMISSIONER GARNER:  And for

9    the record, I'll review it during deliberations

10   also.

11             INMATE LEWIS:  Thank you.  Another issue

12   that I want to point out in respect because Ms.

13   Gonzalez is a sole (indiscernible) witness is

14   that she was given immunity but --

15             DEPUTY COMMISSIONER BLONIEN:  I saw that.

16             INMATE LEWIS:  -- in this case.  The

17   prosecutor told in the court and my attorney, I

18   don't know why, but they told the jury that she

19   was not aware that she was receiving immunity or

20   any benefits for her testimony, and --

21             DEPUTY COMMISSIONER BLONIEN:  So, that's

22   another legal issue.  Get back to your

23   suitability.

24             INMATE LEWIS:  Well, with respect to my

25   suitability, I think I've written up a sum of

26   closing for suitability.  I -- like I would --

27   in making your determination of my current

70

```
 1   threat to society, I would hope that you would
 2   find that my institutional behavior, my strong
 3   support, my sorrowfulness and in the
 4   circumstances of this case, and in -- that I may
 5   have not committed the crime, but a human life
 6   was lost and that's a tragedy for everyone
 7   involved.  I ask the Panel to consider my
 8   consistency throughout my prison term.  Although
 9   my psych report has made me not appear to be
10   sincere, I would hope that the Panel, in viewing
11   me today and in hearing and listening to me, as
12   the prosecutor agreed, that the only factors
13   that weigh real heavily against me is that I've
14   been convicted of taking two human lives.  Now,
15   the discrepancy and the dispute is that I didn't
16   take the human life in this matter, but I've
17   served 16 years of prison for it.  The fact that
18   I was convicted of it.  My not accepting
19   responsibility should not be weighed against me
20   as a factor to deny me parole.  I understand and
21   appreciate that the Panel has to take as true
22   the court of appeals opinion and (indiscernible)
23   that happened (indiscernible).  My claim is that
24   they're false, but as the Panel sees that, that
25   they can't do nothing with that.  I mean, I beg
26   to differ but I'll have to raise that at another
27   time.  But I do believe that I'm ready to re-
```

71

1  enter society. (indiscernible) planted a seed
2  and I intend to -- I intend to water that seed
3  and try to make it proffer, and I will attend a
4  culinary school. I know that my life will be
5  law abiding and productive. I have no doubt of
6  me -- many other people may doubt me, but I have
7  no doubt of that. I am capable of performing as
8  a law-abiding citizen and I'm no longer a threat
9  to anybody. Like I said, maybe the
10 psychologist, I didn't give him a chance to
11 really evaluate me. I was running off trying to
12 make my case to him and I should have been
13 taking a more different approach, but I learned
14 something from that. When I got the report, I
15 was like, God. I looked up some of the words
16 that he used to characterize me, and I was like,
17 that's not me, and it was a shock to me that --
18 and I knew that my initial reaction was to file
19 a 602, you know. And over the little time to
20 think about it, I, you know, I realized that
21 people make mistakes and, you know, the human
22 side is the most important side. All this
23 paperwork and all these rules and stuff, the
24 interaction with another human being and how you
25 feel about another human being. If you love
26 people then you're going to project that and I
27 believe that. That's what I project although

72

1    people may beg to differ.  I made many errors in

2    my life.  I've, you know, I'm 40, well, I'll be

3    40 this month, and I'm not looking forward to

4    turning -- to going back in the past, but I must

5    stay conscious of the past so that I don't fall

6    back into those same pitfalls and entrapment.  I

7    know that once I get to a crossroad or a

8    situation -- I know the choices that I need to

9    make, you know, that I will not harm no other

10   parson and that will guide me to the right

11   destination that I need to go.  So, with that, I

12   respectfully ask that this Panel find me

13   suitable for parole and I submit it.

14        PRESIDING COMMISSIONER GARNER:  Thank

15   you, sir.  It is now 10:59 a.m. and we'll recess

16   for deliberations.

17        DEPUTY COMMISSIONER BLONIEN:  And I'm

18   going on a new tape.

19             R E C E S S

20             --oOo--

21

22

23

24

25

26

27

73

1      CALIFORNIA BOARD OF PAROLE HEARINGS

2                D E C I S I O N

3          DEPUTY COMMISSIONER BLONIEN:  We're on

4      record.   Tape 2, Side 1.

5          PRESIDING COMMISSIONER GARNER:   All

6      right, it's 11:25 a.m. in the matter of Vondell

7      Lewis, E Edward 95977.  Mr. Lewis, the Panel's

8      reviewed all the information received from the

9      public and relied on the following circumstances

10     in concluding that you're not suitable for

11     parole and would pose an unreasonable risk of

12     danger to society or a threat to public safety

13     if you were released from prison.  We considered

14     many factors, sir, as always, we'll start with

15     the commitment offense  The Panel noted the

16     offense was carried out in an especially cruel

17     and callous manner.  We have Mr. Curtis Fairley,

18     23 at the time, the indications from all the

19     records before the Panel is that he was unarmed,

20     an argument ensued and he was shot in the head.

21     The offense was carried out in an especially --

22     excuse me, the offense was carried out in a

23     dispassionate and calculated manner.  And again,

24     the victim was shot in the head while being

25     unarmed.  The offense was carried out in a

26     manner that demonstrates an exceptionally

27     VONDELL LEWIS E-95977   DECISION PAGE 1   5/5/06

74

1    callous disregard for human suffering, in that

2    essentially, the victim was left on the ground

3    and aid was summoned, but the indication, even

4    from the paramedics that arrived to the police

5    officers, that he would not likely survive his

6    wounds, which he did not.

7    And the motive for the crime is very

8    inexplicable. The only thing that we have on

9    the record is that apparently there was a

10   dispute over drugs and some arguments that

11   unfortunately escalated to the point where Mr.

12   Fairley was shot and killed. Conclusions were

13   drawn from the Statement of Facts, and those

14   were taken from the Board report of August 2002,

15   in that about 6:00 a.m. on August 30, 1990, the

16   victim, Curtis Fairley, and Lewis were standing

17   on the sidewalk in Los Angeles in front of a

18   residence, when they began a verbal argument,

19   which escalated into a physical altercation.

20   The witness said Lewis produced a small handgun

21   from his pants pocket and fired one round

22   striking Curtis Fairley in the head. Mr.

23   Fairley fell, Lewis fled the scene. Fairley was

24   transported to the hospital and died the same

25   evening. The area where the crime occurred was

26   a heavy narcotic and gang location. Bot Lewis

27   VONDELL LEWIS E-95977    DECISION PAGE 2    5/5/06

75

1  and Fairley were known to associate with the

2  Waterfront Piru gang.

3  So far as the prior record, the Panel noted that

4  on a previous occasion, that you inflicted

5  serious injury on the victim that ultimately led

6  to the victim's death.  It was in January 1981,

7  that while you were a juvenile.  You used a

8  handgun, the victim was killed and you were

9  convicted of voluntary manslaughter resulting in

10  a record of violence or assaultive behavior.

11  With respect to the pattern of criminality, it

12  was escalating.  It was not involving crimes of

13  violence.  It was all associated with the

14  pattern of drugs that you had yourself in at

15  that time.  Also trespasses and these were over

16  the drug free issues inside of the housing

17  projects.  Insofar as the history of

18  relationships being unstable, it was -- the

19  Panel noted that, I think those were a product

20  of some of the unfortunate circumstances that

21  were involved in your formative years when you

22  were being raised.  You had failed previous

23  grants of probation and parole and cannot be

24  counted upon to avoid criminality.  You failed

25  to profit from society's previous attempts to

26  correct your criminality, and those included the

27  VONDELL LEWIS E-95977   DECISION PAGE 3   5/5/06

76

1    CYA commitment, adult probation.  Insofar as the

2    unstable social history, the Panel also noted

3    that drugs and the gangs -- and again the Panel

4    noted the unfortunate circumstances of your

5    upbringing, basically, you were being parroted

6    by youngsters -- a very young family at the time

7    you were growing up.  The Panel also noted that

8    with respect to the record before us, we did

9    note the unique opportunity you had with the

10   basketball scholarship in Hawaii, but it was

11   unfortunate that you continued to choose the bad

12   side of Mr. Lewis at that time and ultimately

13   resulted in the loss of that very unique

14   opportunity.  Your institutional behavior,

15   you're doing well.  That's one of the things --

16   the two things we just got through talking

17   about, those can never change, and you know

18   that.  We know it too.  So, what we really began

19   to focus on are the ones that follow this, the

20   institutional behavior, you've programmed well,

21   you got a marketable skill that if you want to

22   do well when you get out, there's no doubt in

23   our minds, you can do that.  You've done well in

24   self-help.  We'd encourage you to continue that.

25   You noted at the Hearing today that you know

26   it's going to be a part of your life from this

27   VONDELL LEWIS E-95977    DECISION PAGE 4    5/5/06

77

1    point on.  With respect to misconduct, it's very

2    limited.  You've had two 128A counseling

3    chronos.  They were both in April of --

4         DEPUTY COMMISSIONER BLONIEN:  '96.

5         PRESIDING COMMISSIONER GARNER:  --'96 and

6    they involved the failure to report, and you had

7    one 115 in December of 1993, it was disobeying

8    an order.  So, institutionally, you have no

9,   record of any kind of violence.  The psychiatric

10   report dated -- by Dr. Macomber, dated May 6 --

11   May 2006, excuse me, the Panel noted that at

12   this time, the report is unfavorable in that it

13   gives you a higher risk factor than the average

14   citizen in the community for potentially

15   dangerous behavior, and let me tell you right

16   now, we've already ordered you another psych.

17   The paperwork's been prepared and what we're

18   hoping is that the continued good behavior will

19   get you a more favorable report when you come

20   back before the Board.  With respect to your

21   parole plans, we're going to give you some

22   suggestions, if you don't want to pay a lot of

23   attention to them today, you're going to get

24   them in the transcript, but what -- first of

25   all, they need to be updated for your next

26   Hearing.  If possible, we need very specific

27   VONDELL LEWIS E-95977    DECISION PAGE 5    5/5/06

78

1    things the people are going to do to you, to

2    you, excuse me, sir, do for you. The issue of

3    jobs. If you have an employment offer, if it's

4    in writing, it certainly is better. You don't

5    need t have that. All you need to have is an

6    employable skill. We know that, but it makes

7    you a better package if you've got a really good

8    solid series of letters, particularly, we need

9    the one from -- updated from your mother since

10   she has moved and that would be important to

11   you, so, take a look at that section. Also the

12   other thing that would be helpful to you is, it

13   would tie up a loose end, at the same time, the

14   place where you live, if one of your relatives

15   could identify any AA resources that would be

16   available in that area. And we don't need a lot

17   of the that, it just shows some effort that you

18   put out that you know that there's an AA

19   resource that on a public transportation line,

20   that's maybe 20 minutes from where you live. It

21   looks good and it will help you.

22   You were here, you heard the comments from the

23   District Attorney from Los Angeles indicating

24   opposition to parole. We certainly want to

25   commend you for a number of things, the fact

26   that you've completed AA, that the chronos

27   VONDELL LEWIS E-95977   DECISION PAGE 6  5/5/06

79

1    indicate that you have an ongoing predictable

2    presence in AA, and that's very good.  And also

3    your work ethic and the enthusiasm you bring to

4    the job.  You kind .of lit up when you started

5    talking about that today.  It didn't have

6    anything to do with all this legal stuff.  I

7    think it's something that just displays a

8    passion and you're to be complimented on that.

9    However, these positive aspects don't outweigh

10   the factors of suitability (sic) at this time.

11   And in a separate decision, the Hearing Panel

12   finds it's not reasonable to expect parole would

13   be granted at a Hearing during the following two

14   years, and the specific reasons for this are as

15   follows:  that the prisoner committed the

16   offense in an especially cruel manner and that

17   the victim, Curtis Fairley, 23 years of age, was

18   shot in the head with a handgun.  The offense

19   was carried out in a very dispassionate and

20   calculated manner.  The victim was shot in the

21   head with a handgun.  The record indicates that

22   the vic -- there's no record to indicate that

23   the victim was armed or posing any particular

24   ~~threat.  The offense was carried out in a manner~~

25   that demonstrates an exceptionally callous

26   disregard for human suffering in that, again, we

27   VONDELL LEWIS E-95977   DECISION PAGE 7   5/5/06

80

1    have a victim shot with a firearm, posing no

2    threat.  The motive for the crime is very

3    inexplicable.  Again, our record indicates that

4    what we have is a dispute over drugs and

5    unfortunately, it appears that the record also

6    indicates that both you and the victim were

7    under the influence of drugs at the time.  In a

8    separate decision that you had a prior record of

9    violent behavior in that you were convicted of

10    voluntary manslaughter in January of 1981, which

11    as a juvenile and the Panel noted that a handgun

12    was used in this.  So far as your criminality

13    and misconduct, drugs, gangs, and again, the

14    trespasses in the projects, and again the

15    history of unstable relationships, those were

16    associated with your involvement in drugs and

17    gangs.  The recent psychological report dated

18    May 6 from Dr. Macomber indicates a longer

19    period of observation and evaluation, and that

20    therefore, a longer period of observation and

21    evaluation is going to be required before the

22    Board can find that you're suitable for parole.

23    We're going to encourage you to remain

24    ~~disciplinary free.  You don't seem to have any~~

25    problems with that, but we're going to encourage

26    you to do.  That you continue your participation

27    VONDELL LEWIS E-95977   DECISION PAGE 8   5/5/06

81

1    in AA, and that you cooperate with the

2    clinicians.  Next time you go for the

3    psychologist, make sure you cooperate and get

4    yourself a good psyche report, and that you

5    continue to progress in the things that you're

6    enjoying doing in here right now.  And

7    Commissioner Blonien, any additional?

8          DEPUTY COMMISSIONER BLONIEN:  Just

9    maintain your focus.  Good luck.

10          INMATE LEWIS:  Thank you.

11          PRESIDING COMMISSIONER GARNER:  All

12    right.  It is now 10:35 a.m.  That concludes

13    this Hearing and you did a good job today.

14          INMATE LEWIS:  All right, thank you.

15          PRESIDING COMMISSIONER GARNER:  You did a

16    good job.

17          DEPUTY COMMISSIONER BLONIEN:  You did a

18    very good job.

19          PRESIDING COMMISSIONER GARNER:  You

20    strayed on me every now and then, but you were

21    okay when we brought you back.

22                --oOo--

23    PAROLE DENIED TWO YEARS           SEP  2 ~~2005~~
                                        SEP  2 2006

24    ~~THIS DECISION WILL BE FINAL ON:~~

25    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    VONDELL LEWIS E-95977   DECISION PAGE 9   5/5/06

82

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, P. M. LaCHAPELLE, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do
hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total one in number and cover a total of pages
numbered 1 - 81, and which recording was duly
recorded at CORRECTIONAL TRAINING FACILITY,
SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING OF
VONDELL LEWIS, CDC NO. E-95977, ON MAY 5, 2006,
and that the foregoing pages constitute a true,
complete, and accurate transcription of the
aforementioned tape to the best of my ability.

I hereby certify that I am a
disinterested party in the above-mentioned,
matter and have no interest in the outcome of
the hearing.

Dated July 9, 2006, at Sacramento,
California.


*P. M. LaChapelle*
P. M. LaCHAPELLE
TRANSCRIBER
PETERS SHORTHAND REPORTING

1

# *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| Date: | JULY 18, 2007 | | | | Deputy Clerk |
|---|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | | Reporter |
| | NONE | Bailiff | NONE | | |

(Parties and Counsel checked if present)

BH004281
In re,
VONDELL L. LEWIS,
            Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court acknowledges the receipt of the petitioner's writ of habeas corpus on September 11, 2006.

Respondent Warden was not served with a copy of the petition. Petitioner filed two copies of his petition with the Court. Accordingly, the clerk is directed to mail a copy of the petition for writ of habeas corpus, along with notice of this order, to the Office of the Attorney General, P.O. Box 85266, San Diego, California 92186-5266 to the attention of Cynthia Lumely.

This petition is forwarded to the Office of the Attorney General for safe-keeping and for future use. The petition should be kept in the event an Order to Show Cause should issue by this Court or in the event the petition is required for any purpose by this or any other Court. This Court will not reproduce any portion of the record in the future.

The clerk is directed to give notice to petitioner and the Office of the Attorney General.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Vondell L. Lewis
E-95977
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

Department of Justice - State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Cynthia Lumely

1

Minutes Entered
07-18-07
County Clerk



THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED IS A FULL, TRUE
AND CORRECT COPY OF THE ORIGINAL ON FILE AND OF RECORD IN MY OFFICE.
JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK, SUPERIOR COURT OF
THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES

ATTEST: JUL 2 0 2007    BY: _____ DEPUTY

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | CONFORMED COPY<br><br>JUL 2 0 2007<br><br>LOS ANGELES<br>SUPERIOR COURT |
| PLAINTIFF/PETITIONER:<br><br>VONDELL L. LEWIS | |
| | Joseph M. Pulido |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004281 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time      ☑ Order re: Writ of Habeas Corpus
☐ Order to Show Cause      ☐ Order
☐ Order for Informal Response      ☐ Order re:
☐ Order for Supplemental Pleading      ☐ Copy of Petition for Writ of Habeas Corpus for the
                                         Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

July 20, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _Joseph M. Pulido_ , Clerk
       Joseph M. Pulido

Vondell L. Lewis
E-95977
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

Department of Justice - State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Cynthia Lumely

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | MAY 4, 2007 | | | | Deputy Clerk |
|---|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | | |
| | NONE | Bailiff | NONE | | Reporter |

(Parties and Counsel checked if present)

| | |
|---|---|
| BH 004281 | |
| In re,<br>VONDELL L. LEWIS,<br>    Petitioner,<br>On Habeas Corpus | Counsel for Petitioner:<br><br>Counsel for Respondent: |

Vondell L. Lewis
P.O. Box 689/GW-307
Soledad, CA 93960-0689
E-95977

Department of Justice
Office of the Attorney General – State of California
110 West A Street, Suite 1100
San Diego, CA 92101
Attn: Ms. Cynthia Lumely

2

Minutes Entered
05-4-07
County Clerk

**PROOF OF SERVICE BY MAIL**
**BY PERSON IN STATE CUSTODY**
(C.C.P. §§ 1013(A), 2015,5)

I, _Vondell L. Lewis_____, declare:

I am over 18 years of age and I am party to this action.  I am a
resident of CORRECTIONAL TRAINING FACILITY prison, in the County
of Monterrey, State of California.  My prison address is:

_Vondell Lewis_, CDCR #: _E-95977_
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: _GW-307_
SOLEDAD, CA  93960-0689.

On _June 20, 2007_____, I served the attached:

_Petition For Writ of Habeas Corpus; with_
_Exhibits and Appendixes._

on the parties herein by placing true and correct copies
thereof, enclosed in a sealed envelope (verified by prison
staff), with postage thereon fully paid, in the United States
Mail in a deposit box so provided at the above-named institution
in which I am presently confined.  The envelope was addressed as
follows:

_Clara Shortridge Foltz Criminal_
_Justice Center, Dept. 100_
_210 West Temple Street_
_Los Angeles, CA  90012_

        I declare under penalty of perjury under the laws of the
State of California that the foregoing is true and correct.
Executed on _6/21/2007_____.

_Vondell Lewis_
_Vondell Lewis_
Declarant

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES<br><br>COURTHOUSE ADDRESS:<br>   Clara Shortridge Foltz Criminal Justice Center<br>   210 West Temple Street<br>   Los Angeles, CA 90012<br><br>PLAINTIFF/PETITIONER:<br><br>   VONDELL L. LEWIS | Reserved for Clerk's File Stamp |
|---|---|
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH 004281 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

| | | | |
|---|---|---|---|
| ☐ Order Extending Time | | ☐ | Order re: Request for Extension of Time |
| ☐ Order to Show Cause | | ☐ | Order      Petition |
| ☐ Order for Informal Response | | X | Order re: Writ of Habeas Corpus |
| ☐ Order for Supplemental Pleading | | ☐ | Copy of |

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

June 12, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____ , Clerk
          Anne Nguyen

VONDELL L. LEWIS
P.O. BOX 689/GW-307
SOLEDAD, CA 93960-0689
CDC #E-95977

DEPARTMETN OF JUSTICE
OFFICE OF ATTORNEY GENERAL- STATE OF
CALIFORNIA
110 WEST "A" STREET, SUITE 1100
SAN DIEGO, CA 92101
ATTN: MS. CYNTHIA LUMELY

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | MAY 4, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004281

In re,
VONDELL L. LEWIS,
    Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

**FILED**
Los Angeles Superior Court

**JUN 2 5 2007**

John A. Clarke, Executive Officer/Clerk

By_____, Deputy

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court acknowledges the receipt of the petitioner's Writ of Habeas Corpus (herein "petition") on September 11, 2006.

A review of the petition reveals that the petition has not been served on the responding party. (Penal Code, § 1475) The Warden, who is the respondent, is represented in parole suitability matters by the Office of the Attorney General and must be served with any and all papers filed in this matter. (Id; See also, *In re Scott* (1994) 27 Cal. App. 4th 946; *People vs. Romero* (1994) 8 Cal. 4th 728 [custodian has a due process right to notice and an opportunity to be heard.] )

Petitioner is ordered to lodge a complete copy of the petition, along with all exhibits, and a copy of this minute order, directly to: Clara Shortridge Foltz Criminal Justice Center, Department 100, 210 West Temple Street, Los Angeles, California 90012. After receipt, the clerk will serve the Office of the Attorney General with the lodged petition. In the event petitioner fails to lodge a complete copy of the petition with this Court within 60 days of receipt of this order, the petition will be dismissed.

Furthermore, if an Order to Show Cause issues, petitioner will be required to mail an additional copy of his petition to the Court for service on counsel if one is appointed.

In light of the above, the Court extends time to rule on this matter. After a copy of the complete petition is lodged by petitioner and served on respondent by the clerk, the Court will rule on the matter within 60 days of that date, unless the Court finds it necessary to further extend ruling on the matter. (Cal. Rules of Court, rule 4.551(h).)

The clerk is directed to give notice to petitioner and the Office of the Attorney General.

The court order is signed and filed this date.

A true copy of this minute order is sent via U.S. Mail to the following parties:

1

Minutes Entered
05-4-07
County Clerk